IN THE COURT OF COMMON PLEAS ORIGINAL

HAMILTON COUNTY, OHIO

CIVIL DIVISION

| | |
|---|---|
| FREIDA AARON<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> : <br> : |
| | : |
| And | :    CASE NO.    A 1 4 0 7 4 5 2 |
| | : |
| JASON ROMER<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> :    COMPLAINT AND JURY DEMAND<br> : |
| | : |
| And | : |
| | : |
| JULIE MARTIN<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> : <br> : |
| | : |
| And | : |
| | : |
| CAROL WILSON<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> : <br> : |
| | : |
| And | : |
| | : <br>  |
| TIMOTHY MARSHALL<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> :    D109001087<br> : |
| | : |
| And | : |
| | : |
| CINDY BARTLETT<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> : <br> : |
| | : |
| And | : |
| | : |
| LAURA KRANBUHL MCKEE<br>635 WEST SEVENTH STREET<br>CINCINNATI, OH 45203 | : <br> : <br> : |
| | : |
| And | : |
| | : |

FILED

2014 DEC 23 A 10 31

TRACY-WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

1

**JENNY GRIMM** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**STEVEN SCHULTZ** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**BILLY WOLSING** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**MIKE SAND** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**DOROTHY ROSE** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**JAMES BROWN, JR.** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**KATRINA ALLEN** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :
**And** :
                                          :
**SHERRI CINQUINA** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
                                          :

2

**And**          :
         :
**RYAN DUSTIN HENSLEY**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**BARBARA HENSLEY**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**HEATHER PICKETT**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**KENT REYNOLDS**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**RONALD ROWLEY**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**RYAN WITKO**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**DAMON DECK**          :
**635 WEST SEVENTH STREET**          :
**CINCINNATI, OH 45203**          :
         :
**And**          :
         :
**RONALD SCHUSTER**          :
**635 WEST SEVENTH STREET**          :

3

**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**REBECCA APPLEGATE**                       :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**LEONA BEYER**                             :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**ROBERT WILSON**                           :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**GERALD BOTNER**                           :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**SHERRI LYNN ALLEN**                       :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**JOETTA NAFE**                             :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**SANDRA RADEKE**                           :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :

4

**PATRICIA BOONE**                          :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**CAROLYN DOTSON**                          :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**VICKY WILSON**                            :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**TERESA NICHOLS**                          :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**BRENDA SHELL**                            :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**DEENA BORCHERS**                          :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**TIMOTHY SCHULZE**                         :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
**And**                                     :
                                            :
**SANDRA DENNIS**                           :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :

5

And                         :
                             :

**JOSEPH SCHIMMEL**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**ANDREW CARR**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**WILLIAM DABNEY**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**DAVID SNIDER**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**GLORIA GREENE**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**ROBERT DENSLER, SR.**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**DEREK MAYFIELD**    :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**    :
     :

And    :
     :

**MARK MCMURREN**    :
**635 WEST SEVENTH STREET**  :

6

CINCINNATI, OH 45203        :
        :
And        :
        :
MARJORIE NEWMAN        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :
DOROTHEA HAMILTON        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :
LISA REYNOLDS        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :
JENNIFER HICKEY        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :
NELLIE DAVIS        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :
NICOLE BAKER        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :
DONNA SMALLWOOD        :
635 WEST SEVENTH STREET        :
CINCINNATI, OH 45203        :
        :
And        :
        :

7

**GARY COOTS**                           :
                                            :

**And**    :
    :

**TODD RAY**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

**JOHN RICHARDSON**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

**DAWN DUNKLIN**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

**TROY WILDER**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

**DEBBIE MOORE**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

**JENNIFER BALLINGER**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

**DAVID SMITH**    :
**635 WEST SEVENTH STREET**    :
**CINCINNATI, OH 45203**    :
    :

**And**    :
    :

8

**RANDALL METCALF**　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**VALARIE KOPP**　　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**SARAH JUERGENS**　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**JESSICA COCHRAN**　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**ELIZABETH COMPO**　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**NANCY BEGLEY**　　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**KATHRYN RUEVE**　　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

**And**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:

**ROBERT RUNTZ**　　　　　　　:
**635 WEST SEVENTH STREET**　:
**CINCINNATI, OH 45203**　　　:
　　　　　　　　　　　　　　　　:

9

**And**                                    :
                                           :
**NANCY BOWMAN**                           :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**JASON RILEY**                            :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**GEORGE ARNOLD**                          :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**LINDA KALLMEYER WARD**                   :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**KELLY HENNESSY**                         :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**RHONDA SCOTT**                           :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**KATHRYN HOWELL**                         :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**TONY & TONYA MCCLENDON**                 :
**THROUGH HER HUSBAND AND**                :

10

**NEXT FRIEND, KYRA**              :
**MCCLENDON**                                :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**            :
                                         :
                                         :

**And**     :
    :

**CAROL ROSS**     :
**635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**     :
    :

**And**     :
    :

**SHIRLEY MAINS**     :
**635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**     :
    :

**And**     :
    :

**CLARENCE PHILLIPS**     :
**635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**     :
    :

**And**     :
    :

**JESSICA HASTINGS**     :
**635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**     :
    :

**And**     :
    :

**CHARLOTTE KING**     :
**635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**     :
    :

**And**     :
    :

**TONYA NEAL**     :
**635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**     :
    :

**And**     :
    :

**LEAH RAE WRIGHT**     :
**635 WEST SEVENTH STREET**     :

11

**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
                                          :
**SHEILA KRABACHER**                      :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
**TERESA A. MCMILLEN**                    :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
**LONNIE WHEELER**                        :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
**AMANDA KOCH**                           :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
**BATSCHE, LAURA**                        :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
**BREWER, RANDAL**                        :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :
**FRAZIER, JOANN**                        :
**635 WEST SEVENTH STREET**               :
**CINCINNATI, OH 45203**                  :
                                          :
**And**                                   :
                                          :

**ARLETTA SUE BOWLING** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**DEBORAH KIDD** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**JENNA MCCALL** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**RUHAMA HALL** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**BARBARA BOGGS, DECEASED, BY** :
**AND THROUGH HER SON AND** :
**NEXT FRIEND, PAUL BOGGS** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**KAREN TAYLOR** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**BRENDA ERRGANG** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**PAULA WILSON** :
**635 WEST SEVENTH STREET** :

**CINCINNATI, OH 45203** :
:
**And** :
:
**KATHERINE PRATER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**TONIA MCQUEARY** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**PATRICK STEPHENSON** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**SHARON PRITCHARD, BY AND** :
**THROUGH HER HUSBAND AND** :
**NEXT FRIEND, TOM PRITCHARD** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**CONNIE MCLURE-ELLINGTON** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**ROBERT ELLINGTON** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**RITA HOUNCHELL** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:

14

And                                         :
                                            :
**BILLIE MOORE**                            :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**VICKI BUSCHUR**                           :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**DIANE MEYER**                             :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**KATHLEEN BUSHELMAN**                      :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**PRISCILLA WITTMEYER**                     :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**KIRSTIN WEISMAN**                         :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**DARRELL EARLS**                           :
**635 WEST SEVENTH STREET**                 :
**CINCINNATI, OH 45203**                    :
                                            :
And                                         :
                                            :
**EILEEN BROREIN**                          :
**635 WEST SEVENTH STREET**                 :

CINCINNATI, OH 45203         :
         :
And         :
         :
JETTON WILSON         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :
And         :
         :
THOMAS MEYERS         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :
And         :
         :
GAYLE BACHMAN         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :
And         :
         :
LARRY STEPHEN HAYES         :
AS ADMINISTRATOR OF THE         :
ESTATE OF WILLIAM HAYES         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :
And         :
         :
SUSAN GRIFFIN         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :
And         :
         :
MICHAEL HILLARD         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :
And         :
         :
MICHELE BYAR         :
635 WEST SEVENTH STREET         :
CINCINNATI, OH 45203         :
         :

16

**And** :

:

**DIRK HITCHCOCK** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**EDWARD THIESSEN** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**KIMBERLY UNDERWOOD** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**AMBER WORK** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**TAMMY WILDER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**PAUL MARKSBERRY, JR.** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**EDDIE STALLINGS** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**DOUGLAS DRAFTS** :
**635 WEST SEVENTH STREET** :

17

**CINCINNATI, OH 45203**                                    :
                                                           :
**And**                                                    :
                                                           :
**JEFFREY PEDDICORD**                                      :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :
**TAMMY DALE**                                             :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :
**DENISE BESS**                                            :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :
**DAWN WINGERT**                                           :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :
**DANNIE MAE OWENS**                                       :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :
**LYNN HALEY**                                             :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :
**CHELSEA HORTMAN**                                        :
**635 WEST SEVENTH STREET**                                :
**CINCINNATI, OH 45203**                                   :
                                                           :
**And**                                                    :
                                                           :

**LOIS HUGHES**                            :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**VIOLET WHALEN**                          :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**ERMA JEAN GILBERT**                      :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**JONATHAN BRUNNER**                       :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**ARLENE FAIT**                            :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**VERONICA YEAKLE**                        :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**AILENE LEVAN**                           :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :
**And**                                    :
                                           :
**BILL DUGGER**                            :
**635 WEST SEVENTH STREET**                :
**CINCINNATI, OH 45203**                   :
                                           :

19

And                                    :
                                       :
**BRIAN ATKINS**                       :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**NEIL FAVARON**                       :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**TRACEY WALSH**                       :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**STEPHANIE JOBE**                     :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**LORETTA HON**                        :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**RONALD ROWLEY**                      :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**LISA HALL**                          :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
And                                    :
                                       :
**ROBERT HOUGHTON**                    :
**635 WEST SEVENTH STREET**            :

20

CINCINNATI, OH 45203 :
 :
And :
 :
KATHERINE WALLS :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :
DANIELLE REED :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :
JAMES R. MCCAIN, JR. :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :
BRIAN THIEN :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :
HOBERT "DUANE" PELFREY :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :
PATRICK KEITH WILLOUGHBY :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :
JUDY BECK :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
 :
And :
 :

21

**NANCY BOLAND**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**KELLY WILLIAMS**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**MARGARET RADENHEIMER**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**MICHAEL CRAIL**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**THERESA ANN ROBINSON WOODS**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**REBEKAH BRADY**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**TAMMIE SUE LITTLE**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :
**And**      :
     :
**PATRICK DUGAN**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
     :

22

And                                          :
                                             :
**KAREN LYNNE MILLER**                       :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**PAUL WILSON**                              :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**CORINNE ZACHRY**                           :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**BUNNAVUTH CHHUN**                          :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**PATRICIA BRUCE**                           :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**TONYA CHISMAN**                            :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**AMANDA FRANKS**                            :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
And                                          :
                                             :
**TERRY WILSON**                             :
**635 WEST SEVENTH STREET**                  :

CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
CAROL PUMMELL                                :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
ELAINE CAROL WAXLER                          :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
JUANITA JANE REEDER                          :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
TIMOTHY OSBORN                               :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
ROGER JOHNSON                                :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
WAYNE HATFIELD                               :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :
GLENNA SHAFER                                :
635 WEST SEVENTH STREET                      :
CINCINNATI, OH 45203                         :
                                             :
And                                          :
                                             :

24

**LATOYA BRADSHAW**                 :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**KAREN HIGGINBOTHAN**              :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**PATRICIA ADAMS**                  :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**KAITLYN BOGGS**                   :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**DEBBIE RODRIGUEZ**                :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**VICKY MAINS**                     :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**BILLY SPIVY**                     :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :
And                                 :
                                    :
**CHRISTINA GOLDSTEIN**             :
**635 WEST SEVENTH STREET**         :
**CINCINNATI, OH 45203**            :
                                    :

25

And        :
          :
**NICHOLAS QUINN**    :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
And        :
          :
**NICHOLAS BATTISTA**   :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
And        :
          :
**ROBERT MASTERS**    :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
And        :
          :
**WENDY OBERLANDER**   :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
          :
And        :
          :
**CHRISTOPHER ATWOOD**  :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
And        :
          :
**ELSA IERACI**      :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
And        :
          :
**PENNY BRACKETT**    :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203**  :
          :
And        :
          :
**ANNETTE BUSKIRK**   :

26

635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
DELORES SCOTT :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
JONATHAN ATWELL :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
RACHEL JONES :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
DONNA GOOD :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
TIFFANY MEADOWS :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
KEVIN HARTNESS :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :
:
RICKY HOUNCHELL :
635 WEST SEVENTH STREET :
CINCINNATI, OH 45203 :
:
And :

27

**JENNIFER LAUREN BOOKMAN** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**SHERRI PUCKETT-MORRISSETTE** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**MICHAEL SANDER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**JEFFREY REMLEY** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**ROBBIE GREGORY** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**JACKIE COUCH** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**JAMES KENTON PUMPELLY** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**PHYLLIS BECHTOLD** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

28

                                             :

**And**                                 :

      :

**MELISSA HABERMEHL**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**KATELYN KAUFFMAN**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**CANDI MCKINNEY**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**KRISTINE DORITY**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**KIMBERLY MAYER**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**SHARON BRICE**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**ROBERT W. MOORE**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

      :

**And**  :

      :

**RYAN MILLER**  :

29

**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**RICHARD ALLEN STANFIELD**　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**SHERRIE SPANGENBERG**　　　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**KERRY MCNEAL**　　　　　　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**HIRAM MCCAULEY**　　　　　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**KEVIN ELFERS**　　　　　　　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**WILLIAM WOLDER**　　　　　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
**KELLY ROBINSON**　　　　　　　:
**635 WEST SEVENTH STREET**　　　　:
**CINCINNATI, OH 45203**　　　　　　:
　　　　　　　　　　　　　　　　　:
And　　　　　　　　　　　　　　　:

30

**KIMBERLY JENKINS**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**DONALD MOORE**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**CARRIE BRITTEN**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**JOSEPH BAUMGARDNER**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**SOPHIA WHITE**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**MARCELLA MCDONALD**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**TIMOTHY WHALEN**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :
:
And  :
:
**LENNIE FOSSETT**  :
**635 WEST SEVENTH STREET**  :
**CINCINNATI, OH 45203**  :

31

:

**And** :

:

**DAVID SHEMPERT** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**EVELYN HELTON** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**NATASHA LAINHART** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**JUDY YOUNG** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**LENORA HAGGARD** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**IRENE HYDE** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**DIANA ASHCRAFT** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

:

**And** :

:

**JUDITH GARDNER** :

32

**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**CAROLYN HURSONG**                          :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**CONNIE UNDERWOOD**                         :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**LINDSAY BRAY**                             :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**DOUGLAS CALLAHAN**                         :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**KAREN LEGER**                              :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**RHONDA MAINS**                             :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :
                                             :
**MICHELLE STEPHENS**                        :
**635 WEST SEVENTH STREET**                  :
**CINCINNATI, OH 45203**                     :
                                             :
**And**                                      :

33

**CHRIS SCHEPER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**SUSAN SCHOCK** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**TAMALA LOVETTE** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**TERRY BEIL** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**JOANN YOUNG** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**JOAN JONES** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**COURTNEY HAMMONS** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**CHRISTINE GERALDS** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :

34

                                              :

And                                      :
                                              :

**MAURICE GRABOW**       :
**635 WEST SEVENTH STREET**       :
**CINCINNATI, OH 45203**       :
                                              :

And                                      :
                                              :

**SHANNON KOEHLER**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
                                              :

And                                      :
                                              :

**DERRILL REYNOLDS**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
                                              :

And                                      :
                                              :

**LARRY KRECH**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
                                              :

And                                      :
                                              :

**OLLIE DEATON**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
                                              :

And                                      :
                                              :

**RUVIMBO NYEMBA**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
                                              :

And                                      :
                                              :

**SAMANTHA HAMILTON**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
                                              :

And                                      :
                                              :

**MICHAEL WATKINS**      :

**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
                                                     :
**WILLIAM BENTON**                                   :
**635 WEST SEVENTH STREET**                          : ·
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
                                                     :
**RYAN HENSLEY**                                     :
**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
                                                     :
**DENISE HELTON**                                    :
**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
                                                     :
**LESLIE POWERS,**                                   :
**ADMINISTRATOR**                                    :
**FOR THE ESTATE OF HEATHER**                        :
**HEFFNER**                                          :
**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
                                                     :
**MICHAEL COOK**                                     :
**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
                                                     :
**VALARIE REEVES**                                   :
**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :
                                                     :
**And**                                              :
**LYNDSEY MIDDENDORF**                               :
**635 WEST SEVENTH STREET**                          :
**CINCINNATI, OH 45203**                             :

36

And                        :

**STEVEN BAYLISS**       :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

**KENNETH PFETSCH**       :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

**SANDRA LEMMEL**        :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

**DEBRA HENDERSON**      :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

**DAVID HUSER, EXECUTOR OF**  :
**THE ESTATE OF CONNIE HUSER** :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

**BENJAMIN WILLIAMS**     :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

**RALPH DAWSON**         :
**635 WEST SEVENTH STREET**   :
**CINCINNATI, OH 45203**      :

And                        :

37

**DEBORAH WORLEY**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**KEITH YOUNG**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**CAIDAN BAILEY**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**HALEY PAYNE**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**CARLA WOOTEN**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**MACKENZIE BENDER**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**ROBERT MOORE**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :
**And**      :
       :
**DEBBIE MOORE**      :
**635 WEST SEVENTH STREET**      :
**CINCINNATI, OH 45203**      :
       :

38

**And**                                :
                                       :
**WILLIAM MOORE**                      :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**DONALD MOORE**                       :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**BILLIE MOORE**                       :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**PHYLLIS JUDKINS**                    :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**HEATHER MCCANN**                     :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**ROBERT MOUNCE**                      :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**JACKIE COUCH**                       :
**635 WEST SEVENTH STREET**            :
**CINCINNATI, OH 45203**               :
                                       :
**And**                                :
                                       :
**JENNIFER HICKEY**                    :
**635 WEST SEVENTH STREET**            :

39

**CINCINNATI, OH 45203** :
:
**And** :
:
**CATHY BEIL** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**FAYE ROSEBERRY** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**MICHELLE AGEE** :
**635 WEST SEVENTH STREET** ::
**CINCINNATI, OH 45203** :
:
**And** :
:
**MICHELLE BEAVAN** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**EDYTHE BISHOP** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**CHRISTINA BRASHEAR** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**MELISSA BRAUCHER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:

**BRENDA BUTLER**                     :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**JAN CAMPBELL**                      :
 **635 WEST SEVENTH STREET**     :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**CHRIS CLARK**                       :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**DAVID CONGER**                      :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**KEN CONGER**                        :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**BRENDA CONLEY**                     :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**DANA CONLEY**                       :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
                                      :
**And**                               :
                                      :
**ERIC COURTNEY**                     :
**635 WEST SEVENTH STREET**           :
**CINCINNATI, OH 45203**              :
**And**                               :

41

**JOI CROWE**                                          :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**BOBBIE DOUGLAS**                                     :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**TRACY ESSELMAN**                                     :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**FRANCINE FORD**                                      :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**ERIN GREELISH**                                      :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**TIM HANNON**                                         :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**CELESTE HOFFMAN**                                    :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :
                                                       :
And                                                    :
                                                       :
**TAMMY HUGHES**                                       :
**635 WEST SEVENTH STREET**                            :
**CINCINNATI, OH 45203**                               :

:

**And**                                          :
                                                 :
**CHELSEA JOHNSON**                              :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**TAMMY JONES**                                  :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**MIKE KOELBLIN**                                :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**TAMMY MANN**                                   :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**JEFF MCCLURE**                                 :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**VERA MOFFITT**                                 :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**JENNIFER MYERS**                               :
**635 WEST SEVENTH STREET**                      :
**CINCINNATI, OH 45203**                         :
                                                 :
**And**                                          :
                                                 :
**MICHELLE NOBLE**                               :

43

**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**MARY RAVENSCRAFT** :
 **635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**HOLLY REIFENBERGER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**DONNA RISTER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**ROBIN SCHILLER** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**KEVIN SCHMIT** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**PATRICK SCHMIT** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :
:
**DANA SETTERS** :
**635 WEST SEVENTH STREET** :
**CINCINNATI, OH 45203** :
:
**And** :

44

**CHARLANN SHEPHERD**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**RYAN TANNER**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**MICHELLE WALTERS**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**DANIEL WEBBER**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**LAURA WEISBECKER**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**REGINA WESLEY**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**CHERYL WYATT**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

And

**MARY ZUREICK**
**635 WEST SEVENTH STREET**
**CINCINNATI, OH 45203**

|  |  |
|---|---|
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| **CINCINNATI CHILDREN'S** | : |
| **HOSPITAL MEDICAL CENTER** | : |
| **333 Burnette Ave.** | : |
| **Cincinnati, Ohio 45229** | : |
| | : |
| **SERVE: Frank C Woodside, III** | : |
| **1900 Chemed Center** | : |
| **255 E. Fifth Street** | : |
| **Cincinnati, Ohio 45202** | : |
| | : |
| **(Serve via Certified mail)** | : |
| | : |
| **Defendant.** | |

*REGULAR MAIL WAIVER*

## PARTIES, JURISDICTION AND VENUE

Comes now, Plaintiffs by and through counsel, and for this Complaint states as follows:

1. The subject matter of this Complaint arises out of acts, omissions, and conduct which occurred in Hamilton County, Ohio.  This case is the refiling of **Aaron, et al vs. Children's** in **Case No. A1305864** and Rule 41(a) dismissed on January 7, 2014 to allow time to gather more facts.  However, there are now additional Plaintiffs and those Plaintiffs are now both West Chester and Journey Lite victims of Dr. Durrani.  It also contains more facts to support the claims.

46

2. Plaintiffs are residents of the United States and had surgery and/or medical treatment in Butler County, Ohio at West Chester Medical Center and/or Journey Lite of Cincinnati in Hamilton County. Ohio.

3. Cincinnati Children's Hospital Medical Center (hereafter Children's Hospital or Children's) is a corporation authorized to transact business and perform medical services as a hospital in the State of Ohio including in Hamilton County, Ohio.

4. The amount in controversy exceeds the jurisdictional threshold of this Court.

5. This action is filed on behalf of Plaintiffs to recover all applicable damages.

6. Plaintiffs are citizens and residents of the United States who had surgery or medical treatment performed on them by Dr. Durrani at West Chester Medical Center and/or Journey Lite of Cincinnati without West Chester Medical Center and/or Journey Lite of Cincinnati receiving the benefit of truthful and accurate information regarding settlements involving allegations of medical malpractice against Dr. Durrani and reportable changes in Durrani's privilege/admitting status; and/or reportable events pursuant to the laws and regulations explained herein; Defendant's failure in their duty under state and federal law and their bylaws and regulations to properly discipline, credential, suspend or revoke the privileges of Dr. Durrani; and failure to properly report reportable events to the National Practitioner Data Bank.

7. All Plaintiffs had surgery at West Chester Medical Center and/or Journey Lite of Cincinnati and they would not have had surgery with Dr. Durrani at West Chester Medical Center and/or Journey Lite of Cincinnati had Children's Hospital not breached their duties under the law as described herein. Because of Children's breach of their duties, Plaintiffs each suffered harm at the hands of Dr. Durrani and other doctors

47

employed by CAST when they had surgeries at West Chester /UC Health and Journey Lite.

8. Defendant not only breached their duties, they intentionally breached these duties to protect both Dr. Durrani and themselves to the detriment of the Plaintiffs.

## BACKGROUND

9. While an employee of Children's Hospital from 2004 through 2008, Durrani performed medically unnecessary, negligent, reckless, fraudulent and experimental surgeries on children and adult patients at Children's Hospital.

10. Dr. Durrani applied for and held staff medical privileges at West Chester Medical Center from 2009 through May 2013. Dr. Durrani applied and held staff medical privileges at Journey Lite from April 2011 through 2013. Dr. Durrani applied for privileges at West Chester Medical Center and/or Journey Lite of Cincinnati after "resigning" from Children's due to what he called "an inhospitable environment." (See resignation letter attached as **Exhibit 1**). At the time of his Children's Hospital resignation, Dr. Durrani was under investigation by Children's Hospital. Therefore, this resignation was reportable to the NPDB. It has never been reported.

11. In early 2009, Durrani was recruited, applied and was given privileges at West Chester Medical Center which is owned and managed by UC Health. In 2011, Dr. Durrani applied for and received the same privileges at Journey Lite.

12. From 2004 through 2008, Children's Hospital received, defended and settled numerous complaints, claims and lawsuits concerning medical malpractice, medical negligence, lack of informed consent and claims pertaining to treatment of patients by Dr. Durrani on patients at Children's. These include those described herein and other cases settled

48

with confidential terms. These are cases settled before Dr. Durrani applied and/or was screened for privileges at West Chester and Journey Lite. Discovery is required for full knowledge of all the claims. However, with certainty there were multiple claims settled by Children's involving Dr. Durrani that required reporting to the NPDB on Dr. Durrani.

13. Children's Hospital had a statutory and common law duty to inform and place on notice West Chester Medical Center and Journey Lite through the National Practitioner Data Bank and other regulatory bodies including the Ohio State Medical Board that Children's Hospital had suspended, terminated, and/or revoked the privileges of Dr. Durrani from time to time and accepted his resignation in lieu of termination and that there were numerous complaints, claims and lawsuits they received, defended and settled for allegations of Dr. Durrani committing medical malpractice.

14. To this day, Dr. Durrani denies under oath at depositions of ever being suspended or asked to leave employment at a hospital or informed he should not apply for re-credentialing or privileges because he would not be renewed. This is not true. There is definitive proof Dr. Durrani was suspended at least once by Children's and at least once by West Chester. **Exhibit 3** reflects proof of a suspension at Children's at least from June 25, 2008 to July 22, 2008. Despite the suspension, Children's allowed Dr. Durrani to perform surgeries while suspended.

15. In footnote #7 of *Aaron v. Children's,* the first filing of Case No. A1305864, "Defendant Cincinnati Children's Hospital Medical Center's Motion to Dismiss for Failure to State a Claim Children's states: "… it will contest Plaintiff's allegations that it suspended, terminated, and/or revoked Dr. Durrani's privileges while he was

49

employed at Cincinnati Children's." This is a lie as proven by **Exhibit 3**, Children's own document.

16. In addition, Dr. Durrani resigned his privileges at Children's while under investigation by the Medical Executive Committee. In May 2013, Dr. Durrani left West Chester by either resigning or denial of his privilege renewal request as a result of the litigation filed against him at the time.

17. Children's Hospital had a statutory duty to report to the National Practitioner Data Bank that Children's Hospital had suspended, terminated, and/or revoked the privileges of Dr. Durrani and/or accepted his resignation in lieu of termination pursuant to 42 USC 11151, et seq., and regulations promulgated thereunder.

18. Children's Hospital had a statutory duty to report to the National Practitioner Data Bank that Children's Hospital settled medical and related negligence claims involving the professional medical acts and omissions of Dr. Durrani pursuant to 42 USC 11151 et seq.

19. Children's Hospital had a common law duty to report Dr. Durrani's termination of privileges under these circumstances to other hospitals, insurance companies, Medicaid, Medicare, the medical licensing authorities, and otherwise foreseeable and/or potential patients of Dr. Durrani.

20. At the end of 2008, Dr. Durrani treated and/or performed surgeries on Plaintiffs at West Chester and Journey Lite after Dr. Durrani's employment and admitting privileges terminated at Children's Hospital.

21. Defendant did not report to the National Practitioner Data Bank and the Ohio State Medical Board that:

a) Medical malpractice, lack of informed consent and related claims had been settled involving allegations of his professional negligence while Dr. Durrani had been an employee at Children's Hospital. Some claims would be settled in a manner to protect Dr. Durrani and Children's including but not limited to confidentiality agreements, sealed agreements, payment of expenses and costs of claimants, dismissal of Dr. Durrani prior to settlement by agreement and other means meant to conceal a settlement of a claim.

b) Children's Hospital had terminated and/or restricted Durrani's privileges and/or accepted his resignation in lieu of termination.

c) Children's Hospital had settled cases involving allegations of medical negligence of Dr. Durrani;

d) Durrani left Children's Hospital after an internal investigation revealed his incompetence, negligence and ineptitude;

e) Durrani's privileges had not been revoked, suspended or affected by acts and omissions while an employee at Children's Hospital;

f) Dr. Durrani failed to adhere to Children's Hospital bylaws, regulations, policies and procedures

g) a-f also involved Dr. Durrani as an employee of Children's Hospital performing surgeries and providing medical treatment at Christ Hospital and University Hospital.

22. Dr. Durrani completed an application and applied for privileges at West Chester Medical Center and Journey Lite of Cincinnati. Had Children's not breached their duties detailed herein, West Chester Medical Center and/or Journey Lite of Cincinnati

51

would not have credentialed and privileged Dr. Durrani. Had West Chester and/or Journey Lite not credentialed and privileged Dr. Durrani, none of the Plaintiffs would have been harmed by Dr. Durrani at West Chester and/or Journey Lite.

23. In 2004, 2005, 2006, 2007 and 2008, Children's Hospital knew that Dr. Durrani performed medically unnecessary, negligent, reckless, fraudulent and experimental surgeries, and knew of Dr. Durrani's medical and ethical improprieties, but Children's Hospital continued to allow Dr. Durrani to be an employee and to enjoy full admitting and surgical privileges at Children's Hospital through December 2008, and limited admitting, clinical, and surgical privileges thereafter into at least February 2009 and possibly after. They did so for one reason: Dr. Durrani was Children's Hospital highest physician earner for Children's Hospital while he was employed at Children's Hospital.

24. From April 2006 through 2007, Dr. Durrani, according to his own report, saw 441 children outpatients and 437 adult outpatients at Children's and he performed 68 children surgeries and 56 adult surgeries.

25. From December 16, 2006 through January 7, 2007, Dr. Durrani was in Pakistan.

26. R.C. 2305.251 (B)(1) required Children's Hospital through its medical staff, executive committee and its governing body to take action against Dr. Durrani since he "developed a pattern of incompetence or otherwise inappropriate behavior." They failed to do so until August of 2008. That's when Dr. Durrani resigned to avoid the investigation.

27. Dr. Keith Wilkey, the expert retained by Deters Law Office in the Dr. Durrani cases, has reviewed medical records and radiology of over 80 cases involving Dr. Durrani

52

while he was employed at Children's Hospital. This covers the time prior to Dr.

Durrani applying for privileges at West Chester Medical Center and/or Journey Lite.

Based upon these reviews Dr. Keith Wilkey has signed nearly 80 affidavits of merit

pertaining to Children's Hospital cases which contain evidence of the following:

1. Need to have additional surgery to repair problems created by Dr. Durrani

2. Negligently and intentionally placing BMP-2 without informed consent in minors

3. Failed hardware

4. Failure to obtain proper informed consent for surgery

5. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

6. Failure to properly post-op monitor the patient

7. Failure to properly perform follow up, post-op care

8. Negligent surgical techniques

9. Failure to maintain accurate and complete surgical records and surgical consent forms

10. Failure to disclose important health information to patient

11. Failure to maintain and complete discharge summary

12. Failure to supervise Dr. Durrani

13. Negligent pre-surgical diagnosis

14. Failure to prepare a timely operative report or other medical record

15. Billing for services not completed

16. Not informing the patient another surgeon will be doing all or part of the surgery

17. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

18. Deviation in standard of care

19. Failure to perform thorough and accurate pre-op nonsurgical evaluation

20. Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

21. Failure to disclose additional/changed procedure and reason to patient

22. Failure by Dr. Durrani to properly educate patient regarding diagnosis

23. Prior knowledge of possible complication and not acting properly upon same

24. Failure to disclose pertinent health information to another health care provider

25. Fraudulent, negligent and reckless pre-operative work up

26. Fraudulent, negligent and reckless surgery

27. Inaccurate, fraudulent, and/or exaggeration of diagnoses

28. Failure to properly educate patient regarding diagnoses

29. Failure to attempt non-surgical conservative treatment

30. Failure to perform thorough and accurate pre-op nonsurgical evaluation

31. Failure by Dr. Durrani at Children's Hospital to perform accurate and complete preoperative teaching

32. Failure by Dr. Durrani at Children's Hospital to properly educate   patient regarding diagnoses

33. Failure by Dr. Durrani at Children's Hospital to maintain accurate and/or complete medical records

34.  Failure of informed consent by Dr. Durrani at Children's Hospital

35. Failure of Children's Hospital to insure Dr. Durrani had obtained proper informed consent

36. Failure of Children's Hospital to obtain proper acknowledgement of consent

37. Failure by Dr. Durrani at Children's Hospital to disclose pertinent health information

38. Failure by Children's Hospital to disclose additional/changed procedure and reason to patient

39. Failure by Children's Hospital to supervise staff

40. Failure by Children's Hospital staff to properly document abnormalities and follow up care

41. Non-approved hardware combinations

42. Dr. Durrani made false and material misrepresentations of material facts intended to mislead patients and their parents and concealed material facts he had a duty to disclose. Children's Hospital concealed material facts they had a duty to disclose. Patients and their parents were justified in relying on the misrepresentation and did rely proximately causing harm to patients. Dr. Durrani and Children's Hospital intentionally misled patients and their parents who had the right to correct information.

43. Children's Hospital's motive for their actions and inactions towards Dr. Durrani was financial gain.

44. The Medical Executive Committee (hereafter MEC), administration and Boards of Children's Hospital failed to "govern the affairs of the Medical Staff."

45. The MEC, administration and Boards of Children's Hospital failed to enforce their rules upon Dr. Durrani as they were required to do.

46. The MEC, administration and Boards of Children's Hospital failed to provide oversight of Dr. Durrani as they were required to do.

47. The MEC, administration and Boards of Children's Hospital failed to properly evaluate Dr. Durrani.

48. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

49. The MEC, administration and Boards of Children's Hospital failed to properly discipline Dr. Durrani including summary suspensions and revocation.

50. The MEC, administration and Boards of Children's Hospital failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

51. The MEC, administration and Boards of Children's Hospital ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

52. The MEC, administration and Boards of Children's Hospital failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiffs at risk.

53. The MEC, administration and Boards of Children's Hospital certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and knowing there was not proper informed consent.

54. The MEC, administration and Boards of Children's Hospital failed to act on Dr. Durrani's failure in medical record documentation.

55. The MEC, administration and Boards of Children's Hospital failed to require Dr. Durrani to follow the rules for off label experimental procedures.

56

56. The MEC, administration and Boards of Children's Hospital allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including fellows and interns.

57. The MEC, administration and Boards of Children's Hospital allowed Dr. Durrani to do multiple surgeries at once.

28. Dr. Keith Wilkey on July 1, 2014, prepared a report for Plaintiffs' counsel pertaining to twenty Children's cases. It is attached as **Exhibit 2**. This report describes the conduct of Dr. Durrani known by Children's Hospital while Dr. Durrani practiced at Children's Hospital from 2004 through 2008.

29. According to Krissy Probst, Dr. Durrani's administrative assistant at Children's, Dr. Durrani would begin a surgery, leave, and have fellows and residents do the complete and full surgery while he was in his office with his physician's assistant when they would often being having sex while the surgery took place.

30. According to Krissy Probst, Dr. Durrani would schedule two to three spine fusions a day when other spine surgeons would schedule one. Dr. Durrani would perform more than one at a time too.

31. According to Krissy Probst, Dr. Durrani would leave the OR for "four or five hours, sit in office, and then come and check on when he decided he wanted to."

32. Children's Hospital administration, MEC and Board knew of the conduct described in the prior four paragraphs.

33. From January 12, 2005 to March 3, 2009, Dr. Durrani performed approximately 645 spinal surgeries at Children's based upon information provided by Children's. Of these 645, 80 of them, or 12.5% became clients of the Deters Law Office. The Plaintiffs in

57

this action all had surgeries at West Chester and/or Journey Lite resulting in medical malpractice claims. None of these surgeries would have taken place had Children's not breached their duty as described herein.

34. Knowing Dr. Durrani had his privileges temporarily suspended for not completing his operative reports, Children's allowed him to continue to operate by his calling surgeries "emergencies." This was the "trick" Children's and Dr. Durrani used to pretend they were complying with their bylaws and policies while keeping the money train rolling. (See **Exhibit 3** attached reflecting proof surgeries were performed at Children's by Dr. Durrani when he was supposed to be suspended.)

35. Under Children's Bylaws, Dr. Durrani was not properly disciplined, privileged, suspended and discharged so as to warn the public and West Chester Medical Center.

36. MS-495 Credentials Appendix A do not allow for expedited credentialing if any of the following apply which happen to apply with Dr. Durrani:

> A. No actions against him.
>
> B. Never named in a malpractice action.
>
> C. No pending or past investigations or reports of disciplinary action by any regulatory agency, specialty board, hospital board, medical staff, government payors, or health care plan whether or not reportable to the National Practitioner Data Bank.

37. Under MS-498 Credentials Appendix B have the same criteria.

38. Under MS-499, Credentials Appendix C states in part: "Liability History- Professional liability claims history of all practitioners will be verified with the National Practitioner Data Bank (NPDB) and/or with the practitioners current and/or past liability carrier(s)."

39. "Medicare/Medicaid Sanctions: History of sanctions will be verified via the NPDB. The NPDB will be queried electronically and a hard copy of the report will be placed in specially designated binders. Dates of the query, response and any actions rated will be documented. Actions will be forwarded to the Credentials Committee for review and recommendation."

40. West Chester Medical Center had the same or similar rules described in the five prior paragraphs. Journey Lite had some of them too.

41. Emails produced by Children's Hospital in discovery of the over eighty malpractice claims against them filed by The Deters Law Office, indicate that from 2004 through 2008, Children's Hospital knew the following:

   A. Dr. Durrani was using BMP-2 despite insurance companies rejecting it.

   B. Dr. Durrani was not dictating operative reports in a timely manner.

   C. Dr. Durrani was not signing discharge orders.

   D. Dr. Durrani was having patient safety issues and ethical issues.

   E. Dr. Durrani was having personal issues effecting patient care.

   F. Dr. Durrani regularly deviated from the standard of car causing harm to patients.

42. Dr. Durrani would engage in these exact same issues described in the prior paragraph at West Chester Medical Center and Journey Lite.

43. Children's failed to act on the "triggers" to conduct Focus Professional Peer Evaluation (FPPE) and/or Ongoing Peer Evaluation (OPE) of Dr. Durrani while they employed Dr. Durrani.

44. Children's also failed to properly investigate Dr. Durrani's background from 2004 to 2008, including verification of claims on his resume or CV, which had they, would

have led to their discovery of the issues pertaining to those issues including, but not exclusively identified in **Exhibit 10**.

45. Dr. Crawford, Children's Chief of Pediatric Orthopedics from 2004 through 2014 when he "retired" protected Dr. Durrani from discipline at Children's.

46. The attached Affidavit of Michelle Stultz of Children's Hospital, **Exhibit 4**, emphasizes in paragraphs 24 and 25 the importance of Children's use of the National Practitioner Data Bank. This also applies to West Chester Medical Center and Journey Lite.

47. Dr. Durrani testified at a deposition that that when he applied for privileges at West Chester it was like mailing in a college application. He had no meeting and no follow up, but he was simply approved. Dr. Durrani's Journey Lite application for privileges was also simple. (See **Exhibit 8**)

48. Ann Shelly of UC Health, who owns and operates West Chester Medical Center is involved in the credentialing of physicians at West Chester and testified in a deposition West Chester relied upon the National Practitioner Data Bank and that it would always be checked when a physician would apply for privileges.

49. West Chester Medical Center checked the NPDB and the Ohio Medical Board before approving the privileges for Dr. Durrani and found nothing adverse to Dr. Durrani reported by Children's Hospital despite their being significant information relevant as described herein to report.

50. Journey Lite checked the NPDB in 2011 and 2013 pertaining to Dr. Durrani and the attached reports were generated. They reflect no reporting as required by Children's Hospital on Dr. Durrani. These are the definitive proof there was no reporting on Dr. Durrani. (**Exhibits 5 and 6**).

51.   The National Practitioner Data Bank collects and discloses only to authorized users negative information on health care practitioners, including malpractice information, licensure and privileges information and exclusion from participation in Medicare or Medicaid.

52.   Section II of West Chester Medical Center Bylaws governs credentialing.  Article 5 (A) requires a review of the National Practitioner Data Bank.

53.   The attached form is the application for privileges at West Chester Medical Center.  It's **Exhibit 7**.  Pages 16, 17 and 35 of the application requests malpractice information.  It was blank.  When West Chester contacted the NPDB, there was nothing to refute what Dr. Durrani submitted.

54.   The attached is the application of Dr. Durrani for Journey Lite.  (**Exhibit 8**)

55.   It must be stressed- Dr. Durrani applied for privileges to perform spine surgeries.  A proper review by any hospital is critical to protect the public and in this case, Plaintiffs.

56.   An example of a claim Children's did not properly report, *Ranus v. Durrani* was a claim that named Dr. Durrani as a Defendant because he was in fact negligent. The case resulted in a confidential settlement.  The facts and circumstances surrounding the claim, including the substantial cash settlement, were not reported to any regulatory or licensing authority, including the NPDB.

57.   Children's Hospital and/or its insurer funded the legal defense of Dr. Durrani in *Ranus v. Durrani* and paid a settlement for the benefit of Dr. Durrani in early 2008.

58.   The mother of Alexander Ranus has stated that at Children's Hospital, Durrani performed a medically unnecessary and improper surgery on Mr. Ranus causing harm to Mr. Ranus.

61

59. Children's Hospital did not report the *Ranus* settlement, Durrani's negligence, and/or the adverse event surrounding the claim to the National Practitioner Data Bank in violation of 42 USC 11151 and other applicable law, regulations and duties.

60. Children's Hospital did not report the *Ranus* claim, the settlement, and/or the adverse event surrounding the events to the Ohio State Medical Board.

61. There have been many other out of court settlements by Children's Hospital based upon Dr. Durrani's conduct that were also not reported to the NPDB, in violation of federal and state law including claims handled by The Deters Law Office.

62. In an Amicus Curie brief filed in 2014, Children's Hospital counsel specifically stated that Dr. Durrani, as an employee of Children's Hospital was specifically covered in the release in a settlement of a lawsuit naming Dr. Durrani and Children's. It is stated in footnote 1 of the Brief and page 5 of the Brief: "Against this authority, Mr. XXXXX attempts to now extricate himself from the clear terms of the Settlement Agreement, claiming that he did not fully understand the term "employees" would apply to effectuate a settlement for Dr. Durrani's conduct while employed at CCHMC." Children's never reported this to the NPDB. In claims resolved and settled from 2004 through 2008, Children's used the same language.

63. The above scenario also played out in another case in the exact same language and circumstance. While the case described in the prior paragraph and this one was settled after January 1, 2009, they still should have appeared on the 2013 NPDB report. **(Exhibit 6)**

64. A search of the NPDB reveals that prior to January 1, 2009 or the time Dr. Durrani applied for privileges at West Chester Medical Center and/or Journey Lite that

Children's Hospital had not reported any of these settlements or any adverse actions it took concerning Dr. Durrani.

65. In July 2013, Children's, Dr. Durrani and his attorney continued to mislead the public during news interviews that no settlements have ever been paid on Dr. Durrani's behalf and/or that Dr. Durrani has never committed an act or omission that resulted in a legal or insurance claim that resulted in the payment of money to a patient. This is absolutely false.

66. Dr. Durrani and Cincinnati Children's Hospital who protected him are "Exhibit A" in a failed healthcare system which under the cloak of secrecy, manipulation and lies, fails to warn the public and other hospitals about a doctor who deserves a "warning" or "damaged goods" tag. West Chester Medical Center and Journey Lite did not receive the warning of the NPDB based upon Children's Hospital negligence.

67. The National Practitioner Data Bank Guidebook from as far back as September 2001 and issued by the U.S. Department of Health and Human Services states in part:

    A. The NPDB is primarily an alert or flagging system. The information contained in it is intended to direct discrete inquiry into and scrutiny of specific areas of a practitioner's licensure, professional society memberships, medical malpractice payment history, and record of clinical privileges. NPDB information is an important supplement to a comprehensive and careful review of a practitioner's professional credentials. The NPDB is intended to augment, not replace, traditional forms of credentials review. As a nationwide flagging system, it provides another resource to assist State licensing boards, hospitals, and other health care entities in conducting extensive, independent investigations of the

qualifications of the health care practitioners they seek to license or hire, or to whom they wish to grant clinical privileges. (pg. A-3)

B. The information in the NPDB should serve only to alert State licensing authorities and health care entities that there may be a problem with a particular practitioner's professional competence or conduct. NPDB information should be considered together with the other relevant data in evaluating a practitioner's credentials (e.g., evidence of current competence through continuous quality improvement studies, peer recommendations, health status, verification of training and experience, and relationships with patients and colleagues). (pg. A-3)

C. Disclosure of NPDB Information- Attorneys or individuals representing themselves upon submission of proof that a hospital failed to submit a mandatory query. (pg. A-5)

D. Defining Medical Malpractice Payers- A medical malpractice payer is an entity that makes a medical malpractice payment for the benefit of physicians, dentists, or other health care practitioners in settlement of or in satisfactions in whole or in part of, a claim or judgment against such practitioner. (pg. B-4)

E. A certifying official is the individual selected and empowered by an entity to certify the legitimacy of the registration for participation in the NPDB. (pg. B-4)

F. Plaintiff's attorneys may query under certain limited circumstances. See NPDB Regulations 60.11(a)(5) or Table D-1, Title IV Querying Requirements, on page D-4). (pg. D-1)

64

G. Payments for Corporations and Hospitals- Medical malpractice payments made solely for the benefit of a corporation such as a clinic, group practice, or hospital are currently not reportable to the NPDB. A payment made for the benefit of a professional corporation or other business entity that is comprised of a sole practitioner is reportable if the payment was made by the entity rather than by the sole practitioner out of personal funds. (pg. E-10)

H. Identifying Practitioners- In order for a particular physician, dentist, or other health care practitioner to be named in an MMPR submitted to the NPDB, the practitioner must be named in both the written complaint or claim demanding monetary payment for damages and the settlement of release or final adjudication, if any. (pg. E-11)

I. A practitioner named in the written complaint or claim who is subsequently dismissed from the lawsuit and not named in the settlement release is not reportable to the NPDB. (pg. E-11)

J. Residents and Interns- Reports must be submitted to the NPDB when medical malpractice payments are made for the benefit of licensed residents or interns. Medical malpractice payments made for the benefit of house staff insured by their employers are also reportable to the NPDB. (pg. E-11)

K. Dismissal of a Defendant from a Lawsuit- A payment made to settle a medical malpractice claim or action is not reportable to the NPDB if the defendant healthcare practitioner is dismissed from the lawsuit prior to the settlement or judgment. However, if the dismissal results from a condition in the settlement or release, then the payment is reportable. (pg. E-12)

L.  A malpractice settlement or court judgment includes stipulation that the terms are kept confidential.  Must file report. (pg. E-16)

M.  Payments made for licensed residents and interns.  Must file report. (pg. E-16)

N.  Investigations should not be reported to the NPDB; only the surrender or restriction of clinical privileges while under investigation or to avoid investigation is reportable.  This would include a failure to renew clinical privileges while under investigation. (pg. E-19)

O.  A summary suspensions is reportable if it is:  a) in effect or imposed for more than 30 days b) based on the professional competence or professional conduct of the physician, dentist, or other health care practitioner that adversely affects, or could adversely affect, the health of welfare of a patient c) the result of a professional review action taken by a hospital or other health care entity.  (pg. E-19)

P.  Employers who insure their employees must report medical malpractice payments they make for the benefit of their employees.  (pg. E-31)

Q.  Confidential terms of a settlement or judgment do not excuse an entity from the statutory requirement to report the payment to the NPDB.  The reporting entity should explain in the narrative section of the MMPR that the settlement or court order stipulates that the terms of the settlement are confidential.  (pg. E-31)

R.  Payments made for the benefit of licensed residents and interns are reportable to the NPDB; payments made for the benefit of unlicensed medical or dental students are not reportable to the NPDB.  (pg. E-32)

66

68. In addition, the Ohio Medical Board was not provided information from Defendant necessary for them to properly discipline Dr. Durrani and protect the public.

69. Based upon the lack of information and lack of report to the National Practitioner Databank by Children's Hospital, and West Chester Medical Center and Journey Lite credentialed Dr. Durrani directly leading him to perform negligent and medically unnecessary surgeries on Plaintiffs at West Chester Medical Center and/or Journey Lite.

70. As a result of the protection and concealment of Defendant of Dr. Durrani, when Plaintiffs googled, researched, checked references and investigated Dr. Durrani prior to their surgery(s) and treatment with Dr. Durrani, they found nothing critical of Dr. Durrani so as to be warned about his unreported blemished record. As proof of this reality, since February 2013 when more information through the date of this filing came to light in the media, the public has been warned so patients including Plaintiffs avoided surgeries planned by Dr. Durrani.

71. West Chester Medical Center claims they properly credentialed Dr. Durrani based upon their credentialing process which relies upon the NPDB. They have defended their position in over 322 cases. Journey Lite claims the same. They have defended their position in over 40 cases.

72. JCAHO standards relative to credentialing includes:
    Credentialing- MS.06.01.03

- Standard: The hospital collects information regarding each practitioner's current license status, training, experience, competence and ability to perform the requested privileges.

- EP1. The hospital credentials applicants using a clearly defined process.

67

- EP2. The credentialing process is based on recommendations by the organized medical staff.
- EP3. The credentialing process is approved by the governing body.
- EP4. The credentialing process is outlined in the medical staff bylaws.
- EP6. The credentialing process requires that the hospital verifies in writing and from the primary source whenever feasible, or from a credentials verification organization (CVO), the following information:

  -The applicant's current licensure at the time of initial granting, renewal, and revision of privileges, and at the time of license expiration.

  -The applicant's relevant training.

  -The applicant's current competence.

  Privileging MS.06.02.05

- Standard: The decision to grant or deny a privilege(s) and/or to renew an existing privilege(s), is an objection, evidenced-based process.
- EP1. All licensed independent practitioners that provide care possess a current license, certification, or registration, as required by law and regulation.
- EP 2. The hospital, based on recommendations by the organized medical staff and approval by the governing body, establishes criteria that determine a practitioner's ability to provide patient care, treatment, and services within the scope of the privilege(s) requested. Evaluation of all of the following are included in the criteria:

  -Current licensure and/or certification, as appropriate, verified with the primary source

  -The applicant's specific relevant training, verified with the primary source

  -Evidence of physical ability perform the requested privilege

-Data from professional practice review by an organization(s) that currently privileges the applicant (if available)

-Peer and/or faculty recommendation

-When renewing privileges, review of the practitioner's performance within the hospital

- EP3. All of the criteria used are consistently evaluated for all practitioners holding that privilege.

- EP4. The hospital has a clearly defined procedure for processing applications for the granting, renewal, or revision of clinical privileges.

- EP5. The procedure for processing applications for the granting, renewal, or revision of clinical privileges is approved by the organized medical staff.

- EP6. An applicant submits a statement that no health problems exist that could affect his or her ability to perform the privileges requested.

- EP7. The hospital queries the National Practitioner Data Bank when clinical privileges are initially granted, at the time of renewal of privileges, and when a new privilege(s) is requested.

- EP8. Peer recommendation includes written information regarding the practitioner's current:

  -Medical/Clinical knowledge

  -Technical and clinical skills

  -Clinical judgment

  -Interpersonal skills

  -Communication skills

  -Professionalism

69

- EP9. Before recommending privileges, the organized medical staff also evaluates the following:

  -Challenges to any licensure or registration

  -Voluntary and involuntary termination of medical staff membership

  -Voluntary and involuntary limitation, reduction, or loss of clinical privileges

  -Any evidence of an unusual pattern or an excessive number of professional liability actions resulting in a final judgment against the applicant.

  -Documentation as to the applicant's health status

  -Relevant practitioner-specific data as compared to aggregate data, when available

  -Morbidity and mortality data, when available

- EP10. The hospital has a process to determine whether there is sufficient clinical performance information to make a decision to grant, limit, or deny the requested privilege.

- EP11. Completed applications for privileges are acted on within the time period specified in the medical staff bylaws.

- EP12. Information regarding each practitioner's scope of privileges is updated as changes in clinical privileges for each practitioner are made.

73.    Contemporary in time with the departure of Dr. Durrani from Children's Hospital is an article dated May 27, 2009 from *Public Citizen* by Alan Levine and Sidney Wolfe, M.D. titled "Hospitals Drop the Ball On Physician Oversight." It is attached as **Exhibit 9**. The following are excerpts from the article:

74.    The National Practitioner Data Bank (NPDB) was established by the Health Care Quality Improvement Act of 1986 to protect patients from questionable physicians. The

legislation included a requirement that hospitals report to the NPDB whenever they revoke or restrict a physician's hospital privileges for more than 30 days for problems involving medical competency or conduct. As the only national repository for the records of doctors disciplined by their peers for unprofessional or incompetent behavior, the usefulness of the data bank has been historically handicapped by the failure of thousands of hospitals to report to the NPDB. As of December 2007, almost 50 percent of the hospitals in the U.S. had never reported a single privilege sanction to the NPDB. Prior to the opening of the NPDB in September 1990, the federal government estimated that 5,000 hospital clinical privilege reports would be submitted to the NPDB on an annual basis, while the health care industry estimated 10,000 reports per year. However, the average number of annual reports has been only 650 for the 17 years of the NPDB's existence, which is 1/8th of the government estimate and about 1/16th of the industry estimate.

75. Public Citizen, through its Health Research Group, compiled this report by reviewing a number of studies by the Office of Inspector General (OIG), work by the Citizen Advocacy Center, medical journal articles, and recommendations from an October 1996 national meeting on hospital under-reporting. Public Citizen also analyzed the NPDB Public Use File to examine the relationship between hospital reports and actions taken by state medical boards on the same physicians.

76. Operated by the Health Resources and Services Administration (HRSA), part of the Department of Health & Human Services (HHS), the NPDB was designed as a searchable resource for hospitals and other medical entities to check practitioners' backgrounds and to consider taking their own action based on the information in the

71

data bank. Prior to its launch, this function was not being provided in any systematic way. The NPDB's goal was to reduce the likelihood that disciplined doctors might continue to injure patients by relocating to another hospital or state where their reputations and track records were not known.

77. The *Journal of the American Medical Association* (JAMA) has called hospital peer review one of the pillars of quality assurance in the United States. Hospital under-reporting raises questions about the effectiveness of hospital peer review. Under-reporting to the NPDB suggests that hospital peer review is not fulfilling the public trust.

78. Our review identified and focused on two factors associated with under-reporting: failure of hospitals to report and failure of hospitals to take action on questionable physicians. For example, a HRSA funded study reported in the *American Journal of Public Health* noted that, to avoid reporting, hospitals imposed disciplinary periods of less than 31 days thereby avoiding the need for reporting physicians to the NPDB; a medical board official informed Public Citizen that some hospitals avoid reporting by changing their bylaws or by having physicians take a "leave of absence." In one of the most egregious recent examples of the breakdown of hospital peer review, two physicians at Redding Medical Center in Redding, California performed clearly unnecessary bypass and valve surgeries between 1992 and 2002 on hundreds of patients. Peer review of the cardiac program and discipline of these physicians was not done because of the "prestige" of one of the physicians involved and the revenue for the hospital generated by the surgeries. Furthermore, although both state and Joint

Commission surveys had identified peer review deficiencies at Redding, there was no oversight follow-up.

79. State medical board officials report that hospital clinical privilege sanctions are a valuable source of information for identifying physicians with performance or conduct problems, and many boards use this information to launch investigations that can lead to disciplinary action. However, our analysis of the NPDB Public Use File found that almost 1,000 physicians who had at least two adverse clinical privilege reports to the NPDB did not have any subsequent licensure board disciplinary action. One physician had nine adverse clinical privilege reports but no licensure board actions.

80. Failure to report disciplinary actions to the NPDB violates the law and deprives health care organizations such as hospitals and state licensure boards of potentially useful information for their credentialing and regulatory activities, respectively.

81. The Health Care Quality Improvement Act of 1986 (hereafter referred to as "the Act"), as amended, created the National Practitioner Data Bank. Since it became operational in September 1990, the NPDB has received and maintained records of medical malpractice payments and adverse actions taken against licensed health care practitioners by hospitals, other health care entities, licensure boards, and professional societies. The NPDB makes these reports, with doctor identification, available to hospitals, licensure boards, and managed care organizations to facilitate their background checks and credentialing. As a result of resistance from the AMA and other health care organizations, the NPDB statute does not allow for public access to the doctor-specific information.

82. The NPDB is operated by the Health Resources and Services Administration (HRSA) within the Department of Health & Human Services. The NPDB does not currently receive a congressional appropriation; it is self-supporting through user fees (Congress provided funds for startup costs). Users are charged $4.75 per query.  Hospitals, by law, are required to query in certain circumstances, such as when a physician applies for clinical privileges at the hospital and every two years thereafter. Other health care organizations, such as HMOs, may query provided they have a formal peer review process. Medical licensing boards may also query.  Health care practitioners may query but only to get their own reports.  One-third of all queries are mandatory, i.e. from hospitals; two-thirds are optional. In 2007, the NPDB received 3.8 million queries and about 537,600 of these queries matched practitioner reports in the NPDB (a match rate of 14 percent).

83. HRSA has estimated that, based on a national survey, for a one year period, 48,075 licensure, credentialing, or membership decisions were affected by new information provided in NPDB responses.

84. The House Report further noted:  The purpose of requiring reports even for circumstances in which physicians surrender their privileges is to ensure that health care entities will not resort to 'plea bargains' [...]. While such agreements may serve the immediate self-interests of the two parties involved, they may jeopardize the health and safety of future patients.

85. Congress was also concerned that the threat of private money damage liability under federal law, or lawsuits against hospital peer review physicians, including treble

74

damage liability under federal antitrust law, would discourage physicians from participating in peer review.

86. Hospitals that fail to report reportable actions to the NPDB risk losing the liability protection afforded to their professional review activities under the Act. The regulations implementing the Act require the Secretary of HHS to (1) investigate hospitals that appear to be substantially failing to comply with reporting requirements, (2) provide them with an opportunity to correct their practices if they are found to be in non-compliance, and (3) remove the liability protections for three years if they are found in non-compliance.

87. As of December 31, 2007, according to HRSA data, 2,845 of all 5,823 U.S. NPDB-registered hospitals (49 percent) had never reported a clinical privilege sanction to the NPDB.

88. The approximately 6,500 hospitals in the U.S. submitted only 3,154 adverse action reports to the NPDB. This represented 2.6 reports per 1,000 hospital beds during the 3 1/3 year period.

89. Several medical boards emphasized the high quality of the information in hospital reports. Boards value hospital reports because they are based on peer investigation and review. Because hospitals are so concerned about being sued by doctors against whom they take clinical privilege actions, when a hospital does report, there is substantial evidence of a serious problem.

90. While their state statute may require a hospital to report adverse actions to the medical board, actual enforcement authority is usually the responsibility of another state office, such as the agency that licenses hospitals."

91. Children's Hospital owed the Plaintiffs a duty to insure any hospital considering credentialing Dr. Durrani would not credential him and expose Plaintiffs to being harmed by Dr. Durrani.

92. This claim is not based upon, nor does it need to be based upon, a hospital-patient relationship between Plaintiffs and Children's Hospital. It is based upon a different duty and the breach of that duty.

93. "The HCQIA provides for the creation of a National Practitioner Data Bank (NPDB) and requires hospitals to report to the NPDB certain professional review actions that adversely affect a physician's privileges. Information in the NPDB is made available to hospitals upon request when a physician applies for privileges at the requesting hospitals. 42 U.S.S. § 11137(a)." (Taken from a Children's Hospital pleading)

94. This is a case of first impression under Ohio law, but is simple. It is based upon the simple principles of duty, breach of duty, causation and damages. It is an opportunity to send a message to hospitals, the time for protecting doctors and their profits over the public safety is over.

95. Under Ohio law and all negligence law, causation flows from the breach of duty. "It is in a natural and continuous result which would not have taken place without the act." If Children's Hospital properly reported Dr. Durrani to the NPDB, West Chester and/or Journey Lite would not have credentialed him and none of the Plaintiffs would have been harmed by Dr. Durrani at West Chester and/or Journey Lite.

96. This claim is not brought as a private cause of action under a HCQIA violation. It is brought simply as negligence. HCQIA prohibits claims from doctors. It does not

prohibit claims from patients. There is not one case found in a national search
prohibiting this claim.

97. To prove the point how critical to Plaintiffs the report to the NPDB is, Plaintiffs have
no access to the NPDB. Only authorized entities are permitted to query the NPDB, and
any information taken from the NPDB than eventually is made public must be in the
form of a Public Use Data File. West Chester Medical Center and Journey Lite are two
of these entities.

98. Congress passed the Health Care Quality Improvement Act of 1986 (HCQIA), codified
as amended at, 42 U.S.C.A. 11101-11152 (1988 & Supp. 1993), to improve the quality
of health care and to reduce the number of incompetent physicians. *Hanock v. Blue
Cross Blue Shield of Kansas, Inc.*, 1994 U.S. App. Lexis 7077 (1994).

99. The purpose of the HCQIA is to protect patients from incompetent physicians by
establishing a database to collect information related to professional competence or
conduct which could adversely affect the health or welfare of patients. Doe v.
Thompson, 332 F. Supp. 2d 124, 126 (D.D.C. 2004)

100. To accomplish the purpose of the HCQIA, Congress authorized the Department of
Health and Human Services (DHHS) to maintain the NPDB, 42 U.S.C § § 11133 et seq.
(2004). Id.

101. The NPDB is a database that contains information relating to the professional
performances of medical doctors.

102. Specifically, the NPDB contains records of reports which detail malpractice
settlements, malpractice awards, and adverse disciplinary actions such as suspensions,
terminations from medical staffs, and the loss of licenses to practice medicine. Id.

Hospitals have an assumed duty to protect the public from incompetent physicians. See generally Id.

103. Hospitals also must report instances when physicians "voluntarily surrender their medical staff privileges" rather than undergo a peer review investigation.

104. Immunity under the Health Care Quality Act does not provide immunity from suit. *Decker v. IHC Hosp., Inc.* (1992, (CA 10 Utah) 982 F 2d 433).

105. Children's Hospital won't be able to cite case law from any jurisdiction or any Ohio state or federal statute that specifically denies **patients** a private cause of action, against a hospital who violated the reporting requirement under NPDB, therefore, breaching a legal duty to the Plaintiffs. Dr. Durrani is Exhibit A why claims on behalf of patients are necessary.

## NEGLIGENCE

106. Plaintiffs incorporated by reference each and every allegation in the paragraphs above.

107. Defendant owed Plaintiffs the duty to exercise the degree of skill, care, and diligence of an ordinary prudent health care provider and hospital would have exercised under like or similar circumstances, but by their acts and omissions as described in this Complaint breached their duty.

108. Defendant's breach of their duties causing harm and damages to Plaintiffs.

109. As a direct and proximate result of the Defendant's breach of their duties, Plaintiffs sustained the damages as outlined in this Complaint.

110. Children's Hospital failed to inform and report to the relevant regulatory and licensing entities that Children's Hospital had terminated Dr. Durrani's privileges.

111. Children's Hospital failed to inform and report to these entities that Dr. Durrani had resigned in lieu of termination.

112. Children's Hospital violated the HCQIA, 42 USC 11151, by failing to report the termination and/or resignation in lieu of termination to the National Practitioner Databank.

113. Children's Hospital violated the Safe Medical Device Act, Public Law 101-629, as amended, by failing to report that Dr. Durrani's hardware implants failed, required removal, revision surgeries, corrective surgeries, broke, fractured, broke through the skin, dislodged, and/or caused serious bodily injury and harm to Dr. Durrani patients.

114. Defendant had a duty to reasonably supervise, control, monitor, report, inform, and oversee the conduct and consequences of Dr. Durrani, as well as the accurate reporting of information about his malfeasance, in order for Plaintiffs to make an informed choice and consent to future medical care.

115. Defendant misled Plaintiffs about Durrani's character, reputation in the medical community, his malfeasance, his potential for harm, and the risks associated with continuing care with Dr. Durrani.

116. As part of the agreement of Dr. Durrani's departure from Children's, Children's agreed to purge Dr. Durrani's complete file to avoid West Chester Medical Center access to same.

117. Under Ohio law, negligent conduct is the proximate cause of an injury if the injury is the natural and probable consequence of the conduct, i.e., if it is foreseeable. Plaintiffs' injuries were the exact injuries foreseeable and were supposed to be prevented under NPDB reporting requirements.

79

118. Under Ohio law, the determination of whether negligent conduct is the proximate cause of an injury is a question of fact.

119. Under Ohio law, an injury may have more than one proximate cause and when an injury is the natural and probable consequence of negligent conduct, that the negligence of others unites with that negligence to cause injury does not relieve the original offender from liability. Dr. Durrani's, West Chester's, UC Health's and Journey Lite's negligence does not relieve Children's Hospital from their negligence.

120. Under Ohio law, the mere fact that the intervention of a responsible human being can be traced between the defendant's alleged wrongful act and the injury complained of does not absolve him upon the ground of lack of proximate cause if the injury ensued in the ordinary course of events, and if the intervening cause was set in motion by the defendant. Again, Dr. Durrani's, West Chester's, UC Health's and Journey Lite's negligence does not relieve Children's Hospital from their negligence.

121. Under Ohio law, Children's Hospital negligence set in motion the chain of events which led to harm and damages to Plaintiffs. But for Children's Hospital negligence, Plaintiffs would have never been harmed by Dr. Durrani at West Chester and Journey Lite.

122. As a direct and proximate result of the conduct of the Defendant Plaintiffs suffered:

   A. Permanent disability
   B. Physical deformity and scars
   C. Past, current and future physical and mental pain and suffering
   D. Lost income past, present and future
   E. Loss of enjoyment of life
   F. Past medical expenses
   G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
   H. Aggravation of a pre-existing condition
   I. Decreased ability to earn income

J.  3% increased risk of cancer and fear of cancer if BMP-2 was used.
K.  Unnecessary medical expenses
L.  Increased medical insurance premiums and rates
M.  Deductibles they are obligated to pay
N.  Adverse credit reporting events resulting in lower credit
O.  Numerous miscellaneous expenses

## PRAYER FOR RELIEF (JURY DEMAND)

**WHEREFORE,** Plaintiffs demand judgment against Defendant on all claims for all

compensatory and punitive damages to which they are entitled including costs, attorney fees,

prejudgment interest, trial by jury and all other relief to which they are entitled to.

Respectfully submitted,

Stephanie L. Collins (0089945)
THE DETERS LAW FIRM, P.S.C.
5247 Madison Pike
Independence, KY 41051
859-363-1900 - telephone
859-363-1444 - facsimile
scollins@ericdeters.com

Erica C. Deters (0092526)
THE DETERS LAW FIRM, P.S.C.
635 W Seventh Street, Suite 401
Cincinnati, OH 45203
Phone:  (513) 729-1999
ericadeters@ericdeters.com

## JURY DEMAND

Plaintiff hereby respectfully request trial by jury on all issues.

Erica C. Deters

81

## Index of Exhibits

1. Dr. Durrani's Children's Resignation Letter

2. Dr. Wilkey's July 1, 2014 Report

3. Proof of Surgeries While Suspended

4. Michelle Stultz Affidavit

5. NPDB Report 2011

6. NPDB Report 2013

7. Privileges Application West Chester

8. Dr. Durrani Journey Lite Application

9. Public Citizen Article

10. Discrepancies in Dr. Durrani's Background Not Discovery by Children's

11. Discovery To Be Answered

# 1. Dr. Durrani's Children's Resignation Letter



**EXHIBIT**

11


Cincinnati Children's

Surgical Services

Division of Pediatric
Orthopaedic Surgery

Eric J. Wall, MD
*Director*

Aaron W. Perlman, MD
*Emeritus*

Alvin H. Crawford, MD
Charles T. Mehlman, DO, MPH
Twee T. Do, MD
Junichi Tamai, MD
Diane Von Stein, MD
A. Atiq Durrani, MD
*Associates*

Sandy Singleton
*Business Director*

UNIVERSITY OF UC
Cincinnati

Aug 7th, 2008.

Dear Dr. Azizkhan,

Persuant to our discussion today, I am submitting my resignation from the division of orthopedic surgery effective as of Aug 7th, 2008. I have enjoyed working at CCHMC but due to inhospitable working enviornment in the division, I will not be able to continue my services in the division. As I stated to you that I will fulfill operative commitments to my patients which currently are till December 22nd 2008.I will like my resignation to become effective Jan 1st, 2009.

I have enjoyed our personal friendship and greatly value it.

Sincerely,

A.A.Durrani, MD



Δ(π EXHIBIT 4

Deponent
Date_____Rptr._____
WWW.DEPOBOOK.COM

Cincinnati Children's Hospital Medical Center
MLC 2017, 3333 Burnet Avenue Cincinnati , OH 45229-3039 | www.cincinnatichildrens.org
Appointments 513-636-4454 | Referral Fax Line 513-636-4487 | Administrative Office 513-636-4785, Fax 513-636-3928

14

## 2. Dr. Wilkey's July 1, 2014 Report

# ALPHA SPINE OF ST. LOUIS
## KEITH D. WILKEY, M.D.
1050 OLD DES PERES ROAD, SUITE 100
ST. LOUIS, MO 63131-1865
(314) 569-0612

July 1, 2014


Eric C. Deters & Associates, P.S.C.
Attn: Eric Deters
5247 Madison Pike
Independence, KY 41051

RE: Cincinnati Children's Hospital Case Review Study

Dear Mr. Deters,

I have just completed the review of what I will refer to as
Cincinnati Children's Hospital Case Review Study. As we have
discussed, I have collected data from the last 20 Children's
Hospital claimants records that I have reviewed. This study was
designed to act as a peer review similar to what I have done in
the past while working on peer review committees for the hospital
quality improvement panel.  The obvious bias of this study is
noted as these are cases that have gone through an extensive
selection process from your nurses prior to referral on to me.
However, a similar selection bias would occur on any normal peer
review that occurs at a hospital as the administration directs
which cases they want reviewed. Those are specifically selected
from a list of complications or incidents that were reported for
that provider.

I feel that this data collection is necessary to support the
claims that we are making against Children's Hospital of
Cincinnati. It is important to look at these cases as a whole as
they show the lack of supervision of Dr. Durrani by this facility
during the five years that he was on staff. From my previous
medical experiences, being a member of a peer review committee at
two other facilities and serving as a former orthopedic
department chairman, I am appalled by the lack of supervision
from this facility. Taken as a whole, it is beyond my
comprehension that this surgeon was allowed to operate as long as
he was given the poor patient selection, complication rates, and
use of contraindicated medication. There appears to be a complete
failure of the peer review process with respect to Dr. Durrani.

The cases studied were a consecutive cohort of 20 ongoing
patients that were reviewed for Affidavits of Merit. One patient
that I reviewed did not warrant a signature of Affidavit of Merit
and the other 19 were. Of the remaining 19, several had multiple

Cincinnati Children's Hospital Case Review Study
July 1, 2014
Page Two

surgeries. Therefore, the numbers may show an incidence greater
than 100 percent use of Infuse.

The findings are as follows: There were 16 unnecessary surgical
procedures from review of these 20 patients. Some surgeries had
multiple procedures performed, and if I felt that a procedure
done during a larger global surgery was unnecessary, I counted
that as a positive finding. There were 21 cases of use of Infuse
in these 20 patients. The greater than 100 percent finding can be
explained by the fact that a few patients had more than one
surgery and Infuse was used during those surgeries. Again, it is
noted that the use of Infuse is contraindicated in a patient
under the age of 18 years.

I determined that there were questionable diagnoses in 10 of the
20 patients. This category is my interpretation of what
Dr. Durrani's diagnosis of the patient was prior to surgery and
the actual physical exam and imaging study findings that were
documented in the medical record to support that diagnosis.

Due to the fact that Dr. Durrani and I trained together at the
University of Louisville, separated by one year, I am well
familiar with the techniques that he was trained to perform. One
of the major complaints that I have with Dr. Durrani and
Children's Hospital is the fact that he used novel surgeries to
treat these patients. I have unique knowledge of Dr. Duranni's
training experience, and I know for a fact that he had no
training at all for video assisted thoracoscopic surgery and
minimal access surgeries in his fellowship. He learned these
techniques in weekend seminars and training courses. After
attending these seminars he applied these techniques directly to
patients in an unsupervised manner. It is well known there is a
"sharp learning curve" in these techniques and it is the
recommendation of the majority of instructors and manufacturers
that supervised training from an expert in the field is necessary
before performing these techniques in actual patients. In fact,
John Kostuick, M.D., a founding member of the K2M spine medical
device company, recently said that these techniques "weren't
meant to be applied after attending a weekend seminar." Another
one of my colleagues, Izzy Lieberman, M.D., indicated in a recent
conference that he would expect at least 30 or more cases to be
performed under supervision before he felt that any surgeon
should be performing these procedures in an unsupervised manner.

From those 20 patients that I reviewed, 9 of them had what I
described above as novel surgeries.

Cincinnati Children's Hospital Case Review Study
July 1, 2014
Page Three

Of the 20 patients, a total of 7 complications could be
identified. These range from loss of hardware fixation, nonunion,
infection and screw malposition. Of those 7 complications, I
felt, in retrospect, that had these cases been properly reviewed
by a peer review committee, 2 of them would have resulted in a
summary suspension of his privileges until he could document that
he had obtained adequate training or undergone remedial training
in the procedure that he was performing. This is from my
experiences working at least five years on peer review committees
in other facilities.

Finally, in my opinion, the finding in one patient is that an
experimental surgery was done. Dr. Durrani "invented" the use of
growth rods to treat cervical occipital kyphosis in a child less
than two years old. To my knowledge, this surgery has never been
done before and for good reason. The premise of the surgery is
that growth rods should be used to hold a deformity of kyphosis
in a corrected position long enough for further vertical growth
of the child to occur. However, this relies upon the pullout
strength of the screw to hold the construct in position. This is
the most common reason for failure and it has been well
documented in cases of the use of growth rods with scoliosis and
significant kyphosis, the amount of kyphosis is the reason for
the construct failure. Obviously, given this experience in the
past with growth rods, the use of a growth rod to correct a
kyphotic deformity is absurd. The surgery obviously failed as
expected. Unfortunately, this child was subjected to a total of
three surgeries, the primary surgery and then two revisions,
within one week as Dr. Durrani was too stubborn to admit that the
surgery design was flawed from the start. This surgery should
have never been performed unless it was under the direction and
supervision of a hospital experimental review panel. This panel
requires a process of extensive presurgery evaluation before any
experimental procedure is done. This is to stop bad ideas such as
Dr. Durrani's (independent medical review should have shown what
I noted above) from being tested on unsuspecting patients. There
would be supervision during the ongoing surgery and patients and
families would have had an informed consent that the surgery
being performed was experimental. It disheartens me to the fact
that this was not done in this particular institution.

In summary, I have provided now a reasonable and objective peer
review of 20 consecutive cases of Dr. Durrani's surgery. I found
that of those 20 cases, 10 carried questionable diagnoses and 16
underwent an unnecessary procedure. Dr. Durrani performed novel
surgeries in which he was inadequately trained with regards to

Cincinnati Children's Hospital Case Review Study
July 1, 2014
Page Four

their indications, contraindications and technical aspects in 9
cases. Alarmingly, greater than 100 percent of the patients
reviewed had been exposed to Infuse during their surgery which is
contraindicated due to their young age. My review of those cases
is also noted for one experimental surgery that should have been
controlled by an experimental review panel and the results of two
of these surgeries should have resulted in a summary suspension
due to Dr. Durrani's negligence. One has to ask why this was
allowed to happen at an institution such as Cincinnati Children's
Hospital.

Sincerely yours,


Keith D. Wilkey, M.D.
Fellow, American Academy of Orthopaedic Surgeons
Member of North American Spine Society

KDW:mab

\*\*\*\*\*\*\*\*\*\* NOT FOR SECONDARY RELEASE \*\*\*\*\*\*\*\*\*\*

# 3. Proof of Surgeries While Suspended

CONFIDENTIAL

CCHv.

J002413

Get all these reports.

Why suspended?
suspended?



## JUNE 25-JULY 22, 2008 SURGERIES ON LIST

| | | |
|---|---|---|
| Beyer, Leona | CHRIST | 06/26/08 |
| Hightchew, Alissa | CCHMC | 06/27/08 |
| Bachmann, Gayle | CHRIST | 07/03/08 |

SURGEON: DURRANI, ABUBAKER A

LOCATION: MAIN          SOURCE: CENTRICITY    DATES: 1/1/2005 TO 6/30/2008

| SURGERY DATE | CASE_ID | PATIENT_NAME | MRN | PROCEDURE |
|---|---|---|---|---|
| 06/18/08 | 379898 | | | MASS EXCISION, OPEN APPROACH |
| 06/18/08 | 379899 | | | SPINE POSTERIOR FUSION WITH BONE GRAFT |
| 06/18/08 | 379900 | | | SPINE TRANSFORAMINAL LUMBAR INTERBODY FUSION (TLIF) |
| 06/18/08 | 380142 | | | VASCULAR MALFORMATION EXCISION |
| 06/20/08 | 380403 | | | SPINE IRRIGATION AND DEBRIDEMENT |
| 06/20/08 | 380479 | | | SPINE DIRECT PARS REPAIR WITH PEDICLE SCREWS |
| 06/20/08 | 380523 | | | SPINE POSTERIOR FUSION WITH INSTRUMENTATION AND AUTO/ALLO BONE GRAFT |
| 06/20/08 | 380687 | | | SPINE POSTERIOR FUSION WITH GROWING ROD INSTRUMENTATION AND AUTO/ALLO BONE GRAFT |
| 06/21/08 | 380740 | | | SHOULDER BIOPSY |
| 06/22/08 | 380752 | | | ELBOW CLOSED REDUCTION WITH PERCUTANEOUS PINNING |
| 06/22/08 | 380753 | | | RADIUS/ULNA CLOSED REDUCTION POSSIBLE OPEN REDUCTION INTERNAL FIXATION (ORIF) |
| 06/22/08 | 380754 | | | ELBOW CLOSED REDUCTION WITH PERCUTANEOUS PINNING |
| 06/23/08 | 380719 | | | MASS EXCISION, OPEN APPROACH |
| 06/23/08 | 380720 | | | BONE CURRETTAGE WITH BONE GRAFT |
| 06/23/08 | 380782 | | | SPINE GROWING ROD ADJUSTMENT |
| 06/23/08 | 380807 | | | FEMUR OPEN REDUCTION INTERNAL FIXATION (ORIF) |
| 06/23/08 | 380817 | | | HARDWARE REMOVAL |
| 06/23/08 | 380822 | | | SPINE POSTERIOR FUSION WITH INSTRUMENTATION AND AUTO/ALLO BONE GRAFT |
| 06/23/08 | 380823 | | | FEMUR NANCY NAIL REMOVAL |
| 06/23/08 | 381059 | | | FEMUR CLOSED REDUCTION WITH POSSIBLE PERCUTANEOUS PINNING |
| 06/24/08 | 381006 | | | TIBIA/FIBULA CLOSED REDUCTION WITH POSSIBLE OPEN REDUCTION INTERNAL FIXATION |
| 06/27/08 | 381782 | | | FEMUR OPEN REDUCTION INTERNAL FIXATION (ORIF) |
| 06/27/08 | 381787 | | | EXTERNAL FIXATOR APPLICATION |
| 06/27/08 | 381788 | | | SPINE LUMBAR MICRODISCECTOMY |
| 06/27/08 | 381807 | | | SPINE ANTERIOR LUMBAR INTERBODY FUSION (ALIF) |
| 06/27/08 | 382040 | | | BONE CURRETTAGE WITH BONE GRAFT |

SURGEON: DURRANI, ABUBAKER A

LOCATION: MAIN          SOURCE: CENTRICITY    DATES: 1/1/2005 TO 6/30/2008

| SURGERY DATE | CASE_ID | PATIENT_NAME | MRN | PROCEDURE |
|---|---|---|---|---|
| 06/27/08 | 382041 | | | EXTREMITY EPIPHYSIODESIS PERCUTANEOUS |
| 06/27/08 | 382042 | | | SPINE VATS ANTERIOR RELEASE WITH SIMULTANEOUS POSTERIOR SPINAL FUSION W/ INSTRUMENTATION AND BONE GRAFT |
| 06/28/08 | 382169 | | | SPINE POSTERIOR FUSION WITH INSTRUMENTATION AND AUTO/ALLO BONE GRAFT |
| 06/28/08 | 382170 | | | NERVE BLOCK |
| 06/28/08 | 382170 | | | TIBIA/FIBULA OPEN REDUCTION INTERNAL FIXATION (ORIF) |
| 06/30/08 | 382070 | | | SPINE POSTERIOR FUSION WITH INSTRUMENTATION AND AUTO/ALLO BONE GRAFT |
| 06/30/08 | 382071 | | | RISSER CAST APPLICATION |
| 06/30/08 | 382133 | | | SPINE TRANSFORAMINAL LUMBAR INTERBODY FUSION (TLIF) |
| 06/30/08 | 382134 | | | SPINE ANTERIOR LUMBAR INTERBODY FUSION (ALIF) |
| 06/30/08 | 382143 | | | MASS EXCISION, OPEN APPROACH |
| 06/30/08 | 382144 | | | WRIST OPEN REDUCTION INTERNAL FIXATION (ORIF) |

SURGEON: DURRANI, ABUBAKER A
LOCATION: MAIN    SOURCE: EPIC    DATES: 7/1/2008 TO 3/7/2009

| SURGERY DATE | LOG_ID | PAT_NAME | MRN | PROC_NAME |
|---|---|---|---|---|
| 2008-07-05 | 3433 | | | ELBOW CLOSED RED. PERC PINNING |
| 2008-07-06 | 3360 | | | ELBOW CLOSED REDUCTION |
| 2008-07-06 | 3438 | | | ANKLE I & D |
| 2008-07-07 | 3441 | | | EXTREMITY I & D |
| 2008-07-07 | 3445 | | | ELBOW CLOSED RED. PERC PINNING |
| 2008-07-07 | 3446 | | | ELBOW ORIF |
| 2008-08-04 | 6066 | | | MASS EXCISION, OPEN APPROACH |
| 2008-08-04 | 6215 | | | SPINAL MONITORING |
| 2008-08-04 | 6215 | | | SPINE POST. FUSION W/ INSTRUMENTATION & BONE GRAFT |
| 2008-08-04 | 6234 | | | NERVE BLOCK |
| 2008-08-04 | 6234 | | | BONE CURRETTAGE W/ BONE GRAFT |
| 2008-08-04 | 6742 | | | SPINAL MONITORING |
| 2008-08-04 | 6742 | | | SPINE TLIF |
| 2008-08-04 | 7113 | | | SPINE DIRECT PARS REPAIR W/ PEDICLE SCREWS |
| 2008-08-08 | 5423 | | | EXTREMITY OSTEOCHONDROMA EXCISION |
| 2008-08-08 | 7233 | | | SPINE DIRECT PARS REPAIR W/ PEDICLE SCREWS |
| 2008-08-08 | 7238 | | | SPINAL MONITORING |
| 2008-08-08 | 7238 | | | SPINE POST. FUSION W/ INSTRUMENTATION & BONE GRAFT |
| 2008-08-08 | 7240 | | | SPINE GROWING ROD ADJUSTMENT |
| 2008-08-08 | 7872 | | | SPINAL MONITORING |
| 2008-08-08 | 7872 | | | SPINE CERVICAL ANT. DISCECTOMY W/ FUSION |
| 2008-08-08 | 7872 | | | SPINE CERVICAL POST. FUSION W/ INSTRUMENTATION & BONE GRAFT |
| 2008-08-08 | 8425 | | | PIN REMOVAL STERILE |
| 2008-08-08 | 8660 | | | EXTREMITY I & D |
| 2008-08-09 | 7247 | | | SPINAL MONITORING |
| 2008-08-09 | 7247 | | | SPINE DIRECT PARS REPAIR W/ PEDICLE SCREWS |
| 2008-08-09 | 7496 | | | SPINAL MONITORING |
| 2008-08-09 | 7496 | | | SPINE DIRECT PARS REPAIR W/ PEDICLE SCREWS |
| 2008-08-11 | 5543 | | | SPINE VATS ANT. RELEASE W/ SIMULTANEOUS POST. SPINAL FUSION W/ INSTRUMENTATION & BONE GRAFT |
| 2008-08-11 | 5856 | | | EXTREMITY EPIPHYSIODESIS |
| 2008-08-11 | 6090 | | | MASS EXCISION, OPEN APPROACH |
| 2008-08-15 | 6102 | | | BONE CURRETTAGE W/ BONE GRAFT |
| 2008-08-15 | 7519 | | | SPINAL MONITORING |
| 2008-08-15 | 7519 | | | SPINE POST. FUSION W/ INSTRUMENTATION & BONE GRAFT |
| 2008-08-15 | 7617 | | | SPINE DIRECT PARS REPAIR W/ PEDICLE SCREWS |



J. David Brittingham (0061577)
Trial Attorney for Defendant
Cincinnati Children's Hospital Medical Center

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| WILLIAM and DONNA FELTNER, Individually and as Best Friend of their Minor Child, JACOB FELTNER, et al | : Case No. A1301232 |
| | : Judge Robert P. Ruehlman |
| Plaintiffs, | : |
| v. | : DEFENDANT CINCINNATI |
| | : CHILDREN'S HOSPITAL MEDICAL |
| ABUBAKAR ATIQ DURRANI, M.D., | : CENTER'S NOTICE OF FILING |
| et al | : AFFIDAVIT OF MICHELLE STULTZ, |
| Defendants. | : RN, CPMSM, CPCS |
| | : |
| | : |

Please take notice that Defendant Cincinnati Children's Hospital Medical Center hereby files the affidavit of Michelle Stultz, RN, CPMSM, CPCS executed on October 16, 2014.

Respectfully submitted,

*/s/ Allison G. Davis*
J. David Brittingham (0061577)
Allison Davis (0088235)
DINSMORE & SHOHL LLP
255 East Fifth Street
Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 977-8200

*Counsel for Defendant*
*Cincinnati Children's Hospital*
*Medical Center*

1



# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by regular U.S. Mail, postage prepaid, this 16th day of October, 2014 upon the following:

Stephanie L. Collins
The Deters Firm
5247 Madison Ave.
Independence, KY 41051

Robert A. Winter, Jr.
P.O. Box 175883
Fort Mitchell, KY 41017

*Counsel for Plaintiffs*

Michael F. Lyon
James F. Brockman
Laurie A. McCluskey
LINDHORST & DREIDAME CO., L.P.A.
312 Walnut Street, Suite 3100
Cincinnati, Ohio 45202

Paul W. McCartney
Bonezzi Switzer Polito & Hupp Co. L.P.A.
201 E. Fifth St., Suite 1900
Cincinnati, OH 45202

*Counsel for Defendant*
*Abubakar Atiq Durrani*

/s/ Allison G. Davis

2



## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

WILLIAM and DONNA FELTNER : Case No. A1301232
Individually and as Best Friend of their :
Minor Child, JACOB FELTNER : Judge Robert P. Ruehlman
                                :
            Plaintiffs,         :
                                :
                                : AFFIDAVIT OF MICHELLE STULTZ,
v.                              : RN, CPMSM, CPCS
                                :
ABUBAKAR ATIQ DURRANI, M.D. et. :
al.,                            :

            Defendants

STATE OF OHIO          )
                       ) ss
COUNTY OF HAMILTON     )

I, Michelle Stultz, having been duly cautioned and sworn, hereby state as follows:

1.      I have knowledge of and am competent to testify to the matters set forth herein. This Affidavit is made upon both my personal knowledge and from documents or other sources within Cincinnati Children's Hospital Medical Center ("CCHMC"). I rely upon these documents and individuals for the accuracy of the information contained herein and, on that basis, I am informed and believe that the matters stated herein are true, correct, and complete.

2.      I am presently employed by CCHMC as Senior Director, Medical Staff Services.

3.      Medical Staff Services coordinates the credentialing and/or privileging of the more than 1,900 employed and community providers on the medical staff at CCHMC.

4.      Medical Staff Services follows credentialing standards mandated by the federal and state government as well as by regulatory agencies such as the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission"), National Committee for Quality Assurance, and the American Accreditation HealthCare Commission/URAC.

1



5.    The Joint Commission, also formerly known as the Joint Commission on Accreditation of Healthcare Organizations or the Joint Commission on Accreditation of Hospitals, provides accreditation to hospitals throughout the county.

6.    CCHMC is currently accredited by the Joint Commission.

7.    CCHMC has maintained its accreditation by the Joint Commission since at least 2003.

8.    Pursuant to the Joint Commission requirements, CCHMC has medical staff bylaws, rules and regulations, and policies ("Medical Staff Documents").

9.    CCHMC's Medical Staff Documents set out the process for providers seeking appointment to and privileges from the medical staff at CCHMC ("Medical Staff").

10.    CCHMC complies with and follows its Medical Staff Documents when credentialing and granting privileges to physicians.

11.    When a physician seeks appointment to the Medical Staff at CCHMC, he/she must submit a completed application to the Medical Staff Services Department.

12.    In 2004, applicants for appointment to the medical staff were required to complete the Ohio Department of Insurance Standardized Credentialing Form, attached as Exhibit 1.

13.    Upon receipt of a physician's application, the Medical Staff Services Department collects or verifies the references, licensure, training, experience, and current competence information. When collection and verification is completed, one of the coordinators in the Medical Staff Services Department provides the application and all supporting material to the director of the division in which the applicant seeks privileges.

14.    The division director then reviews the application and supporting documentation. The division director also has the discretion to conduct a personal interview with the applicant if

2



they have not already done so as a result of the employment process. Others within the department may also interview the applicant. Next, the division director makes a recommendation to the Credentials Committee.

15. I have served as an *ex-officio* member of the Credentials Committee since 1998. The Credentials Committee meets monthly.

16. The Credentials Committee also reviews a summary of the application and any other supporting documentation for the applicant that falls outside of what is reasonable and customary for an application to CCHMC. In addition, the Credentials Committee reviews the report and recommendation of the division director and may elect to call the applicant to appear before the Credentials Committee.

17. After its review, the Credentials Committee transmits to the Medical Executive Committee its recommendations.

18. The Medical Executive Committee then reviews the information from the Credentials Committee and then makes its own recommendation to the Board of Trustees for Cincinnati Children's Hospital Medical Center, which considers the recommendation and any supporting documentation.

19. After consideration, the Board of Trustees can affirm or reject the Medical Executive Committee's recommendation and also has the option of referring the matter back to the Medical Executive Committee for further consideration.

20. The only other way to obtain credentials as a member of the Medical Staff is to go through Expedited Credentialing, which is provided in limited circumstances pursuant to CCHMC's Medical Staff Documents.



3



21.     The applicant under the Expedited Credentialing process has the same burden to meet the same requirements for appointment to the Medical Staff and still requires full completion and verification of information.

22.     From at least 2004-2008, applicants for appointment and reappointment to the Medical Staff were required to demonstrate via documentation, references, or other evidence certain baseline qualifications, including, but not limited, to licensure, possession of a DEA certificate, competency, standards, and an ability to participate in Medical Staff functions.

23.     Specific examples of verification that CCHMC performs include, but are not limited to, as follows:

a.  Licensure: Medical Staff Services will verify licensure status with the appropriate State Licensing Board of the state(s) in which the practitioner practices. Verification includes the status of the license, effective date, expiration date, and any actions or sanctions taken or pending.

b.  Hospital Clinical Privileges and Membership: Privileges are verified with all hospitals indicated by the practitioner. Verification includes, at a minimum, the date of appointment, scope of privileges, and current restrictions or sanctions.

c.  Identity: CCHMC will check the license, passport, current hospital ID card, or other valid picture identification issued by a state or federal agency to verify identity.

24. From at least 2004 to 2008, CCHMC requested information from the National Practitioner Data Bank, for each person applying for appointment to the Medical Staff and/or privileges.

4



25. In addition, CCHMC requested information from the National Practitioner Data Bank, at least every two years for each member of the Medical Staff and/or individual who had clinical privileges at CCHMC.

26. Notably, once an individual was appointed to the Medical Staff in 2004, they were placed in a provisional status for the first year, and then subject to reappointment at least every two years.

FURTHER AFFIANT SAYETH NAUGHT.

Michelle Stultz, RN, CPMSM, CPCS

Subscribed and Sworn to and subscribed before me, this 16th day of October, 2014.

Notary Public
My Commission Expires: 5-14-16

Debra G Cook
Notary Public - Ohio
My Commission Expires 05-14-16

2648803v2

5

*the* DataBank

P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

```
DCN: 5500000070430300
Process Date: 09/01/2011
Page: 1    of    1
DURRAUI, ABUBAKAR ATIQ
For authorized use by:
JOURNEYLITE OF CINCINNATI, LLC
```

# QUERY RESPONSE

This query was processed under the provisions of:

| X | Title IV (NPDB) | X | Section 1921 (NPDB) | | Section 1128E (HIPDB) |

**A. SEARCH RESULT** (Based on the subject identification information provided, the reports found are listed below.)

| Medical Malpractice Payment Report(s): | No Reports | Professional Society Action(s): | No Reports |
|---|---|---|---|
| State Licensure Action(s): | No Reports | DEA/Federal Licensure Action(s): | No Reports |
| Exclusion or Debarment Action(s): | No Reports | Peer Review Organization Action(s): | No Reports |
| Clinical Privileges Action(s): | No Reports | | |

**B. SUBJECT IDENTIFICATION INFORMATION** (Recipients should verify that subject identified is, in fact, the subject of interest.)

| | |
|---|---|
| Subject Name: | DURRAUI, ABUBAKAR ATIQ |
| Gender: | MALE |
| Date of Birth: | 08/29/1968 |
| Other Name(s) Used: | |
| Organization Name: | CENTER FOR ADVANCED SPINE TECHNOLOGIES |
| Organization Type: | MEDICAL GROUP/PRACTICE (365) |
| Work Address: | 4555 LAKE FOREST |
| | #150 |
| City, State, ZIP: | CINCINNATI, OH 45242 |
| Home Address: | 4800 BETHANY RD |
| City, State, ZIP: | MASON, OH 45040 |
| Social Security Numbers (SSN): | ***-**-3567 |
| Individual Taxpayer Identification Numbers (ITIN): | |
| Professional School(s) & Year of Graduation: | GOVERNMENT COLLEGE, MULTAN, PAKISTAN (1985) |
| | ARMY MEDICAL COLLEGE QUAID-I-ASAM UNIV ISLAMABAD PAKISTAN (1991) |
| | UNI OF CINCINNATI CINCINNATI OH (2003) |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) (010) |
| State License Number, State of Licensure: | 35-085087, OH |
| Specialty: | ORTHOPEDIC SURGERY (83) |
| Drug Enforcement Administration (DEA) Numbers: | BD7432115 |
| National Provider Identifiers (NPI): | 158869700 |
| Federal Employer Identification Numbers (FEIN): | |
| Unique Physician Identification Numbers (UPIN): | |

**C. ENTITY INFORMATION**

| | |
|---|---|
| Entity Name: | JOURNEYLITE OF CINCINNATI, LLC (DBID ending in ...75) |
| Authorized Agent: | STRATEGIC SURGERY CENTER CONSULTING, LLC |
| Authorized Submitter's Name: | Drucilla A Wentworth, RN, MA |
| Authorized Submitter's Title: | CEO |
| Authorized Submitter's Telephone: | (316) 631-3723 |

*the* DataBank

P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

Continuous Query ID: 300000001946303
DCN: 5500000081644385
Process Date: 04/29/2013    Page: 1    of 1
DURRANI, ABUBAKAR
For authorized use by:
JOURNEYLITE OF CINCINNATI, LLC

## DURRANI, ABUBAKAR - CONTINUOUS QUERY RESPONSE

### A. SUBJECT IDENTIFICATION INFORMATION (Recipients should verify that subject identified is, in fact, the subject of interest.)

| | |
|---|---|
| Practitioner Name: | DURRANI, ABUBAKAR |
| Date of Birth: | 08/29/1968          Gender: MALE |
| Organization Name: | CAST |
| Organization Type: | MEDICAL GROUP/PRACTICE (365) |
| Work Address: | 10475 READING ROAD, SUITE 206, CINCINNATI, OH 45241 |
| Social Security Number: | ***-**-3567          DEA:    BD7432115 |
| NPI: | 158869700 |
| License: | PHYSICIAN (MD), 35.085087, OH, ORTHOPEDIC SURGERY |

### B. CONTINUOUS QUERY ENROLLMENT INFORMATION

NPDB Enrollment Status: Enrolled - 04/29/2013 - 04/30/2014*
HIPDB Enrollment Status: Not Enrolled
* Unless enrollment is canceled by the entity prior to this date

| | |
|---|---|
| Statutes Queried: | Title IV (NPDB), Section 1921 (NPDB) |
| Entity Name: | JOURNEYLITE OF CINCINNATI, LLC (DBID ending in ...75) |
| Authorized Submitter: | LISA SPRONG, ADMINISTRATIVE DIRECTOR, (513) 259-2488 Ext. 340 |

### C. SUMMARY OF REPORTS ON FILE WITH THE DATA BANK AS OF 04/29/2013

The following report types have been searched:

| | | | |
|---|---|---|---|
| Medical Malpractice Payment Report(s): | No Reports | Professional Society Action(s): | No Reports |
| State Licensure Action(s): | No Reports | DEA/Federal Licensure Action(s): | No Reports |
| Exclusion or Debarment Action(s): | No Reports | Peer Review Organization Action(s): | No Reports |
| Clinical Privileges Action(s): | No Reports | | |

-------------------------- No Reports Found --------------------------

# 7.   Privileges Application
# West Chester



# West Chester Medical Center

Health Alliance™

Medical Staff Office
3200 Burnet Avenue
Cincinnati, OH 45229

«longname_of_providers»
«groupname_of_groups»
«addressline1_of_providerstreetaddresses»
«addressline2_of_providerstreetaddresses»
«city_of_providerstreetaddresses», «state_of_providerstreetaddresses»
«zipcode_of_providerstreetaddresses_forma»

Dear «salutation_of_provideraddresses»:

Thank you for your interest in applying for medical staff membership and privileges at West Chester Medical Center. I am pleased to provide you with the medical staff application and clinical privilege request forms.

The Alliance Partners Central Verification Office (CVO) provides centralized credentialing services for Health Alliance hospitals. The CVO will process your application and then West Chester Medical Center will be responsible for the evaluation of the information that is verified and make a decision regarding membership and clinical privileges.

*There is a non-refundable application-processing fee of $150 made payable to **West Chester Medical Center Medical Staff.** This fee must be included with your application packet.*

1. The CVO will process your completed application and perform all verifications. Ohio HB 125, Simplification Act, is now in effect and the CAQH Application is required. It is essential that your application be complete in order to proceed. It is essential that you read the application carefully and address all areas of the application. Do not leave any sections of the application blank. **Please re-attest the CAQH Application before printing so signatures *do not expire.***

**Please note:** An incomplete application will be returned to you and will delay completion of the credentialing process. A complete application is defined as an application on which every item is addressed. Non-applicable areas should be indicated with the statement, "not applicable". All items must be legible. All signatures must be present and dated. All additional requested documentation is to be enclosed with the application. We must receive your completed application within 30 days of the date on this letter or we will assume that you have no further interest in affiliation. If you decide to submit an application after the 30th day submission period has lapsed, you will be required to contact the Medical Staff Office and have them reauthorize processing of your application.

The following additional items must be included in order to process your application:

2. Copy of your current professional liability insurance face sheet that shows your name, expiration dates and limits of at least $1/3 million in coverage.



3. There can be no unexplained gaps greater than 60 days. All time since professional school/training must be accounted for on the application and should include months and years.

4. The application must be received by the CVO within 30 days of the date it was signed by the applicant.

5. Check for $150 made payable to West Chester Medical Center Medical Staff (non-refundable application processing fee).

6. **For Certified Practitioners, a copy of your current Standard Care Agreement must be returned along with the required delineation of privileges and documentation to support requested privileges.**

7. **For Physician Assistants, please provide copies of your State Approval Utilization Plans (as well as any supplemental plans approved by the state) along with copies of physician supervision letters.**

8. **TB and Varicella Status Form** must be completed.

9. **Photograph** – The initial applicant shall submit a jpeg photograph which will be attached to the release executed by the applicant and distributed to references to confirm the applicant's identity. Email your jpeg photograph to *Barbara.Butz@healthall.com*.

10. Mail completed applications to Alliance Partners CVO, 3120 Burnet Avenue, Suite 203, Cincinnati, OH 45229. You are welcome to e-mail your applications to *AP-CVO@healthall.com* or fax to 513-585-7904. If e-mailing or faxing your application, please send your application fee to the Alliance Partners CVO at the address listed above.

If you have any questions concerning the credentialing process, please contact the CVO at 513-585-7999. For questions regarding privileges please contact Barbara Butz at 513-585-6834.

Once the CVO has received your application with all required enclosures, they will complete all required verifications and will forward a completed file to our office for processing.

West Chester Medical Center has grown from a vision to the reality of combining a state-of-the-art facility with a very dedicated, compassionate group of clinical and administrative professionals. Our team is eager to serve the community and we are very excited you have chosen to be part of the West Chester Medical Center. We look forward to receiving your application.

Sincerely,

*Carol King*

Carol King, Senior Vice President
West Chester Medical Center

# WEST CHESTER MEDICAL CENTER
## APPLICATION CHECK LIST

[]    1. CAQH application with current attestation date and all information completed.

[]    2. Health Status Form completed, signed and dated.

[]    3. TB Form completed, signed and dated.

[]    4. CME attestation completed, signed and dated.

[]    5. Confidentiality Agreement signed and dated.

[]    6. Copy of Professional Liability Insurance face sheet.

[]    7. Copy of current DEA

[]    8. Copy of current Ohio License (include an Standard of Care agreements)

[]    9. IS & T questionnaire completed

[]    10. E-mail jpeg photograph to Barbara.Butz@healthall.com

[]    11. Delineation of Privileges request form signed and dated

[]    12. Practice Intention Form

[]    13. Emergency Department Preference Card **(Primary Care Physicians)**

[]    14. Curriculum Vitae

[]    15. Application fee of $150.00

 

## HEALTH STATUS QUESTIONNAIRE

To answer this two-part question appropriately, please respond affirmatively if you have any condition, which is infectious, which affects motor skills, cognitive ability or judgment, or which may affect your ability to care for patients or to interact appropriately with other caregivers.

*(If the answer to any part of this question is **YES**, please attach a detailed explanation).*

Do you have any physical, mental, or emotional conditions which could affect your ability to exercise the clinical privileges requested or would require an accommodation in order for you to exercise the privileges requested safely and competently for a Health Alliance affiliated organization?

[] Yes          [] No

*Do you have, a chemical dependency/substance abuse problem, which could interfere with your ability to care for patients in any way?*

[] Yes          [] No

**APPLICANT'S SIGNATURE**

«longname_of_providers»
*APPLICANT'S PRINTED NAME*

**DATE**

*Regardless of how this two-part question is answered, the verification process will proceed in a usual manner. If you have answered this question affirmatively and are found to be professionally qualified for appointment and the clinical privileges requested, you will be required to undergo further review to determine what accommodations are necessary to allow you to practice.*

**This form will be separated from the application prior to Credentialing Committee Review.**



# West Chester Medical Center
Health Alliance™

**NAME (please print):** «longname_of_providers»

*Tuberculosis Screening and Varicella Immune Status Documentation:*
The Ohio Department of Health (section 3701-84-08) requires that all health care services develop and follow a tuberculosis plan that is based on CDC guidelines and risk assessment of that facility. Consistent with these guidelines, all patient care providers are required to submit *evidence of ongoing TB testing/response to screening questions in order to maintain membership* on the Medical/Allied Health Staff. In order to further protect patients and staff, we request information regarding varicella immune status at the time of initial appointment.

TB TESTING
*Check one of the following:*
[ ]     I do not provide patient care

[ ]     I receive annual tuberculosis skin testing and I am tuberculosis skin test negative
        ***Test results from any source are acceptable in order to avoid repeat skin testing***

**PPD test information:  Documentation must be provided**

| Date Given | Date Read | Read by | Result |
|------------|-----------|---------|--------|
|            |           |         |        |
|            |           |         |        |

## OR ATTACH A COMPLETED TB FORM

[ ] I have a positive reaction to TB skin testing but do not have active tuberculosis and I
[ ] Receive annual tuberculosis symptom screening.
    [ ] I need a chest x-ray
    [ ] I have a previous negative chest x-ray, and have no symptoms suggestive of
    [ ] Tuberculosis (please answer questions below)
    **Location and approximate date of negative chest x-ray:**_____

**For anyone with a previously positive skin test, an annual verification of negative signs and symptoms of TB is required. This includes answering the following questions: (Answer all Questions)**
    Are you currently experiencing:
       • Unexplained productive cough?       ___ Yes ___ No
       • Hemoptysis?       ___ Yes ___ No
       • Unexplained weight loss or increased fatigue?       ___ Yes ___ No
       • Arriving within the last 5 years from a foreign country?       ___ Yes ___ No
       • Have any TB associated risk factors?       ___ Yes ___ No
       • Have you ever received the BCG vaccine?       ___ Yes ___ No

**VARICELLA STATUS (INITIAL applicants only)**
*Check one of the following:*
    [ ] I have had chickenpox
    [ ] I have received the complete series of varicella vaccine
    [ ] I know that I have antibodies to varicella
    [ ] I do not know whether or not I am immune to chickenpox
    [ ] I know that I am not immune to chickenpox

**Signature of Applicant**_____  **Date**_____



## West Chester Medical Center

Health Alliance™

Today's Date:

I, «longname_of_providers», attest that I have successfully completed Continuing Medical Education credits as required by the state*. The majority of the classes are in my specialty,

_____.
(enter specialty above)

_____
(Provider's signature)**

*Ohio state requirement 100 hours of approved CME in the two-year registration period, with a minimum of 40 hours in category 1.
ORC 4731-10-02, review date 3/25/01
*Board Regulation 201 KAR 9:310 requires all physicians maintaining a current Kentucky medical license to complete sixty (60) hours of CME every (3) year cycle, with thirty (30) hours being certified in AMA Category I by an organization accredited by the Accreditation Council on Continuing Medical Education (CME). Two (2) hours of the required CME must be acquired in HIV/Aids courses approved by the Cabinet for Health Services pursuant to 902 KAR 2:160 every ten years. The two (2) hours of HIV/Aids must be obtained ten years from the date of your last HIV/Aids certificate and can be used towards your CME requirements.

**Documentation due upon request



# Health Alliance™

| CONFIDENTIALITY AND DATA SECURITY AGREEMENT |
| :---: |
| **Contractors or Non-employees** |

As a contractor or non-employee of the *Health Alliance of Greater Cincinnati,* you have a legal obligation to protect the rights of patients as defined under the Health Insurance Portability and Accountability Act (HIPAA). You are required to keep confidential "Protected Health Information" and other vital data you may access during the course of your work with the *Health Alliance.* The following defines this information and provides a series of statements you must review to fully understand your obligations, as well as appropriate use of the Internet at the *Health Alliance.* **Please read all sections on front and back and sign at the end.**

### *Description of Protected Health Information (PHI)*

PHI includes medical records and financial or billing information relating to a patient's past, present or future mental or physical condition; or past, present or future provision of healthcare; or past, present or future payment for provision of healthcare and contains any of the following identifiers that may be used to identify the patient:

- Name
- Place of residency (including street address, county, city, zip code)
- Telephone/fax numbers
- E-mail addresses
- Social Security Number
- Medical Record Number
- Health plan beneficiary number
- Account numbers
- Birth date, admission date, discharge date, date of death, all ages over 89
- Certificate/license numbers
- Vehicle identifiers and serial numbers including license numbers
- Device identifiers/serial numbers
- Web Universal Resource Locators (URLs, i.e. web page identifiers), Internet Protocol (IP address number)
- Biometric identifiers (voice, finger prints)
- Full face photo image
- Any other unique identifying number, characteristic, or code

### Description of Other Confidential Information

Confidential information also includes, but is not limited to, combined clinical data, employee records, processes, marketing plans or techniques, product or service plans, strategies, forecasts, customer/patient lists, supplier lists, discoveries, ideas, pricing



policies and financial information. This confidential information can be obtained through hearing it, seeing it, viewing the medical record or accessing it in a hospital computer system.

## Requirements of All Health Alliance Contractors or Non-Employees Regarding PHI and Confidential Information

The services provided by the *Health Alliance* and corresponding PHI are highly confidential and must not be released or discussed with unauthorized personnel either inside or outside of the hospitals. There are both Federal and State Laws which safeguard the privacy of PHI and other confidential information from unauthorized access, use or disclosure.

## Contractor or Non-Employee Agreements Regarding Use of PHI, Confidential Information and the Internet

- I agree to abide by the *Health Alliance* policies on confidentiality of protected health information (HIPAA policies).

- I agree to access, use or disclose only PHI for which I am authorized through my work with the Health Alliance and as complies with the *Health Alliance* HIPAA policies. I agree not to invade patient privacy by examining PHI or data for inappropriate review.

- I agree not to discuss PHI in unauthorized areas such as hallways, elevators and cafeterias, where it could be overheard.

- I understand unauthorized access or disclosure of PHI may subject the *Health Alliance* to Federal fines or penalties.

- I agree not to make unauthorized disclosures, copies or transmissions of PHI in any form including electronic transfer of PHI to personal devices.

- I understand that any access to PHI for research purposes requires proper documentation and approval according to HIPAA policies.

- If given a system password(s) to use, I agree to keep it (them) confidential and not share it (them) with any individual or allow any individual to access information *through my password(s). I understand that giving a password to an unauthorized* individual may result in disciplinary action up to and including contract or account access termination.

- I understand my password(s) may identify information that I have accessed, which may be monitored.

- I understand my password(s) may be changed periodically to help maintain the security of the *Health Alliance*.

- I understand that I must safeguard data at all times – during its origin, entry, processing, distribution, storage and disposal. This includes data in electronic, paper, film, video or other forms.

- I understand that I must safeguard data from unauthorized access (accidental or intentional), modification, destruction or disclosure.

- I understand that data used in business and clinical operations is an asset of the *Health Alliance*.

- I understand that e-mail is the property of the *Health Alliance* and its member institutions and may be monitored. I further understand that I should have no reasonable expectation of privacy when using *Health Alliance* e-mail or Internet.

- I understand that, should I have access to the Internet, it is provided by the *Health Alliance* to assist in completion of work assignments (i.e. patient care, research, education). I understand that this access should be considered an extension of my work environment.

- I understand that the *Health Alliance* may monitor usage or restrict access of the Internet.

- I understand that the use of unlicensed or unapproved software constitutes a serious risk to *Health Alliance* operations.

- I understand that upon my contract termination or end of work with the *Health Alliance*, my ability to access *Health Alliance* information will end. I agree that I will not attempt to access the systems or disclose any confidential information and/or PHI to any person or entity at that time.

- I understand at the termination of my contract or end of work with the *Health Alliance*, I will return any confidential information including PHI that is in my possession, to my immediate supervisor with the *Health Alliance*.

- I understand I must continue to honor all of the obligations mentioned above after termination of my contract or end of work with the *Health Alliance*.

I have read this document and understand that my signature constitutes my acceptance of the terms of this agreement and that a violation of it can result in disciplinary action, up to and including termination of my contract or relationship with the *Health Alliance*. I also recognize that by signing this agreement, there may be legal, ethical and personal consequences for violating its terms.


«longname_of_providers»
Name (Print)                                    Organization (Print)


_____                        _____
Signature                                       Date of Signature


_____                        _____
Social Security Number or Associate ID          Date of Submission or Receipt



# WEST CHESTER MEDICAL CENTER
## IS & T APPLICATIONS
*Please indicate your training needs for the following software applications.*

«longname_of_providers»
**Practitioner Name**

**REQUEST**
**TRAINING**

- [ ] Access Anywhere

- [ ] CPOE

- [ ] HealthBridge

- [ ] LastWord

- [ ] Fusion (Enterprise transcription application)

- [ ] Electronic EMR – Centricity – IPS (Can utilize HealthBridge)

- [ ] Micromedex/Care Notes (drug information library)

- [ ] Pharmacy One Source - amplifi

- [ ] Trissels (Drug injection compatibility database on the Intranet)

- [ ] Pulmonary CAD **(Radiologists)**

- [ ] Biologic EEG (EEG and Sleep Monitoring) **(Neurologists)**

- [ ] Brain Lab **(Surgical and Ortho navigation)**

- [ ] Dyna CAD (Invivo MRI) **(Radiologists)**

- [ ] Endo Works (Endoscopy Image/Data Management) **(Gastroenterologists)**

- [ ] MUSE (EKG Management) **(Cardiologists)**

- [ ] R2 CAD Mammography (breast Imaging CAD Workstation) **(Radiologists)**

«longname_of_providers»
**Practitioner Name**

**REQUEST**
**TRAINING**

- [ ] Vitrea 2 (3D Reconstruction Workstation) **(Radiologists)**

- [ ] iMDsoft (Anesthesia Information Management System) **(Anesthesiologists**

- [ ] Midas+ (Quality Management Database) – Date Vision Module

- [ ] NaviCare (Patient Flow Management for Periop and Cath Lab)

- [ ] DDNS, DHCP, ect.

- [ ] Novell

- [ ] Microsoft Outlook

- [ ] McKesson PACS

- [ ] PowerScribe **(Radiologists)**

- [ ] QuadRIS

- [ ] Vericis (Hemodynamic monitoring) – **Heart Suites (Cardiologists)**

- [ ] Vericis Imaging **(Cardiologists)**

- [ ] CADStream (MRI Breast Imaging – uses MRI scanner – software for treatment planning **(Radiologists)**

- [ ] NaviCare

- [ ] PowerPath **(Pathologists)**

# West Chester Medical Center

Health Alliance™ 

## Practice Intention

Please indicate the nature of your intended practice at West Chester Medical Center by selecting the category that best describes your intended activity. **Your staff category may be changed at reappointment to be consistent with your actual activity over the previous cycle.**

___ **Active Staff**
**Requirements**
- **West Chester is your primary hospital**
- **Fifty or more patient encounters per year**
- **Participate in hospital committees as appointed**
- **Evidence of annual TB testing**
- **Required to take ER Call**
- **Annual dues**

___ **Telemedicine Staff**
**Requirements**
- **Annual dues**
- **Fifty or more Telemedicine patient encounters per year**

___ **Courtesy Staff**
**Requirements**
- **West Chester is not your primary hospital**
- **Commitment to provide OPPE data from your primary hospital with application and reappointment.**
- **Participate in hospital committees as appointed**
- **May be required to take ER Call**
- **Annual dues**

___ **Affiliate Staff**
**Requirements**
- **Participate in hospital committees as appointed**
- **No Admitting or Delineation of Privileges**
- **No volume requirements**
- **Annual dues**

_____     _____
*Applicant's Signature*                                        **Date**

«longname_of_providers»
**Applicant's Printed Name**

# Provider Application



| CORRECT NUMBERS AND LETTERS | A B C 1 2 3 | CORRECT MARK | X | INCORRECT MARKS | ✎ ✓ • | CAQH AUTOMATICALLY APPLIES MIXED-CASE FORMATTING, COMMON ABBREVIATIONS, AND ZIP CODE MATCHING. PLEASE MAKE CORRECTIONS ONLINE OR CALL THE HELP DESK. |

**Instructions**

Read all instructions carefully prior to submitting your application.

Tips to avoid processing delays
1. Complete only this application and its supplemental forms. **Do not use another provider's application.**
2. Use a blue or black ink ball-point pen only. Do not use a pencil or a felt-tip pen.
3. Print legibly and inside the boxes provided based upon the examples given above.
4. Do not enter more than 1 character per box. If necessary, write outside the provided spaces.
5. Complete all sections that are applicable to you.
6. Some fields use "codes" to help you easily report information (e.g., schools, languages). Code lists are found on pages 36 - 43.

NOTE: Fields with asterisks (*) indicate that a response is required. All other fields will be considered not applicable if left blank.

## SECTION 1 — Personal Information and Professional IDs

**Provider Type**

Code list is found on page 36. Enter the associated 3-digit code in the space provided.*    YES    NO

DO YOU PRACTICE EXCLUSIVELY WITHIN THE INPATIENT SETTING?* (E.G. PATHOLOGISTS, ANESTHESIOLOGISTS, ER PHYSICIANS, NURSE PRACTITIONER, RADIOLOGISTS, PHYSICIAN ASSISTANT, ETC.)

**Name**

Do not use nicknames or initials, unless they are part of your legal name.

LAST NAME*                                                                                 SUFFIX (JR, III)

FIRST NAME*                                                    MIDDLE NAME

HAVE YOU EVER USED ANOTHER NAME?*    YES    NO    IF YES, PLEASE LIST ALL OTHER NAMES USED AND THEIR DATES OF USE BELOW.

OTHER LAST NAME                                                                           SUFFIX (JR, III)

OTHER FIRST NAME                                          OTHER MIDDLE NAME

DATE STARTED USING OTHER NAME          DATE STOPPED USING OTHER NAME

**General Information**

Only enter a Foreign National Identification Number if you do not have a SSN. Do not enter National Provider Identification (NPI) Number here.

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

GENDER*    MALE    FEMALE          DATE OF BIRTH*

CITY OF BIRTH                                                    STATE OF BIRTH    COUNTRY OF BIRTH

SSN*

FOREIGN NATIONAL IDENTIFICATION NUMBER (FNIN)          FNIN COUNTRY OF ISSUE

ENTER ALL NON-ENGLISH LANGUAGES YOU SPEAK

LANGUAGE CODE    LANGUAGE CODE    LANGUAGE CODE    LANGUAGE CODE    LANGUAGE CODE

**Home Address**

NUMBER          STREET                                                    APT NUMBER

CITY                                                              STATE    ZIP CODE

TELEPHONE

NOTE: CAQH will use this method for application follow-up.

E-MAIL

FAX                                          PREFERRED METHOD OF CONTACT*    E-MAIL    FAX

3076

* REQUIRED RESPONSE, NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 01*
Std App v 5.0



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

## Section 1    Personal Information and Professional IDs (Continued)

**Professional IDs**

Include all state licenses, DEA Registration and State Controlled Dangerous Substance (CDS) certification numbers.

Provide all current and previous licenses/ certifications.

Non-licensed professionals should enter certification/ registration number in the space provided for license number.

If you have additional Professional IDs to report, use the Professional IDs Supplemental Form on page 19.

| FEDERAL DEA NUMBER | DEA ISSUE DATE |
|---|---|
| DEA STATE OF REGISTRATION | DEA EXPIRATION DATE |
| CDS CERTIFICATE NUMBER | CDS ISSUE DATE |
| CDS STATE OF REGISTRATION | CDS EXPIRATION DATE |

STATE LICENSE NUMBER                    LICENSE ISSUING STATE    LICENSE ISSUE DATE

IF THIS IS A STATE LICENSE, ARE YOU CURRENTLY PRACTICING IN THIS STATE?    YES    NO

LICENSE EXPIRATION DATE

LICENSE STATUS CODE — Code list is found on page 36; use license status codes. Enter 3-digit code in space provided.

LICENSE TYPE — Code list is found on page 36; use provider type codes. Enter 3-digit code in space provided.

STATE LICENSE NUMBER                    LICENSE ISSUING STATE    LICENSE ISSUE DATE

IF THIS IS A STATE LICENSE, ARE YOU CURRENTLY PRACTICING IN THIS STATE?    YES    NO

LICENSE EXPIRATION DATE

LICENSE STATUS CODE — Code list is found on page 36; use license status codes. Enter 3-digit code in space provided.

LICENSE TYPE — Code list is found on page 36; use provider type codes. Enter 3-digit code in space provided.

**Other ID Numbers**

If you have additional Professional IDs to report, use the Professional IDs Supplemental Form on page 19.

ARE YOU A PARTICIPATING MEDICARE PROVIDER?*    YES    NO

MEDICARE NUMBER                              UPIN

ARE YOU A PARTICIPATING MEDICAID PROVIDER?*    YES    NO

MEDICAID NUMBER                              MEDICAID STATE

NATIONAL PROVIDER IDENTIFICATION (NPI) NUMBER        USMLE NUMBER (WITHOUT HYPHENS)

WORKERS COMPENSATION NUMBER

**0**

ECFMG NUMBER (NON-U.S./CANADIAN GRADUATE ONLY)        ECFMG CERTIFICATE ISSUE DATE (NON-U.S./CANADIAN GRADUATE ONLY)

3077



| Section 2 | Education and Training |
|---|---|

### UNDERGRADUATE SCHOOL

**Undergraduate School(s)**

Provide the appropriate information for the school that issued your undergraduate degree and all schools attended.

OFFICIAL NAME OF UNDERGRADUATE SCHOOL

ADDRESS

CITY STATE ZIP/POSTAL CODE

COUNTRY CODE TELEPHONE FAX

**Professional School(s)**

Provide the appropriate information for the school that issued your professional degree.

START DATE END DATE (GRADUATION DATE) DEGREE AWARDED

Fifth Pathway Graduates please complete the following sections: U.S. School that issued your certificate, the Non-U.S. School where you attended, and the Fifth Pathway institution where you completed your training on Supplemental Page 20.

DID YOU COMPLETE YOUR UNDERGRADUATE EDUCATION AT THIS SCHOOL? YES NO

### GRADUATE TYPE*:

Code lists are found on pages 35-43. Enter the associated 3-digit code in the space provided.

U.S. OR CANADIAN GRADUATE NON-U.S./CANADIAN GRADUATE FIFTH PATHWAY GRADUATE

### U.S. OR CANADIAN SCHOOL

If you have additional Undergraduate or Professional Schools to report, use the Education Supplemental Form on page 20.

SCHOOL CODE (U.S./CANADIAN ONLY) NAME OF U.S./CANADIAN SCHOOL:

START DATE* END DATE (GRADUATION DATE)* DEGREE AWARDED

DID YOU COMPLETE YOUR GRADUATE EDUCATION AT THIS SCHOOL? YES NO

### NON - U.S. OR CANADIAN SCHOOL

OFFICIAL NAME OF NON-U.S. PROFESSIONAL SCHOOL

ADDRESS

CITY COUNTRY CODE POSTAL CODE

START DATE* END DATE (GRADUATION DATE)* DEGREE AWARDED

DID YOU COMPLETE YOUR GRADUATE EDUCATION AT THIS SCHOOL? YES NO

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 03*



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 2 | Education and Training (Continued) |
|---|---|

**Training**

List all training programs you attended. Use one section per institution.

If you have additional post-graduate training programs, use the Supplemental Training Form on page 21.

Please explain on the Supplemental Professional / Work History Gap Form on page 33 any training gap(s) of three (3) months or greater, or any gap(s) of a shorter duration if required by the organization for which you are being credentialed.

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

SCHOOL CODE (E.G., *AFFILIATED MEDICAL SCHOOL)

INSTITUTION/HOSPITAL NAME (USE BOTH LINES IF REQUIRED)

NUMBER          STREET                                          SUITE/BUILDING

CITY                                    STATE        ZIP/POSTAL CODE

COUNTRY CODE              TELEPHONE                    FAX

DID YOU COMPLETE THIS TRAINING PROGRAM AT THIS INSTITUTION?      YES      NO

(IF NOT, PLEASE USE THE SPACE BELOW TO EXPLAIN.)

List each department separately, if applicable.

List Internship/ Residency, Fellowship and Other programs separately.

INTERNSHIP/RESIDENCY      FELLOWSHIP      OTHER

START DATE                  END DATE

DEPARTMENT/SPECIALTY (DO NOT ABBREVIATE)

NAME OF DIRECTOR

INTERNSHIP/RESIDENCY      FELLOWSHIP      OTHER

START DATE                  END DATE

DEPARTMENT/SPECIALTY (DO NOT ABBREVIATE)

NAME OF DIRECTOR

INTERNSHIP/RESIDENCY      FELLOWSHIP      OTHER

START DATE                  END DATE

DEPARTMENT/SPECIALTY (DO NOT ABBREVIATE)

NAME OF DIRECTOR

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.



\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

## Section 3    Professional / Medical Specialty Information

### Primary Specialty

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

| SPECIALTY CODE | | | INITIAL CERTIFICATION DATE | | DO YOU WISH TO BE LISTED IN THE DIRECTORY UNDER THIS SPECIALTY? | HMO | YES | NO |
|---|---|---|---|---|---|---|---|---|
| BOARD CERTIFIED? | YES | NO | RECERTIFICATION DATE (IF APPLICABLE) | | | PPO | YES | NO |
| CERTIFYING BOARD CODE | | | EXPIRATION DATE (IF APPLICABLE) | | | POS | YES | NO |

| IF NOT BOARD CERTIFIED (SELECT ONE) | I HAVE TAKEN EXAM, RESULTS PENDING FOR | | I INTEND TO SIT FOR AN EXAM ON | | I DO NOT INTEND TO TAKE A CERTIFYING BOARD EXAM. |
|---|---|---|---|---|---|

CERTIFYING BOARD CODE

IF YOU INDICATED THAT YOU DID NOT INTEND TO TAKE A CERTIFYING BOARD EXAM, PLEASE USE THE FOLLOWING SPACE TO EXPLAIN, OTHERWISE LEAVE THE SPACE BLANK.

### Secondary Specialty

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you have additional Professional / Medical Specialties to report, use the Additional Specialties Supplemental Form on page 22.

| SPECIALTY CODE | | | INITIAL CERTIFICATION DATE | | DO YOU WISH TO BE LISTED IN THE DIRECTORY UNDER THIS SPECIALTY? | HMO | YES | NO |
|---|---|---|---|---|---|---|---|---|
| BOARD CERTIFIED? | YES | NO | RECERTIFICATION DATE (IF APPLICABLE) | | | PPO | YES | NO |
| CERTIFYING BOARD CODE | | | EXPIRATION DATE (IF APPLICABLE) | | | POS | YES | NO |

| IF NOT BOARD CERTIFIED (SELECT ONE) | I HAVE TAKEN EXAM, RESULTS PENDING FOR | | I INTEND TO SIT FOR AN EXAM ON | | I DO NOT INTEND TO TAKE A CERTIFYING BOARD EXAM. |
|---|---|---|---|---|---|

CERTIFYING BOARD CODE

IF YOU INDICATED THAT YOU DID NOT INTEND TO TAKE A CERTIFYING BOARD EXAM, PLEASE USE THE FOLLOWING SPACE TO EXPLAIN, OTHERWISE LEAVE THE SPACE BLANK.

\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

## Section 3 — Professional / Medical Specialty Information (Continued)

**Certifications**

Do you hold the following certifications? If yes, provide expiration dates.

| | | | EXPIRATION DATE | | | | | EXPIRATION DATE |
|---|---|---|---|---|---|---|---|---|
| BASIC LIFE SUPPORT?* | YES | NO | | ADV LIFE SUPPORT IN OB?* | YES | NO | | |
| CPR?* | YES | NO | | ADV TRAUMA LIFE SUPPORT?* | YES | NO | | |
| ADV CARDIAC LIFE SPT?* | YES | NO | | PEDIATRIC ADVANCED LIFE SPT?* | YES | NO | | |
| NEONATAL ADVANCED LIFE SPT?* | YES | NO | | | | | | |

**Practice Interests**

Provide additional areas of professional practice interest, activities, procedures, diagnoses or populations.

**Primary Credentialing Contact**

CHECK HERE TO USE THE OFFICE MANAGER AND ADDRESS OF THE PRIMARY PRACTICE LOCATION AS THE CREDENTIALING INFORMATION.

NOTE:

Even if you checked the boxes above, please provide the e-mail address, if available.

LAST NAME

FIRST NAME                                                                                    M.I.

NUMBER            STREET                                                    SUITE/BUILDING

CITY                                                           STATE      ZIP CODE

TELEPHONE                          FAX

E-MAIL ADDRESS

3082



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information |
|---|---|

**Primary Practice Location**

NOTE: IF YOU INDICATED THAT YOU PRACTICE EXCLUSIVELY WITHIN THE INPATIENT SETTING ON PAGE 1, YOU ARE ONLY REQUIRED TO COMPLETE THE CREDENTIALING CONTACT QUESTION ABOVE. SECTION 4 MAY BE LEFT BLANK. YOU MAY PROCEED TO SECTION 5 ON PAGE 11.

If you have additional practice locations, use the Supplemental Practice Location Information Form on pages 25-29.

NOTE: "General Correspondence" refers to any correspondence that might be sent to the provider that does not solely relate to credentialing or billing information.

TIP Your Individual Tax ID is assumed to be your Primary Tax ID unless you specify otherwise to the right.

| CURRENTLY PRACTICING AT THIS ADDRESS?* | YES | NO | PREVIOUS OR FUTURE START DATE? | | | |
|---|---|---|---|---|---|---|

PHYSICIAN GROUP / PRACTICE NAME TO APPEAR IN DIRECTORY (DO NOT ABBREVIATE)*

GROUP / CORPORATE NAME AS IT APPEARS ON W-9, IF DIFFERENT FROM ABOVE (DO NOT ABBREVIATE)

| NUMBER* | STREET* | | SUITE/BUILDING |
|---|---|---|---|

| CITY* | | STATE* | ZIP CODE* |
|---|---|---|---|

| SEND GENERAL CORRESPONDENCE HERE?* | YES | NO | | |
|---|---|---|---|---|

TELEPHONE*      FAX

OFFICE E-MAIL ADDRESS

| | PRIMARY TAX ID (ONE ONLY)* | USE INDIVIDUAL TAX ID | USE GROUP TAX ID |
|---|---|---|---|

INDIVIDUAL TAX ID      GROUP TAX ID

**Office Manager or Business Office Staff Contact**

List each contact separately. You may use the check boxes below for convenience. Do not write instructions like "see above". These responses will be rejected and will require follow-up.

LAST NAME*

FIRST NAME*      M.I.

TELEPHONE*      FAX

E-MAIL ADDRESS

**Billing Contact**

CHECK HERE TO USE OFFICE MANAGER AND OFFICE ADDRESS AS BILLING INFORMATION

NOTE:

Even if you checked the box above, please provide the E-mail Address of the Billing Contact.

LAST NAME*

FIRST NAME*      M.I.

| NUMBER* | STREET* | | SUITE/BUILDING |
|---|---|---|---|

| CITY* | | STATE* | ZIP CODE* |
|---|---|---|---|

TELEPHONE*      FAX

E-MAIL ADDRESS

3083

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information (Continued) |
|---|---|

**Payment and Remittance**

ELECTRONIC BILLING CAPABILITIES?*   YES   NO

BILLING DEPARTMENT (IF HOSPITAL-BASED)

YOUR "CHECK PAYABLE TO" INFORMATION SHOULD BE CONSISTENT WITH YOUR W-9.

CHECK PAYABLE TO*

CHECK HERE TO USE OFFICE MANAGER AND OFFICE ADDRESS AS PAYEE INFORMATION

LAST NAME*

FIRST NAME*                                                                M.I.

NUMBER*        STREET*                                          SUITE/BUILDING

**NOTE:**

Even if you checked the box above, please provide the E-mail Address of the Payee Contact.

CITY*                                                     STATE*    ZIP CODE*

TELEPHONE*              FAX

E-MAIL ADDRESS

**Office Hours**

(USE HHMM FORMAT AND ROUND TO THE NEAREST HALF-HOUR)

| | START | A=AM P=PM | END | A=AM P=PM | | START | A=AM P=PM | END | A=AM P=PM |
|---|---|---|---|---|---|---|---|---|---|---|
| MONDAY | | | | | FRIDAY | | | | |
| TUESDAY | | | | | SATURDAY | | | | |
| WEDNESDAY | | | | | SUNDAY | | | | |
| THURSDAY | | | | | | | | | |

**NOTE:**

After hours back office telephone will be used only by the health plan and will not be published under any circumstances.

24/7 PHONE COVERAGE?*   IF YES                                    AFTER HOURS BACK OFFICE TELEPHONE

YES   NO   ANSWERING SERVICE   VOICE MAIL WITH INSTRUCTIONS TO CALL ANSWERING SERVICE   VOICE MAIL WITH OTHER INSTRUCTIONS

**Open Practice Status**

ACCEPT NEW PATIENTS INTO THIS PRACTICE?*   YES   NO   ACCEPT ALL NEW PATIENTS?*   YES   NO

ACCEPT EXISTING PATIENTS WITH CHANGE OF PAYOR?*   YES   NO   ACCEPT NEW MEDICARE PATIENTS?*   YES   NO

ACCEPT NEW PATIENTS WITH PHYSICIAN REFERRAL?*   YES   NO   ACCEPT NEW MEDICAID PATIENTS?*   YES   NO

IF ANY OF THE ABOVE INFORMATION VARIES BY PLAN, EXPLAIN (USE BOTH LINES IF REQUIRED)

ARE THERE ANY PRACTICE LIMITATIONS?*   GENDER LIMITATIONS   AGE LIMITATIONS   LIST OTHER LIMITATIONS

YES   NO   IF YES   MALE ONLY   NONE   MINIMUM AGE

FEMALE ONLY   MAXIMUM AGE

3084



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information (Continued) |
|---|---|

**Mid-Level Practitioners**

DO MID-LEVEL PRACTITIONERS (NURSE PRACTITIONERS, PHYSICIAN ASSISTANTS, ETC.) CARE FOR PATIENTS IN YOUR PRACTICE?*       , YES       NO

(IF YES, PLEASE PROVIDE THE INFORMATION BELOW)

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME          M.I.     PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER          PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME          M.I.     PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER          PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME          M.I.     PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER          PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME          M.I.     PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER          PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME          M.I.     PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER          PRACTITIONER STATE

3085

* REQUIRED RESPONSE, NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 09*

\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information (Continued) |
|---|---|

## Languages

Code lists are found on pages 37. Enter the associated 3-digit code in the space provided.

**LANGUAGES**

NON-ENGLISH LANGUAGES
SPOKEN BY OFFICE PERSONNEL

| | | | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE |
|---|---|---|---|---|---|---|---|
| INTERPRETERS AVAILABLE?* | YES | NO | LANGUAGES INTERPRETED | | | | |
| | | | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | |

## Accessibilities

DOES THIS OFFICE MEET ADA ACCESSIBILITY REQUIREMENTS?*    YES    NO

| DOES THIS SITE OFFER HANDICAPPED ACCESS FOR THE FOLLOWING | | | DOES THIS SITE OFFER OTHER SERVICES FOR THE DISABLED?* | YES | NO | ACCESSIBLE BY PUBLIC TRANSPORTATION?* | YES | NO |
|---|---|---|---|---|---|---|---|---|
| BUILDING?* | YES | NO | TEXT TELEPHONY (TTY)* | YES | NO | BUS* | YES | NO |
| PARKING?* | YES | NO | AMERICAN SIGN LANGUAGE* | YES | NO | SUBWAY* | YES | NO |
| RESTROOM?* | YES | NO | MENTAL/PHYSICAL IMPAIRMENT SERVICES* | YES | NO | REGIONAL TRAIN* | YES | NO |

OTHER HANDICAPPED ACCESS          OTHER DISABILITY SERVICES          OTHER TRANSPORTATION ACCESS

## Services

Does this location provide any of the following services?

| LABORATORY SERVICES? | YES | NO | IF YES, PROVIDE ACCREDITING/ CERTIFYING PROGRAM (E.G., CLIA, COLA, MLE) | | | | | |
|---|---|---|---|---|---|---|---|---|
| RADIOLOGY SERVICES? | YES | NO | IF YES, PROVIDE X-RAY CERTIFICATION TYPE | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| EKGS? | YES | NO | ALLERGY INJECTIONS? | YES | NO | ALLERGY SKIN TESTING? | YES | NO | ROUTINE OFFICE GYNECOLOGY (PELVIC/PAP)? | YES | NO |
| DRAWING BLOOD? | YES | NO | AGE APPROPRIATE IMMUNIZATIONS? | YES | NO | FLEXIBLE SIGMOIDOSCOPY? | YES | NO | TYMPANOMETR Y/ AUDIOMETRY SCREENING? | YES | NO |
| ASTHMA TREATMENT? | YES | NO | OSTEOPATHIC MANIPULATION? | YES | NO | IV HYDRATION/ TREATMENT? | YES | NO | CARDIAC STRESS TEST? | YES | NO |
| PULMONARY FUNCTION TESTING? | YES | NO | PHYSICAL THERAPY? | YES | NO | CARE OF MINOR LACERATIONS? | YES | NO | | |

| IS ANESTHESIA ADMINISTERED IN YOUR OFFICE? | YES | NO | IF YES, WHAT CLASS/CATEGORY DO YOU USE? |
|---|---|---|---|
| IF YES, WHO ADMINISTERS IT? | | | |

| LAST NAME | FIRST NAME |
|---|---|

| TYPE OF PRACTICE (SELECT ONE ONLY)* | SOLO PRACTICE | SINGLE SPECIALTY GROUP | MULTI-SPECIALTY GROUP |
|---|---|---|---|

ADDITIONAL OFFICE PROCEDURES PROVIDED (INCLUDING SURGICAL PROCEDURES)

\* REQUIRED RESPONSE, NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 10*



\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information (Continued) |
|---|---|

**Partners/ Associates**

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you have additional partners/associates at THIS location, use the Partner/Associate Supplemental Form on page 23. Photocopy as necessary. Be certain to check "Primary Location" at the top of the page.

LIST ALL PARTNERS/ASSOCIATES AT THIS PRACTICE

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

**Covering Colleagues**

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you have additional covering colleagues that are not partners at THIS location, use the Covering Colleagues Supplemental Form on page 24. Photocopy as necessary. Be certain to check "Primary Location" at the top of the page.

LIST ALL COVERING COLLEAGUES THAT ARE <u>NOT</u> PARTNERS/ASSOCIATES AT THIS PRACTICE

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| Section 5 | Hospital Affiliations |
|---|---|

**Admitting Arrangements**

DO YOU HAVE HOSPITAL PRIVILEGES?\*   YES   NO   IF YOU DO NOT ADMIT PATIENTS, WHAT TYPE OF ADMITTING ARRANGEMENTS DO YOU HAVE?

3087

\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 11*



* REQUIRED RESPONSE, NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 5 | Hospital Affiliations (Continued) |
| --- | --- |

**Hospital Privileges**

If applicable, list all hospital affiliations. List primary hospital, then other current affiliations, followed by previous affiliations in chronological order.

If you have additional hospital privileges, use the Supplemental Hospital Privileges Form on page 30.

TIP Be certain your admission percentages add up to 100% for current hospitals. Otherwise, you will have to correct this error.

**PRIMARY HOSPITAL**

HOSPITAL NAME

NUMBER                STREET                                                SUITE/BUILDING

CITY                                                        STATE      ZIP CODE

TELEPHONE                          FAX

DEPARTMENT NAME

DEPARTMENT DIRECTOR'S LAST NAME

DEPARTMENT DIRECTOR'S FIRST NAME                                                M.I.

FULL, UNRESTRICTED PRIVILEGES?   YES   NO   ARE PRIVILEGES TEMPORARY?   YES   NO

AFFILIATION START DATE         AFFILIATION END DATE

OF YOUR TOTAL ANNUAL ADMISSIONS, WHAT PERCENTAGE IS TO THIS HOSPITAL?   %

ADMITTING PRIVILEGE STATUS (E.G. NONE, FULL UNRESTRICTED, PROVISIONAL, TEMPORARY)

**OTHER HOSPITAL**

HOSPITAL NAME

NUMBER                STREET                                                SUITE/BUILDING

CITY                                                        STATE      ZIP CODE

TELEPHONE                          FAX

DEPARTMENT NAME

DEPARTMENT DIRECTOR'S LAST NAME

DEPARTMENT DIRECTOR'S FIRST NAME                                                M.I.

FULL, UNRESTRICTED PRIVILEGES?   YES   NO   ARE PRIVILEGES TEMPORARY?   YES   NO

AFFILIATION START DATE         AFFILIATION END DATE

OF YOUR TOTAL ANNUAL ADMISSIONS, WHAT PERCENTAGE IS TO THIS HOSPITAL?   %

ADMITTING PRIVILEGE STATUS (E.G. NONE, FULL UNRESTRICTED, PROVISIONAL, TEMPORARY)

PLEASE EXPLAIN TERMINATED AFFILIATION

3088



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

## Section 6    Professional Liability Insurance Carrier

**Professional Liability Insurance Carrier**

IMPORTANT
IF YOU DO NOT CARRY MALPRACTICE INSURANCE, CHECK THIS BOX AND SKIP THIS SECTION.

SELF-INSURED?    YES    NO

CARRIER OR SELF-INSURED NAME*

NUMBER*    STREET*    SUITE/BUILDING

CITY*    STATE*    ZIP CODE*

TYPE OF COVERAGE?*    INDIVIDUAL    SHARED

ORIGINAL EFFECTIVE DATE*    EFFECTIVE DATE*    EXPIRATION DATE

DO YOU HAVE UNLIMITED COVERAGE WITH THIS INSURANCE CARRIER?*    YES    NO

AMOUNT OF COVERAGE PER OCCURRENCE    AMOUNT OF COVERAGE AGGREGATE

POLICY INCLUDES TAIL COVERAGE?    YES    NO

POLICY NUMBER*

---

**Professional Liability Insurance Carrier**

List other current, future, or previous carrier(s) if current carrier is less than ten (10) years.

NOTE: A longer period may be required by your healthcare entity.

If you have additional insurance, use the Supplemental Insurance Form on page 31.

SELF-INSURED?    YES    NO

CARRIER OR SELF-INSURED NAME

NUMBER*    STREET*    SUITE/BUILDING

CITY*    STATE*    ZIP CODE*

TYPE OF COVERAGE?*    INDIVIDUAL    SHARED

ORIGINAL EFFECTIVE DATE*    EFFECTIVE DATE*    EXPIRATION DATE

DO YOU HAVE UNLIMITED COVERAGE WITH THIS INSURANCE CARRIER?    YES    NO

AMOUNT OF COVERAGE PER OCCURRENCE    AMOUNT OF COVERAGE AGGREGATE

POLICY INCLUDES TAIL COVERAGE?    YES    NO

POLICY NUMBER*

## Section 7    Work History and References

**Military Duty**

Are you currently on active military duty or military reserve?    YES    NO

**Work History**

Include a chronological work history for the past 10 years.

A longer period may be required by your healthcare entity.

If you have additional work history, use the Supplemental Work History Form on page 32.

WORK HISTORY

PRACTICE / EMPLOYER NAME

NUMBER    STREET    SUITE/BUILDING

CITY    STATE    ZIP/POSTAL CODE

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.    Page 13



\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

## Section 7: Work History and References (Continued)

**Work History**

Do not list current positions. Those should be listed in Section 4.

Include a chronological work history for the past 10 years.

A longer period may be required by your healthcare entity.

If you have additional work history, use the Supplemental Work History Form on page 32.

TELEPHONE       FAX

COUNTRY CODE    START DATE       END DATE

REASON FOR DEPARTURE (IF APPLICABLE)

---

**WORK HISTORY**

PRACTICE / EMPLOYER NAME

NUMBER       STREET                     SUITE/BUILDING

CITY       STATE    ZIP/POSTAL CODE

TELEPHONE       FAX

COUNTRY CODE    START DATE       END DATE

REASON FOR DEPARTURE (IF APPLICABLE)

---

**WORK HISTORY**

PRACTICE / EMPLOYER NAME

NUMBER       STREET                     SUITE/BUILDING

CITY       STATE    ZIP/POSTAL CODE

TELEPHONE       FAX

COUNTRY CODE    START DATE       END DATE

REASON FOR DEPARTURE (IF APPLICABLE)

3090



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

## Section 7 — Work History and References (Continued)

**Gaps in Professional / Work History**

PLEASE EXPLAIN ANY TIME PERIODS OR GAPS IN TRAINING OR WORK HISTORY THAT HAVE OCCURRED SINCE GRADUATION FROM PROFESSIONAL SCHOOL AND ARE LONGER THAN THREE MONTHS IN DURATION OR OF A SHORTER DURATION IF REQUIRED BY THE ORGANIZATION FOR WHICH YOU ARE BEING CREDENTIALED.

GAP START DATE                                    GAP END DATE

If you have additional professional / work history gaps, use the Supplemental Professional Work History Gaps Form on page 33.

**Professional References**

Provide three professional references to whom you are not related or are not partners in your practice.

Code lists are found on pages 36-43. Enter the associated 3-digit code for provider type.

NOTE:

You are required to provide exactly 3 references. Your application will not be complete without this information.

Please check with credentialing entity for any special requirements.

LAST NAME*

FIRST NAME*                                                                          PROVIDER TYPE (CODE PG 36)

NUMBER*            STREET*                                                           APT/SUITE/BUILDING

CITY*                                                               STATE*    ZIP CODE*

TELEPHONE                              FAX

LAST NAME*

FIRST NAME*                                                                          PROVIDER TYPE (CODE PG 36)

NUMBER*            STREET*                                                           APT/SUITE/BUILDING

CITY*                                                               STATE*    ZIP CODE*

TELEPHONE                              FAX

LAST NAME*

FIRST NAME*                                                                          PROVIDER TYPE (CODE PG 36)

NUMBER*            STREET*                                                           APT/SUITE/BUILDING

CITY*                                                               STATE*    ZIP CODE*

TELEPHONE                              FAX

3091

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 15



\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 8 | Disclosure Questions |
|---|---|

**Disclosure Questions**

Answer all questions. For any "Yes" response, provide an explanation on the Supplemental Disclosure Question Explanation Form on page 34.

**Allied Health Providers**

If you are an Allied Health Provider and you do not believe a question is applicable to you, you should answer the question "NO".

**LICENSURE**

1. YES NO Has your license, registration or certification to practice in your profession, ever been voluntarily or involuntarily relinquished, denied, suspended, revoked, restricted, or have you ever been subject to a fine, reprimand, consent order, probation or any conditions or limitations by any state or professional licensing, registration or certification board?*

2. YES NO Has there been any challenge to your licensure, registration or certification?*

**HOSPITAL PRIVILEGES AND OTHER AFFILIATIONS**

3. YES NO Have your clinical privileges or medical staff membership at any hospital or healthcare institution, voluntarily or involuntarily, ever been denied, suspended, revoked, restricted, denied renewal or subject to probationary or to other disciplinary conditions (for reasons other than non-completion of medical record when quality of care was not adversely affected) or have proceedings toward any of those ends been instituted or recommended by any hospital or healthcare institution, medical staff or committee, or governing board?*

4. YES NO Have you voluntarily or involuntarily surrendered, limited your privileges or not reapplied for privileges while under investigation?*

5. YES NO Have you ever been terminated for cause or not renewed for cause from participation, or been subject to any disciplinary action by any managed care organizations (including HMOs, PPOs, or provider organizations such as IPAs, PHOs)?*

**EDUCATION, TRAINING AND BOARD CERTIFICATION**

6. YES NO Were you ever placed on probation, disciplined, formally reprimanded, suspended or asked to resign during an internship, residency, fellowship, preceptorship or other clinical education program? If you are currently in a training program, have you been placed on probation, disciplined, formally reprimanded, suspended or asked to resign?*

7. YES NO Have you ever, while under investigation or to avoid an investigation, voluntarily withdrawn or prematurely terminated your status as a student or employee in any internship, residency, fellowship, preceptorship, or other clinical education program?*

8. YES NO Have any of your board certifications or eligibility ever been revoked?*

9. YES NO Have you ever chosen not to re-certify or voluntarily surrendered your board certification(s) while under investigation?*

**DEA OR STATE CONTROLLED SUBSTANCE REGISTRATION**

10. YES NO Have your Federal DEA and/or State Controlled Dangerous Substances (CDS) certificate(s) or authorization(s) ever been challenged, denied, suspended, revoked, restricted, denied renewal, or voluntarily or involuntarily relinquished?*

**MEDICARE, MEDICAID OR OTHER GOVERNMENTAL PROGRAM PARTICIPATION**

11. YES NO Have you ever been disciplined, excluded from, debarred, suspended, reprimanded, sanctioned, censured, disqualified or otherwise restricted in regard to participation in the Medicare or Medicaid program, or in regard to other federal or state governmental healthcare plans or programs?*

**OTHER SANCTIONS OR INVESTIGATIONS**

12. YES NO Are you currently the subject of an investigation by any hospital, licensing authority, DEA or CDS authorizing entities, education or training program, Medicare or Medicaid program, or any other private, federal or state health program or a defendant in any civil action that is reasonably related to your qualifications, competence, functions, or duties as a medical professional for alleged fraud, such act of violence, child abuse or a sexual offense or sexual misconduct?*

13. YES NO To your knowledge, has information pertaining to you ever been reported to the National Practitioner Data Bank or Healthcare Integrity and Protection Data Bank?*

14. YES NO Have you ever received sanctions from or are you currently the subject of investigation by any regulatory agencies (e.g., CLIA, OSHA, etc.)?*

15. YES NO Have you ever been convicted of, pled guilty to, pled nolo contendere to, sanctioned, reprimanded, restricted, disciplined or resigned in exchange for no investigation or adverse action within the last ten years for sexual harassment or other illegal misconduct?*

16. YES NO Are you currently being investigated or have you ever been sanctioned, reprimanded, or cautioned by a military hospital, facility, or agency, or voluntarily terminated or resigned while under investigation or in exchange for no investigation by a hospital or healthcare facility of any military agency?*

**PROFESSIONAL LIABILITY INSURANCE INFORMATION AND CLAIMS HISTORY**

17. YES NO Has your professional liability coverage ever been cancelled, restricted, declined or not renewed by the carrier based on your individual liability history?*

18. YES NO Have you ever been assessed a surcharge, or rated in a high-risk class for your specialty, by your professional liability insurance carrier, based on your individual liability history?*

3092

\* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 16



* REQUIRED RESPONSE, NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| **Section 8** | **Disclosure Questions (Continued)** |

**Disclosure Questions**

Answer all questions. For any "Yes" response, provide an explanation on the Supplemental Disclosure Question Explanation Form on page 34.

**IMPORTANT**
If you answered "Yes" to question #19, you must complete the Supplemental Malpractice Claims Explanation Form on page 35 for each malpractice claim.

**MALPRACTICE CLAIMS HISTORY**

19.   YES  NO  Have you had any professional liability actions (pending, settled, arbitrated, mediated or litigated) within the past 10 years?* If yes, provide information for each case.

**CRIMINAL/CIVIL HISTORY**

20.   YES  NO  Have you ever been convicted of, pled guilty to, or pled nolo contendere to any felony?*

21.   YES  NO  In the past ten years have you been convicted of, pled guilty to, or pled nolo contendere to any misdemeanor (excluding minor traffic violations) or been found liable or responsible for any civil offense that is reasonably related to your qualifications, competence, functions, or duties as a medical professional, or for fraud, an act of violence, child abuse or a sexual offense or sexual misconduct?*

22.   YES  NO  Have you ever been court-martialed for actions related to your duties as a medical professional?*

    Note: A criminal record will not necessarily be a bar to acceptance. Decisions will be made by each health plan or credentialing organization based upon all the relevant circumstances, including the nature of the crime.

**ABILITY TO PERFORM JOB**

23.   YES  NO  Are you currently engaged in the illegal use of drugs?*
("Currently" means sufficiently recent to justify a reasonable belief that the use of drugs may have an ongoing impact on one's ability to practice medicine. It is not limited to the day of, or within a matter of days or weeks before the date of application, rather that it has occurred recently enough to indicate the individual is actively engaged in such conduct. "Illegal use of drugs" refers to drugs whose possession or distribution is unlawful under the Controlled Substances Act, 21 U.S.C. § 812.22. It "does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provision of Federal law." The term does include, however, the unlawful use of prescription controlled substances.)

24.   YES  NO  Do you use any chemical substances that would in any way impair or limit your ability to practice medicine and perform the functions of your job with reasonable skill and safety?*

25.   YES  NO  Do you have any reason to believe that you would pose a risk to the safety or well being of your patients?*

26.   YES  NO  Are you unable to perform the essential functions of a practitioner in your area of practice even with reasonable accommodation?*

3093

* REQUIRED RESPONSE, NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 17*



# Standard Authorization, Attestation and Release

(Not for Use for Employment Purposes)

I understand and agree that, as part of the credentialing application process for participation, membership and/or clinical privileges (hereinafter, referred to as "Participation") at or with each healthcare organization indicated on the "List of Authorized Organizations" that accompanies this Provider Application (hereinafter, each healthcare organization on the "List of Authorized Organizations" is individually referred to as the "Entity"), and any of the Entity's affiliated entities, I am required to provide sufficient and accurate information for a proper evaluation of my current licensure, relevant training and/or experience, clinical competence, health status, character, ethics, and any other criteria used by the Entity for determining initial and ongoing eligibility for Participation. Each Entity and its representatives, employees, and agent(s) acknowledge that the information obtained relating to the application process will be held confidential to the extent permitted by law.

I acknowledge that each Entity has its own criteria for acceptance, and I may be accepted or rejected by each independently. I further acknowledge and understand that my cooperation in obtaining information and my consent to the release of information do not guarantee that any Entity will grant me clinical privileges or contract with me as a provider of services. I understand that my application for Participation with the Entity is not an application for employment with the Entity and that acceptance of my application by the Entity will not result in my employment by the Entity.

**Authorization of Investigation Concerning Application for Participation.** I authorize the following individuals including, without limitation, the Entity, its representatives, employees, and/or designated agent(s); the Entity's affiliated entities and their representatives, employees, and/or designated agents; and the Entity's designated professional credentials verification organization (collectively referred to as "Agents") to investigate information, which includes both oral and written statements, records, and documents, concerning my application for Participation. I agree to allow the Entity and/or its Agent(s) to inspect and copy all records and documents relating to such an investigation.

**Authorization of Third-Party Sources to Release Information Concerning Application for Participation.** I authorize any third party, including, but not limited to, individuals, agencies, medical groups responsible for credentials verification, corporations, companies, employers, former employers, hospitals, health plans, health maintenance organizations, managed care organizations, law enforcement or licensing agencies, insurance companies, educational and other institutions, military services, medical credentialing and accreditation agencies, professional medical societies, the Federation of State Medical Boards, the National Practitioner Data Bank, and the Health Care Integrity and Protection Data Bank, to release to the Entity and/or its Agent(s), information, including otherwise privileged or confidential information, concerning my professional qualifications, credentials, clinical competence, quality assurance and utilization data, character, mental condition, physical condition, alcohol or chemical dependency diagnosis and treatment, ethics, behavior, or any other matter reasonably having a bearing on my qualifications for Participation in, or with, the Entity. I authorize my current and past professional liability carrier(s) to release my history of claims that have been made and/or are currently pending against me. I specifically waive written notice from any entities and individuals who provide information based upon this Authorization, Attestation and Release.

**Authorization of Release and Exchange of Disciplinary Information.** I hereby further authorize any third party at which I currently have Participation or had Participation and/or each third party's agents to release "Disciplinary Information," as defined below, to the Entity and/or its Agent(s). I hereby further authorize the Agent(s) to release Disciplinary Information about any disciplinary action taken against me to its participating Entities at which I have Participation, and as may be otherwise required by law. As used herein, "Disciplinary Information" means information concerning (i) any action taken by such health care organizations, their administrators, or their medical or other committees to revoke, deny, suspend, restrict, or condition my Participation or impose a corrective action plan; (ii) any other disciplinary action involving me, including, but not limited to, discipline in the employment context; or (iii) my resignation prior to the conclusion of any disciplinary proceedings or prior to the commencement of formal charges, but after I have knowledge that such formal charges were being (or are being) contemplated and/or were (or are) in preparation.

**Release from Liability.** I release from all liability and hold harmless any Entity, its Agent(s), and any other third party for their acts performed in good faith and without malice unless such acts are due to the gross negligence or willful misconduct of the Entity, its Agent(s), or other third party in connection with the gathering, release and exchange of, and reliance upon, information used in accordance with this Authorization, Attestation and Release; I further agree not to sue any Entity, any Agent(s), or any other third party for their acts, defamation or any other claims based on statements made in good faith and without malice or misconduct of such Entity, Agent(s) or third party in connection with the credentialing process. This release shall be in addition to, and in no way shall limit, any other applicable immunities provided by law for peer review and credentialing activities. In this Authorization, Attestation and Release, all references to the Entity, its Agent(s), and/or other third party include their respective employees, directors, officers, advisors, counsel, and agents. The Entity or any of its affiliates or agents retains the right to allow access to the application information for purposes of a credentialing audit to customers and/or their auditors to the extent required in connection with an audit of the credentialing processes and provided that the customer and/or their auditor executes an appropriate confidentiality agreement. I understand and agree that this Authorization, Attestation and Release is irrevocable for any period during which I am an applicant for Participation at an Entity, a member of an Entity's medical or health care staff, or a participating provider of an Entity. I agree to execute another form of consent if law or regulation limits the application of this irrevocable authorization. I understand that my failure to promptly provide another consent may be grounds for termination or discipline by the Entity in accordance with the applicable bylaws, rules, and regulations, and requirements of the Entity, or grounds for my termination of Participation at or with the Entity. I agree that information obtained in accordance with the provisions of this Authorization, Attestation and Release is not and will not be a violation of my privacy.

I certify that all information provided by me in my application is current, true, correct, accurate and complete to the best of my knowledge and belief, and is furnished in good faith. I will notify the Entity and/or its Agent(s) within 10 days of any material changes to the information (including any changes/challenges to licenses, DEA, insurance, malpractice claims, NPDB/HIPDB reports, discipline, criminal convictions, etc.) I have provided in my application or authorized to be released pursuant to the credentialing process. I understand that corrections to the application are permitted at any time prior to a determination of Participation by the Entity, and must be submitted online or in writing, and must be dated and signed by me (may be a written or an electronic signature). I acknowledge that the Entity will not process an application until they deem it to be a complete application and that I am responsible to provide a complete application and to produce adequate and timely information for resolving questions that arise in the application process. I understand and agree that any material misstatement or omission in the application may constitute grounds for withdrawal of the application from consideration; denial or revocation of Participation; and/or immediate suspension or termination of Participation. This action may be disclosed to the Entity and/or its Agent(s). I further acknowledge that I have read and understand the foregoing Authorization, Attestation and Release and that I have access to the bylaws of applicable medical staff organizations and agree to abide by these bylaws, rules and regulations. I understand and agree that a facsimile or photocopy of this Authorization, Attestation and Release shall be as effective as the original.

_____            _____
Signature*                                              Name (print)*

DATE SIGNED*

3094

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.



# Professional IDs
# Supplemental Form

| Section 1 | Personal Information and Professional IDs |
|---|---|

**Professional IDs**

Include all additional state licenses, DEA Registration and State Controlled Dangerous Substance (CDS) certification numbers.

Provide all current and previous licenses/certifications.

If you need to report additional Professional IDs, photocopy this page as needed and submit as instructed.

FEDERAL DEA NUMBER

DEA ISSUE DATE

DEA STATE OF REGISTRATION

DEA EXPIRATION DATE

FEDERAL DEA NUMBER

DEA ISSUE DATE

DEA STATE OF REGISTRATION

DEA EXPIRATION DATE

CDS CERTIFICATE NUMBER

CDS ISSUE DATE

CDS STATE OF REGISTRATION

CDS EXPIRATION DATE

CDS CERTIFICATE NUMBER

CDS ISSUE DATE

CDS STATE OF REGISTRATION

CDS EXPIRATION DATE

STATE LICENSE NUMBER

LICENSE ISSUING STATE    LICENSE ISSUE DATE

IF THIS IS A STATE LICENSE, ARE YOU CURRENTLY PRACTICING IN THIS STATE?    YES    NO

LICENSE EXPIRATION DATE

Code list is found on page 36; use license status codes. Enter 3-digit code in space provided.
LICENSE STATUS CODE

Code list is found on page 36; use provider type codes. Enter 3-digit code in space provided.
LICENSE TYPE

STATE LICENSE NUMBER

LICENSE ISSUING STATE    LICENSE ISSUE DATE

IF THIS IS A STATE LICENSE, ARE YOU CURRENTLY PRACTICING IN THIS STATE?    YES    NO

LICENSE EXPIRATION DATE

Code list is found on page 36; use license status codes. Enter 3-digit code in space provided.
LICENSE STATUS CODE

Code list is found on page 36; use provider type codes. Enter 3-digit code in space provided.
LICENSE TYPE

* REQUIRED RESPONSE (IF THIS PAGE IS USED), NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 19
Std. App. v.5.0

# Other Relevant Education
## Supplemental Form



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 2 | Education and Training |
|---|---|

**Fifth Pathway Education**

**FIFTH PATHWAY GRADUATES ONLY**

INSTITUTION/HOSPITAL WHERE U.S. CLINICAL TRAINING WAS PERFORMED  (DO NOT ABBREVIATE)

ADDRESS

CITY                                                                                    STATE          ZIP CODE

TELEPHONE                                         FAX

DID YOU COMPLETE YOUR
EDUCATION AT THIS SCHOOL?          YES     NO

START DATE                              END DATE (GRADUATION DATE)

---

**Other Relevant Education**

If you need to report additional Education, photocopy this page as needed and submit as instructed.

INSTITUTION/SCHOOL ISSUING DEGREE (DO NOT ABBREVIATE)

NUMBER                    STREET                                                            SUITE/BUILDING

CITY                                                          STATE          ZIP/POSTAL CODE

TELEPHONE                                         FAX

COUNTRY CODE        START DATE                    END DATE (GRADUATION DATE)        DEGREE AWARDED

DID YOU COMPLETE YOUR
EDUCATION AT THIS SCHOOL?          YES     NO

---

INSTITUTION/SCHOOL ISSUING DEGREE (DO NOT ABBREVIATE)

NUMBER                    STREET                                                            SUITE/BUILDING

CITY                                                          STATE          ZIP/POSTAL CODE

TELEPHONE                                         FAX

COUNTRY CODE        START DATE                    END DATE (GRADUATION DATE)        DEGREE AWARDED

DID YOU COMPLETE YOUR
EDUCATION AT THIS SCHOOL?          YES     NO

3079

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 20

Std. App. v.5.0

# Other Training
## Supplemental Form



\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 2 | Education and Training |
|---|---|

**Training**

List all postgraduate training programs you attended. Use one section per institution.

If you need to report additional Training, photocopy this page as needed and submit as instructed.

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

INSTITUTION / HOSPITAL NAME  (USE BOTH LINES IF REQUIRED)

SCHOOL CODE (E.G., AFFILIATED MEDICAL SCHOOL)

NUMBER          STREET                                                SUITE/BUILDING

CITY                                  STATE      ZIP/POSTAL CODE

COUNTRY CODE                TELEPHONE                              FAX

DID YOU COMPLETE THIS TRAINING PROGRAM AT THIS INSTITUTION?          YES      NO

(IF NOT, PLEASE USE THE SPACE BELOW TO EXPLAIN.)

---

List each department separately, if applicable.

List Internship/ Residency, Fellowship and Other programs separately.

INTERNSHIP/ RESIDENCY          FELLOWSHIP          OTHER

START DATE                    END DATE

DEPARTMENT/SPECIALTY (DO NOT ABBREVIATE)

NAME OF DIRECTOR

INTERNSHIP/ RESIDENCY          FELLOWSHIP          OTHER

START DATE                    END DATE

DEPARTMENT/SPECIALTY (DO NOT ABBREVIATE)

NAME OF DIRECTOR

INTERNSHIP/ RESIDENCY          FELLOWSHIP          OTHER

START DATE                    END DATE

DEPARTMENT/SPECIALTY (DO NOT ABBREVIATE)

NAME OF DIRECTOR

3096

\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 21*

Std. App. v.5.0



# Additional Specialty
## Supplemental Form

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 3 | Professional / Medical Specialty Information |
|---|---|

**Additional Specialty**

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

| SPECIALTY CODE | | INITIAL CERTIFICATION DATE | | DO YOU WISH TO BE LISTED IN THE DIRECTORY UNDER THIS SPECIALTY? | HMO | YES | NO |
| BOARD CERTIFIED? | YES NO | RECERTIFICATION DATE (IF APPLICABLE) | | | PPO | YES | NO |
| CERTIFYING BOARD CODE | | EXPIRATION DATE (IF APPLICABLE) | | | POS | YES | NO |

IF NOT BOARD CERTIFIED (SELECT ONE)   I HAVE TAKEN EXAM, RESULTS PENDING FOR _____   I INTEND TO SIT FOR AN EXAM ON _____   I DO NOT INTEND TO TAKE A CERTIFYING BOARD EXAM

CERTIFYING BOARD CODE

IF YOU INDICATED THAT YOU DID NOT INTEND TO TAKE A CERTIFYING BOARD EXAM, PLEASE USE THE FOLLOWING SPACE TO EXPLAIN, OTHERWISE LEAVE THE SPACE BLANK.

**Additional Specialty**

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you need to report additional Specialties, photocopy this page as needed and submit as instructed.

| SPECIALTY CODE | | INITIAL CERTIFICATION DATE | | DO YOU WISH TO BE LISTED IN THE DIRECTORY UNDER THIS SPECIALTY? | HMO | YES | NO |
| BOARD CERTIFIED? | YES NO | RECERTIFICATION DATE (IF APPLICABLE) | | | PPO | YES | NO |
| CERTIFYING BOARD CODE | | EXPIRATION DATE (IF APPLICABLE) | | | POS | YES | NO |

IF NOT BOARD CERTIFIED (SELECT ONE)   I HAVE TAKEN EXAM, RESULTS PENDING FOR _____   I INTEND TO SIT FOR AN EXAM ON _____   I DO NOT INTEND TO TAKE A CERTIFYING BOARD EXAM.

CERTIFYING BOARD CODE

IF YOU INDICATED THAT YOU DID NOT INTEND TO TAKE A CERTIFYING BOARD EXAM, PLEASE USE THE FOLLOWING SPACE TO EXPLAIN, OTHERWISE LEAVE THE SPACE BLANK.

3097

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 22
Std. App. v.5.0

# Partners/Associates
## Supplemental Form

\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.



| **Section 4** | **Practice Location Information** |
|---|---|
| **Partner/ Associates** | **SPECIFY PRACTICE LOCATION**  INDICATE THE PRACTICE LOCATION TO WHICH YOU ARE ASSOCIATING THESE PROVIDERS. |

Use this page to report additional partners/associates at the designated practice location.

**IMPORTANT**

In the box provided, indicate to which practice location this page belongs.

Check "Covering Colleague?" if he/she provides coverage for you at THIS location.

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you need to report additional partners/associates, photocopy this page as needed and submit as instructed.

→ **LOCATION #**   **PRIMARY PRACTICE**   PRACTICE NAME

PRACTICE ADDRESS

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
|---|---|---|
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

3098

\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 23*

# Covering Colleagues
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information |
|---|---|

**Covering Colleagues**

Include all colleagues providing regular coverage and his/her specialty, including if he/she is a partner in one or more of your practice locations.

**IMPORTANT**

In the box provided, indicate to which practice location this page belongs.

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you need to report additional Covering Colleagues, photocopy this page as needed and submit as instructed.

SPECIFY PRACTICE LOCATION   INDICATE THE PRACTICE LOCATION TO WHICH YOU ARE ASSOCIATING THESE PROVIDERS.

LOCATION #        PRIMARY PRACTICE   PRACTICE NAME

PRACTICE ADDRESS

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

LAST NAME                                                    SPECIALTY CODE

FIRST NAME                                          M.I.   PROVIDER TYPE (CODE PG 36)

3099

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 24*

# Practice Location Information
## Supplemental Form



\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information - Page 1 of 5 |
|---|---|

**Additional Practice Location**

➤ LOCATION\* #

CURRENTLY PRACTICING AT THIS ADDRESS?\*   YES   NO   PREVIOUS OR FUTURE START DATE?

**IMPORTANT**

In the box provided, indicate to which practice location this page belongs.

For example, if you practice at three locations, the primary location is reported in the main application and remaining locations would be reported on Supplemental Forms as Location 2 and Location 3.

PHYSICIAN GROUP / PRACTICE NAME TO APPEAR IN DIRECTORY (DO NOT ABBREVIATE)\*

GROUP / CORPORATE NAME AS IT APPEARS ON W-9, IF DIFFERENT FROM ABOVE (DO NOT ABBREVIATE)

NUMBER\*   STREET\*   SUITE/BUILDING

CITY\*   STATE\*   ZIP CODE\*

SEND GENERAL CORRESPONDENCE HERE?\*   YES   NO

TELEPHONE\*   FAX

**TIP** Your Individual Tax ID is assumed to be your Primary Tax ID unless you specify otherwise to the right.

OFFICE E-MAIL ADDRESS

PRIMARY TAX ID (ONE ONLY)\*   USE INDIVIDUAL TAX ID   USE GROUP TAX ID

INDIVIDUAL TAX ID   GROUP TAX ID

**Office Manager or Business Office Contact**

List each contact separately. You may use the check boxes below for convenience. Do not write instructions like "see above". These responses will be rejected and will require follow-up.

LAST NAME\*

FIRST NAME\*   M.I.

TELEPHONE\*   FAX

E-MAIL ADDRESS

**Billing Contact**

CHECK HERE TO USE OFFICE MANAGER AND OFFICE ADDRESS AS BILLING INFORMATION

LAST NAME\*

FIRST NAME\*   M.I.

NUMBER\*   STREET\*   SUITE/BUILDING

**NOTE:**

Even if you checked the boxes above, please provide the e-mail address of the Billing Contact, if available.

CITY\*   STATE\*   ZIP CODE\*

TELEPHONE\*   FAX

E-MAIL ADDRESS



3100

\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 25

# Practice Location Information
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information - Page 2 of 5 |
|---|---|

**Add'l Practice Location** (Cont.)

**LOCATION* #**

**Payment and Remittance**

ELECTRONIC BILLING CAPABILITIES?*  YES  NO

BILLING DEPARTMENT (IF HOSPITAL-BASED)

YOUR "CHECK PAYABLE TO" INFORMATION SHOULD BE CONSISTENT WITH YOUR W-9.

CHECK PAYABLE TO*

CHECK HERE TO USE OFFICE MANAGER AND OFFICE ADDRESS AS BILLING INFORMATION

LAST NAME*

FIRST NAME*  M.I.

NUMBER*  STREET*  SUITE/BUILDING

**NOTE:**

Even if you checked the boxes above, please provide the E-mail Address, Department Name, Electronic Billing and Check Payable To, if applicable.

CITY*  STATE*  ZIP CODE*

TELEPHONE*  FAX

E-MAIL ADDRESS

**Office Hours**

(USE HHMM FORMAT AND ROUND TO THE NEAREST HALF-HOUR)

|  | START | A=AM P=PM | END | A=AM P=PM |  | START | A=AM P=PM | END | A=AM P=PM |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY |  |  |  |  | FRIDAY |  |  |  |  |
| TUESDAY |  |  |  |  | SATURDAY |  |  |  |  |
| WEDNESDAY |  |  |  |  | SUNDAY |  |  |  |  |
| THURSDAY |  |  |  |  |  |  |  |  |  |

**NOTE:**

After hours back office telephone will be used only by the health plan and will not be published under any circumstances.

24/7 PHONE COVERAGE?*  IF YES  AFTER HOURS BACK OFFICE TELEPHONE

YES  NO  ANSWERING SERVICE  VOICE MAIL WITH INSTRUCTIONS TO CALL ANSWERING SERVICE  VOICE MAIL WITH OTHER INSTRUCTIONS

**Open Practice Status**

ACCEPT NEW PATIENTS INTO THIS PRACTICE?*  YES  NO  ACCEPT ALL NEW PATIENTS?*  YES  NO

ACCEPT EXISTING PATIENTS WITH CHANGE OF PAYOR?*  YES  NO  ACCEPT NEW MEDICARE PATIENTS?*  YES  NO

ACCEPT NEW PATIENTS WITH PHYSICIAN REFERRAL?*  YES  NO  ACCEPT NEW MEDICAID PATIENTS?*  YES  NO

IF ANY OF THE ABOVE VARIES BY PLAN, EXPLAIN

ARE THERE ANY PRACTICE LIMITATIONS?*  IF YES  GENDER LIMITATIONS  AGE LIMITATIONS  LIST OTHER LIMITATIONS

YES  NO  MALE ONLY  NONE  MINIMUM AGE

FEMALE ONLY  MAXIMUM AGE

3101

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

**Page 26**

Std. App. v.5.0

# Practice Location Information
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information - Page 3 of 5 |
|---|---|

**Additional Practice Location** (Continued)

**IMPORTANT**

In the box provided, indicate to which practice location this page belongs.

**Mid-Level Practitioners**

LOCATION* #

DO MID-LEVEL PRACTITIONERS (NURSE PRACTITIONERS, PHYSICIAN ASSISTANTS, ETC.) CARE FOR PATIENTS IN YOUR PRACTICE?*     YES     NO

(IF YES, PLEASE PROVIDE THE INFORMATION BELOW)

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME                                M.I.    PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER               PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME                                M.I.    PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER               PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME                                M.I.    PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER               PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME                                M.I.    PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER               PRACTITIONER STATE

PRACTITIONER LAST NAME

PRACTITIONER FIRST NAME                                M.I.    PRACTITIONER TYPE (E.G., PA, CNP, NP)

PRACTITIONER LICENSE / CERTIFICATE NUMBER               PRACTITIONER STATE

3102

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 27*
Std. App. v 5.0

# Practice Location Information
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED), NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information - Page 4 of 5 |
|---|---|

**Additional Practice Location** (Continued)

**IMPORTANT**
In the box provided, indicate to which practice location this page belongs.

➤ **LOCATION\* #**

### LANGUAGES

NON-ENGLISH LANGUAGES SPOKEN BY OFFICE PERSONNEL

| | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE |
|---|---|---|---|---|---|
| INTERPRETERS AVAILABLE\* | YES | NO | LANGUAGES INTERPRETED | :: | |

| | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE | LANGUAGE CODE |
|---|---|---|---|---|

### Accessibilities

DOES THIS OFFICE MEET ADA ACCESSIBILITY REQUIREMENTS?*    YES    NO

DOES THIS SITE OFFER HANDICAPPED ACCESS FOR THE FOLLOWING

| | | | DOES THIS SITE OFFER OTHER SERVICES FOR THE DISABLED?* | YES | NO | ACCESSIBLE BY PUBLIC TRANSPORTATION?* | YES | NO |
|---|---|---|---|---|---|---|---|---|
| BUILDING?* | YES | NO | TEXT TELEPHONY (TTY)* | YES | NO | BUS* | YES | NO |
| PARKING?* | YES | NO | AMERICAN SIGN LANGUAGE* | YES | NO | SUBWAY* | YES | NO |
| RESTROOM?* | YES | NO | MENTAL/PHYSICAL IMPAIRMENT SERVICES* | YES | NO | REGIONAL TRAIN* | YES | NO |
| OTHER HANDICAPPED ACCESS | | | OTHER DISABILITY SERVICES | | | OTHER TRANSPORTATION ACCESS | | |

### Services

Does this location provide any of the following services?

| LABORATORY SERVICES? | YES | NO | IF YES, PROVIDE ACCREDITING/ CERTIFYING PROGRAM (E.G., CLIA, COLA, MLE) | | | | | |
|---|---|---|---|---|---|---|---|---|
| RADIOLOGY SERVICES? | YES | NO | IF YES, PROVIDE X-RAY CERTIFICATION TYPE | | | | | |
| EKGS? | YES | NO | ALLERGY INJECTIONS? | YES | NO | ALLERGY SKIN TESTING? | YES | NO | ROUTINE OFFICE GYNECOLOGY (PELVIC/PAP)? | YES | NO |
| DRAWING BLOOD? | YES | NO | AGE APPROPRIATE IMMUNIZATIONS? | YES | NO | FLEXIBLE SIGMOIDOSCOPY? | YES | NO | TYMPANOMETRY/AUDIOMETRY SCREENING? | YES | NO |
| ASTHMA TREATMENT? | YES | NO | OSTEOPATHIC MANIPULATION? | YES | NO | IV HYDRATION/ TREATMENT? | YES | NO | CARDIAC STRESS TEST? | YES | NO |
| PULMONARY FUNCTION TESTING? | YES | NO | PHYSICAL THERAPY? | YES | NO | CARE OF MINOR LACERATIONS? | YES | NO | | | |

| IS ANESTHESIA ADMINISTERED IN YOUR OFFICE? | YES | NO | IF YES, WHAT CLASS/CATEGORY DO YOU USE? |
|---|---|---|---|

IF YES, WHO ADMINISTERS IT?

| LAST NAME | | FIRST NAME |
|---|---|---|

| TYPE OF PRACTICE (SELECT ONE ONLY)* | SOLO PRACTICE | SINGLE SPECIALTY GROUP | MULTI-SPECIALTY GROUP |
|---|---|---|---|

ADDITIONAL OFFICE PROCEDURES PROVIDED (INCLUDING SURGICAL PROCEDURES)

3103

* REQUIRED RESPONSE (IF THIS PAGE IS USED), NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 28*

Std. App. v.5.0

# Practice Location Information
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 4 | Practice Location Information - Page 5 of 5 |

**Additional Practice Location** (Continued)

**IMPORTANT**

In the box provided, indicate to which practice location this page belongs.

If you have additional partners/associates at THIS location, use the Partner/Associate Supplemental Form on page 23. Photocopy as necessary. Be certain to indicate the Practice Location Number at the top of the page.

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

➤ **LOCATION* #**

**LIST ALL PARTNERS/ASSOCIATES AT THIS PRACTICE**

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

| LAST NAME | | SPECIALTY CODE | COVERING COLLEAGUE (Y/N)? |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) | |

**Covering Colleagues**

Code lists are found on pages 36-43. Enter the associated 3-digit code in the space provided.

If you have additional covering colleagues that are not partners at THIS location, use the Covering Colleagues Supplemental Form on page 24. Photocopy as necessary. Be certain to indicate the Practice Location Number at the top of the page.

**LIST ALL COVERING COLLEAGUES THAT ARE NOT PARTNERS/ASSOCIATES AT THIS PRACTICE**

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | M.I. | PROVIDER TYPE (CODE PG 36) |

| LAST NAME | | SPECIALTY CODE |
| FIRST NAME | - M.I. | PROVIDER TYPE (CODE PG 36) |

3104

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 29*

# Hospital Privileges (Current)
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 5 | Hospital Affiliations |
|---|---|

**Hospital Privileges**

Use this form to continue listing hospitals where you currently have privileges.

If you need to report additional space for Hospital Privileges, photocopy this page as needed and submit as instructed.

TIP Be certain your admission percentages add up to 100% for current hospitals. Otherwise, you will have to correct this error.

OTHER HOSPITAL

HOSPITAL NAME

NUMBER          STREET                                          SUITE/BUILDING

CITY                                              STATE    ZIP CODE

TELEPHONE                        FAX

DEPARTMENT NAME

DEPARTMENT DIRECTOR'S LAST NAME

DEPARTMENT DIRECTOR'S FIRST NAME                                    M.I.

FULL, UNRESTRICTED PRIVILEGES?    YES    NO    ARE PRIVILEGES TEMPORARY?    YES    NO

AFFILIATION START DATE          AFFILIATION END DATE

OF YOUR TOTAL ANNUAL ADMISSIONS, WHAT PERCENTAGE IS TO THIS HOSPITAL?    %

ADMITTING PRIVILEGE STATUS (E.G. NONE, FULL UNRESTRICTED, PROVISIONAL, TEMPORARY)

PLEASE EXPLAIN TERMINATED AFFILIATION

THIS SPACE HAS BEEN PURPOSELY LEFT BLANK

3105

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 30

# Professional Liability Insurance Carrier
## Supplemental Form



* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 6 | Professional Liability Insurance Carrier |
|---|---|

**Other Professional Liability Insurance Carrier**

List secondary / second layer / future or previous carrier(s).

For second layer coverage list name of hospital/organization providing coverage

SELF-INSURED?     YES     NO

CARRIER OR SELF-INSURED NAME

NUMBER*          STREET*                                    SUITE/BUILDING

CITY*                                        STATE*     ZIP CODE*

TYPE OF COVERAGE?*     INDIVIDUAL     SHARED

ORIGINAL EFFECTIVE DATE*     EFFECTIVE DATE*          EXPIRATION DATE

DO YOU HAVE UNLIMITED COVERAGE WITH THIS INSURANCE CARRIER?     YES     NO

AMOUNT OF COVERAGE PER OCCURRENCE     AMOUNT OF COVERAGE AGGREGATE

POLICY INCLUDES TAIL COVERAGE?     YES     NO

POLICY NUMBER*

---

**Other Professional Liability Insurance Carrier**

List secondary / second layer / future or previous carrier(s).

For second layer coverage list name of hospital/organization providing coverage

If you need additional space for Insurance Coverage, photocopy this page as needed and submit as instructed.

SELF-INSURED?     YES     NO

CARRIER OR SELF-INSURED NAME

NUMBER*          STREET*                                    SUITE/BUILDING

CITY*                                        STATE*     ZIP CODE*

TYPE OF COVERAGE?*     INDIVIDUAL     SHARED

ORIGINAL EFFECTIVE DATE*     EFFECTIVE DATE*          EXPIRATION DATE

DO YOU HAVE UNLIMITED COVERAGE WITH THIS INSURANCE CARRIER?     YES     NO

AMOUNT OF COVERAGE PER OCCURRENCE     AMOUNT OF COVERAGE AGGREGATE

POLICY INCLUDES TAIL COVERAGE?     YES     NO

POLICY NUMBER*

3106

* REQUIRED RESPONSE. NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

Page 31
Std. App. v 5.0

# Work History
## Supplemental Form



★ REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 7 | Work History |
|-----------|--------------|

**Work History**

Use this form to continue listing work history.

If you need additional space for Work History, photocopy this page as needed and submit as instructed.

**WORK HISTORY**

PRACTICE / EMPLOYER NAME

NUMBER          STREET                                                   SUITE/BUILDING

CITY                                          STATE        ZIP/POSTAL CODE

TELEPHONE                         FAX

COUNTRY CODE      START DATE            END DATE

REASON FOR DEPARTURE (IF APPLICABLE)

---

**WORK HISTORY**

PRACTICE / EMPLOYER NAME

NUMBER          STREET                                                   SUITE/BUILDING

CITY                                          STATE        ZIP/POSTAL CODE

TELEPHONE                         FAX

COUNTRY CODE      START DATE            END DATE

REASON FOR DEPARTURE (IF APPLICABLE)

# Professional Training / Work History Gaps
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 7 | Professional Training / Work History Gaps |
|---|---|

**Professional Training / Work History Gaps**

Please explain any time periods or gaps in training or work history that have occurred since graduation from professional school and are longer than three month in duration or of a shorter duration if required by the organization for which you are being credentialed:

GAP START DATE        GAP END DATE

GAP START DATE        GAP END DATE

GAP START DATE        GAP END DATE

GAP START DATE        GAP END DATE

GAP START DATE        GAP END DATE

3108

* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 33*

Std. App. v.5.0

# Disclosure Questions
## Supplemental Form



* REQUIRED RESPONSE (IF THIS PAGE IS USED), NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 8 | Disclosure Questions |
|---|---|
| **Disclosure Questions** | QUESTION #　EXPLANATION |

**Disclosure Questions**

Use this form to report any "Yes" response to one or more of the Disclosure Questions in Section 8. Your response should not exceed the spaces provided.

Record the question number in the first column, then your explanation in the second column.

If you need additional space to explain a Yes response, photocopy this page as needed and submit as instructed.

QUESTION #　EXPLANATION

QUESTION #　EXPLANATION

# Malpractice Claims Explanation
## Supplemental Form



\* REQUIRED RESPONSE (IF THIS PAGE IS USED). NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

| Section 8 | Malpractice Claims Explanation |
|---|---|

**Malpractice Claims Explanation**

Use this form to report any "Yes" response to Disclosure Question #19.

If you need additional space to explain a Yes response, photocopy this page as needed and submit as instructed.

DATE OF OCCURRENCE*                    DATE CLAIM WAS FILED*

STATUS OF CLAIM* (NOTE: IF CASE IS PENDING, SELECT OPEN)

OPEN        CLOSED            IF SETTLED, ENTER DATE CLAIM WAS SETTLED

PROFESSIONAL LIABILITY CARRIER INVOLVED* (USE BOTH LINES IF NECESSARY)

NUMBER*              STREET*                                                SUITE/BUILDING

CITY*                                                        STATE*      ZIP CODE*

TELEPHONE                          POLICY NUMBER

METHOD OF RESOLUTION?*        DISMISSED        SETTLED        MEDIATION        ARBITRATION

AMOUNT OF AWARD OR SETTLEMENT*        JUDGMENT FOR DEFENDANT(S)        JUDGMENT FOR PLAINTIFF(S)

DESCRIPTION OF ALLEGATIONS* (USE ALL FOUR LINES BELOW, IF NECESSARY)

WERE YOU THE PRIMARY DEFENDANT OR CO-DEFENDANT?*        PRIMARY DEFENDANT        CO-DEFENDANT        NUMBER OF OTHER CO-DEFENDANTS (IF ANY)

YOUR INVOLVEMENT IN CASE* (ATTENDING, CONSULTING, ETC)

DESCRIPTION OF ALLEGED INJURY TO THE PATIENT (USE ALL FOUR LINES BELOW, IF NECESSARY)

DID THE ALLEGED INJURY RESULT IN DEATH?        YES        NO        TO THE BEST OF YOUR KNOWLEDGE, IS THE CASE INCLUDED IN THE NATIONAL PRACTITIONER DATA BANK (NPDB)?*        YES        NO

3110

\* REQUIRED RESPONSE (IF THIS PAGE IS USED), NO RESPONSE MAY CAUSE PROCESSING DELAYS AND REQUIRE FOLLOW-UP.

*Page 35*
Std. App. v 5.0

# 8. Dr. Durrani Journey Lite Application



ASCIRA Partners, LLC
Policy and Procedures

JourneyLife of Cincinnati, LLC
10475 Reading Road, Suite 115
Cincinnati, Ohio 45241

INITIAL APPLICATION FOR STAFF PRIVILEGES
[Please Print or Type]

## GENERAL INFORMATION

Last Name: Durrani   First Name: AbubaKaR   Middle Name: Atiq

Sex: X Male ___ Female (Photo Attached)  Date of Birth: 8-29-1968  Birth Place: Multan. Pak.

Citizenship: Pakistan   Social Security Number: 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

Professional Group Name: Center For Advanced Spine Technologies

Office Address: 4555 Lake Forest   Home Address: 4800 Bethany RD.

Address/Suite: 150   P.O. Box: _____

City: Cinti  State: Ohio  Zip: 45242  City: Mason  State: Ohio  Zip: 45040

Office Phone Number: (513) 281-2278   Home Phone Number: (513) 256-6372

Exchange: ( ) ___ - ___   Specialty: Orthopedic Spine & Neck Surgery

Fax: (513) 221-8219   Medicare Provider Number: 4180852

Email Address: adurrani@castwood.org  ContactPerson: Julie Hartmann

NPI Number: 1588869700   U-PIN Number: _____   ECFMG Number: 0-436-459-2

## MEDICAL LICENSURE – CERTIFICATION INFORMATION

State License Issued: Ohio   Number: 35-085087   Expire Date: 4-1-2013

Controlled Substances Certification Number: _____   Expire Date: _____

DEA Number: BD7432115   Expire Date: 6-30-2013

Other State Licenses Held [provide on separate sheet listing State Name, License Number, Expire Dates]

Specialty Certification – Name of Board: Aur. Board Of Orth. Surg.  Date of Certification: 7-07

If not certified are you Board Eligible: ___ Yes ___ No  Comments: _____

## EDUCATION INFORMATION
[Provided additional information in resume and attach]

Premedical - University Name: Government College   City: Multan   State: Pakistan

Degree: _____   Date of Graduation: 1985

ASCIRA Partners, LLC
Policy and Procedures

JourneyLite of Cincinnati, LLC
10475 Reading Road, Suite 115
Cincinnati, Ohio 45241

Medical School: Army Medical College    Quaid-e-Azam Inter. University    City: Islamabad State: Pakistan

Degree: MBBS    Date of Graduation: 3-1991

Internship-School: _____ City: _____ State: _____

Description: _____ Dates Attended: _____

Residency Programs-Hospital: University of Cincinnati    City: Cinti    State: Ohio

Description: Orthopaedic Surgery    Dates Attended: _____

## HOSPITAL AND UNIVERSITY AFFILIATIONS
[If more than one (1) list on attached resume]

Hospital Name: West Chester Medical Center    Address: 7700 University Dr.
City: West Chester    State: Ohio    Zip: 45069    Telephone: 513-298-3000

## PROFESSIONAL SOCIETIES
[List all memberships past, present, or pending in professional societies. Include date of memberships. Use additional sheet if necessary or include in attached resume.]

| | | |
|---|---|---|
| AAOS- Active | ORS - Active | Musculoskeletal Tumor Society-Active |
| AMA- Active | NASS- Active | Mid America Orthop. Assoc. - Active |
| Amer. College of Surgeons Active | | |

## PROFESSIONAL LIABILITY CARRIER: [attached a copy-include claims history]
[Attach a copy]

Insurance Carrier: Medical Protective    Policy Number: 696241

Amount of coverage: $ 5,000,000    and $ 7,000,000    Expire Date: 1-1-2012

I chose not to carry liability insurance at this time. _____ Yes please submit letter explaining.

## PROFESSIONAL REFERENCES

1) Name: Nael Shanti, MD    Address: 4555 Lake Forest #150
City: Cincinnati    State: Ohio    Zip: 45242    Telephone: 513-281-2278
2) Name: Zeeshan Tayeb, MD    Address: 4555 Lake Forest #150

Dr. A. Atiq Durrani
4555 Lake Forest
Cincinnati, OH  45242

Page 2 of 5

ASCIRA Partners, LLC
Policy and Procedures

JourneyLite of Cincinnati, LLC
10475 Reading Road, Suite 115
Cincinnati, Ohio 45241

City: Cincinnati    State: Ohio    Zip: 45242    Telephone: 513-281-2278

3) Name: Randall Wolf, MD    Address: 4555 Lake Forest #150

City: Cincinnati    State: Ohio    Zip: 45242    Telephone: 513-281-2278

## PROFESSIONAL LIABILITY OR SANCTIONS

1. Have your staff privileges at any hospital or surgical center ever been revoked or suspended? _____ Yes _X_ No

2. Have you had a voluntary or an involuntary termination of medical staff privileges at a health care institution? _____ Yes _X_ No

3. Has your medical license in any jurisdiction ever been suspended, revoked or placed on probation? _____ Yes _X_ No

4. Have any adverse actions on your privileges ever been reported to any state licensing board? _____ Yes _X_ No

5. Have there been, or are there currently pending, any malpractice claims or suites involving your professional practice? _X_ Yes _____ No

6. Has your DEA registration ever been suspended or revoked? _____ Yes _X_ No

7. Has your state controlled substances license ever been suspended or revoked? _____ Yes _X_ No _X_ NA

8. Do you presently have any physical or mental health condition, including drug or alcohol dependence that affects or is reasonably likely to affect your ability to perform professional duties appropriately? _____ Yes _X_ No

9. Are you currently under treatment for a continuing health problem? _____ Yes _X_ No [if yes-explain in letter]

10. Have you been sanctioned by either the Medicare or Medicaid program: _____ Yes _X_ No

## LIABILITY RELEASE STATEMENT

By applying for clinical privileges, I hereby signify my willingness to appear for interviews regarding my application, and authorize the organization, its medical staff and their representatives to consult with members of management and members of medical staffs of other hospitals with which I have been associated and with others, including malpractice insurance companies. I hereby further consent to inspection by JourneyLite of Cincinnati, LLC, its medical staff and its representatives of all records and documents, including medical and credential records at other hospitals, which may be material to an evaluation of my qualifications for staff membership. I hereby release from liability all representatives of JourneyLite of Cincinnati, LLC and its medical staff, in their individual and collective capacities, for their acts performed in good faith and without malice in connection with evaluating my application and my credentials and qualifications, I hereby release from any liability any and all individuals and organizations who provide information to the Organization or to members of its medical staff in good faith and without malice concerning my professional competence, ethics, character, and other qualifications for staff appointment and clinical privileges. I hereby consent to the release of information by other hospitals, other medical associations, and other authorized persons, on request, regarding any information JourneyLite of Cincinnati, LLC may have concerning me as long as such release of information is done in good faith and without malice, and I hereby release from liability JourneyLite of Cincinnati, LLC for so doing. I understand and agree that I, as an applicant for clinical privileges, have the burden of producing adequate information for the proper evaluation of my

Dr. A. Atiq Durrani
4555 Lake Forest
Cincinnati, OH 45242

Page 3 of 5



ASCIRA Partners, LLC
Policy and Procedures

JourneyLite of Cincinnati, LLC
10475 Reading Road, Suite 115
Cincinnati, Ohio 45241

professional competence, character, ethics, and other qualifications and for the resolution of any doubts about such qualifications.

By accepting appointment or reappointment to the medical staff at the JourneyLite of Cincinnati, LLC, I hereby acknowledge and represent that I have read and am familiar with the bylaws, rules and regulations of JourneyLite of Cincinnati, LLC, as well as the principles, standards and ethics of the national, state and local associations and state law and regulations that apply to and govern my specialty and profession, which are the Governing Standards. And agree to abide by those standards as may be enacted. I agree to notify the Organization of any circumstances regarding my status in licensure, DEA, State Control Substance License, Medicare participation, liability insurance coverage or Board certification status or hospital privileges.

I understand and agree any significant misstatements in or omissions from this application shall constitute cause for denial of appointment or cause for summary dismissal from the medical staff with no right of appeal. All information submitted by me in this application is true to the best of my knowledge and belief.

I further authorize a photostatic copy of the requests, authorizations and releases to this application to serve as the original.

_____          8-24-11
Signature of Applicant                              Date

Abubakar Atiq Durrani MD
Print Name

| CHECKLIST |
|---|

[Include the following items with the completed returned application.]

✓ Application and Request

✓ Copies of Education Certificates

✓ Copy of Board Certification – [if applicable]

✓ Delineation of Privileges – specific service(s)

✓ Current Curriculum Vitae

✓ Copy current Medical License

✓ Copy of ECFMG (Education Commission for Foreign Medical Graduates) Certificate

✓ Copy current DEA Certificate

___ Copy current State Control Substance [if applicable]

✓ Copy of current Malpractice Insurance Coverage

___ List of current healthcare plans you participate in.

___ Copy of current BLS, CPR, ACLS or PALS

ASCIRA Partners, LLC
Policy and Procedures

JourneyLite of Cincinnati, LLC
10475 Reading Road, Suite 115
Cincinnati, Ohio 45241

_____Health Information: Copy of current TB, Hepatitis B

| REVIEW PROCESS |
|---|

Appointment Recommended to the service of _____Medical_____ staff with clinical privileges as
requested. Approved ___✓___ Denied _____

Signature_____ Date: _10/17/11_
           Peer Review Chairman

Signature_____ Date: _10/17/11_
           Medical Director

Appointment Granted Effective Date: _10/17/11_ for a period of __2__ Years.

Appointment Denied:_____

Signature_____ Date:_____
           Governing Board, Chair

Dr. A. Atiq Durrani
4555 Lake Forest
Cincinnati, OH 45242

**JOURNEYLITE OF CINCINNATI**
10475 Reading Road, Ste 115
Cincinnati, OH 45241

Date: September 1, 2011

To: Dr. Abubakar Durrani
4555 Lake Forest #150
Cincinnati, OH 45242

Re: Application for re-appointment status at JourneyLite of Cincinnati, LLC, 10475
Reading Rd, Ste 115, Cincinnati, OH 45241.

Dear Dr. Durraui;

This letter is to inform you of your (check one) __X__ appointment-privilege status
or, _____ denial for privileges granted at JourneyLite of Cincinnati, LLC.

Your privileges are effective from _10/17/11_ until _10/17/13_.
Privileges are granted for one year from your initial appointment, and thereafter every
two years. Any changes or expirations occurring from your appointment date to your
reappointment are to be forwarded to the Administrator so your file remains current.

We look forward to serving you and your patients. If you have questions please do not
hesitate to contact me.

Sincerely,

_____          _10/17/11_
Medical Director/Representative            Date

Cc: File



**PUBLICCITIZEN**

May 27, 2009

# Hospitals Drop the Ball on Physician Oversight

**Failure of Hospitals to Discipline and Report Doctors Endangers Patients**

Alan Levine
Sidney Wolfe, M.D.

www.citizen.org/hrg

# Table of Contents

Executive Summary ................................................................. 2

## Reporting and Disciplining of Doctors by U.S. Hospitals

National Practitioner Data Bank Reporting Rates, 1990 - 2007 ........................... 5
National Practitioner Data Bank ............................................................ 6

## Analysis of Hospital Compliance

State Variation in Hospital Reporting ........................................................ 9
Importance of Hospital Reporting for State Licensure Board Actions................. 11
Factors Affecting Hospital Reporting........................................................ 16
    Failure to Report ........................................................................ 16
    Failure to Act .............................................................................. 19
OIG Investigations of Hospital Under-Reporting and Peer Review..................... 23
1996 Consensus Agreement that Under-Reporting is a Problem ....................... 26
Failure of Hospitals to Voluntarily Comply in a Study on Hospital Reporting......... 28

## Conclusions and Recommendations

Public Citizen's Health Research Group Conclusion ....................................... 29
Status of Previous Recommendations ...................................................... 30
Public Citizen's Health Research Group Recommendations ............................. 31

## Appendices

A: Total Number of Adverse Hospital Privileges Reports by Year ...................... 37
B: Currently Active Registered Non-Federal Hospitals that Have Never Reported
to the National Practitioner Data Bank by State .......................................... 38

# Executive Summary

*Lack of detection and widespread under-reporting to the National Practitioner Data Bank raise serious questions about hospital peer review.*

The National Practitioner Data Bank (NPDB) was established by the Health Care Quality Improvement Act of 1986 to protect patients from questionable physicians. The legislation included a requirement that hospitals report to the NPDB whenever they revoke or restrict a physician's hospital privileges for more than 30 days for problems involving medical competency or conduct. As the only national repository for the records of doctors disciplined by their peers for unprofessional or incompetent behavior, the usefulness of the data bank has been historically handicapped by the failure of thousands of hospitals to report to the NPDB. As of December 2007, almost 50 percent of the hospitals in the U.S. had never reported a single privilege sanction to the NPDB. Prior to the opening of the NPDB in September 1990, the federal government estimated that 5,000 hospital clinical privilege reports would be submitted to the NPDB on an annual basis, while the health care industry estimated 10,000 reports per year. However, the average number of annual reports has been only 650 for the 17 years of the NPDB's existence, which is $1/8^{th}$ of the government estimate and about $1/16^{th}$ of the industry estimate.

Hospital reporting varies by state. For example, about 70 percent of the hospitals in Louisiana have never reported while only about 25 percent of the hospitals in Connecticut have never reported.

Public Citizen, through its Health Research Group, compiled this report by reviewing a number of studies by the Office of Inspector General (OIG), work by the Citizen Advocacy Center, medical journal articles, and recommendations from an October 1996 national meeting on hospital under-reporting. Public Citizen also analyzed the NPDB Public Use File to examine the relationship between hospital reports and actions taken by state medical boards on the same physicians.

Operated by the Health Resources and Services Administration (HRSA), part of the Department of Health & Human Services (HHS), the NPDB was designed as a searchable resource for hospitals and other medical entities to check practitioners' backgrounds and to consider taking their own action based on the information in the data bank. Prior to its launch, this function was not being provided in any systematic way. The NPDB's goal was to reduce the likelihood that disciplined doctors might continue to injure patients by relocating to another hospital or state where their reputations and track records were not known.

The OIG at HHS did an initial assessment after the NPDB had been in operation for three years. This assessment found that a wide variation in reporting rates from state to state could suggest differences in the

2

quality of care rendered, or perhaps in the capacity or willingness of hospitals to discipline doctors and to submit reports to the NPDB. In response to the OIG report, HRSA convened a national conference in October 1996 of many stakeholders such as the American Hospital Association, American Medical Association, the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission"), Center for Medicare and Medicaid Services, Public Citizen and OIG. The consensus report from the conference found that the number of reports in the NPDB is unreasonably low, compared with what would be expected if hospitals pursued peer review effectively.

Collectively, the OIG report, the 1996 national conference, and a 2002 HRSA funded study of hospital compliance made a total of 10 different recommendations to remedy this serious problem. However, as of December 31, 2008, only one of the recommendations has been fully implemented.

The *Journal of the American Medical Association* (JAMA) has called hospital peer review one of the pillars of quality assurance in the United States. Hospital under-reporting raises questions about the effectiveness of hospital peer review. Under-reporting to the NPDB suggests that hospital peer review is not fulfilling the public trust.

Our review identified and focused on two factors associated with under-reporting: failure of hospitals to report and failure of hospitals to take action on questionable physicians. For example, a HRSA funded study reported in the *American Journal of Public Health* noted that, to avoid reporting, hospitals imposed disciplinary periods of less than 31 days thereby avoiding the need for reporting physicians to the NPDB; a medical board official informed Public Citizen that some hospitals avoid reporting by changing their bylaws or by having physicians take a "leave of absence." In one of the most egregious recent examples of the breakdown of hospital peer review, two physicians at Redding Medical Center in Redding, California performed clearly unnecessary bypass and valve surgeries between 1992 and 2002 on hundreds of patients. Peer review of the cardiac program and discipline of these physicians was not done because of the "prestige" of one of the physicians involved and the revenue for the hospital generated by the surgeries. Furthermore, although both state and Joint Commission surveys had identified peer review deficiencies at Redding, there was no oversight follow-up.

State medical board officials report that hospital clinical privilege sanctions are a valuable source of information for identifying physicians with performance or conduct problems, and many boards use this information to launch investigations that can lead to disciplinary action. However, our analysis of the NPDB Public Use File found that almost 1,000 physicians who had at least two adverse clinical privilege reports to the NPDB did not have any subsequent licensure board disciplinary action. One physician had nine adverse clinical privilege reports but no licensure board actions.

Public Citizen's report offers specific recommendations for making hospital peer review, hospital reporting, and hospital oversight more accountable to the public. These recommendations include:

- HRSA and CMS should work together to achieve a regulatory and statutory change so that the Medicare conditions of participation require fulfillment of hospitals' reporting responsibilities to the NPDB under the Health Care Quality Improvement Act.

- CMS should require that the standards for compliance with the Medicare conditions of participation include all aspects of peer review.

- Congress should provide CMS with the statutory authority to impose financial and other sanctions on hospitals and physicians for failure to perform peer review.

- Congress should amend the Health Care Quality Improvement Act to impose a civil money penalty on hospitals for failure to report.

- HRSA should seek legislative authority for conducting compliance reviews of clinical privilege reporting, including authority to mandate access to peer review records.

- The OIG should review hospital peer review practices relating to granting and renewing hospital admitting privileges.

- HRSA should initiate corrective educational and compliance activities involving hospitals that have not reported.

- To address hospitals' concerns about the effectiveness of peer review immunity, HRSA should update its 1996 survey of case law which found that the peer review immunity provisions of the statute were protecting peer review in the vast majority of cases.

- State medical boards should request their respective state legislatures to adopt those provisions of the Citizen Advocacy Center model act that have the potential to increase reporting.

- Congress should provide the OIG with authority to investigate state medical boards' handling of adverse hospital clinical privilege reports.

- Hospital compliance officers should be required to monitor hospital peer review and reporting to the NPDB.

- The OIG, HHS, should use corporate integrity agreements to assure hospital compliance with NPDB reporting requirements.

4

# Reporting and Disciplining of Doctors by U.S. Hospitals

## National Practitioner Data Bank Reporting Rates, 1990 – 2007

Federal law requires hospitals to report a physician to the National Practitioner Data Bank (NPDB) whenever a hospital revokes or restricts the physician's privileges for more than 30 days for an issue involving medical competency or conduct.  The NPDB opened for reporting and querying September 1, 1990. Although the NPDB has been open for nearly two decades, 49 percent of U.S. hospitals (2,845 of 5,823) have never submitted a clinical privilege sanction report on a physician; at the end of CY 2007, the NPDB contained only 11,221 · adverse hospital clinical privilege reports,[1] which is significantly below government and private sector estimates.

Prior to the opening of the NPDB, there was a range of estimates of annual hospital reports, as follows:

- The Public Health Service (PHS) submitted a planning document to the Office of Management and Budget in 1989 that estimated 5,000 hospital adverse actions a year would be reportable.

- The American Medical Association (AMA) estimated 10,000 reports per year. This estimate was based on an American Hospital Association (AHA) study, which found that the number of hospital disciplinary actions averaged 2.5 per year per hospital for hospitals in the study.

Contrary to these initial estimates, since the NPDB opened, the range of total reports per year has varied from a high of 830 in 1991 to a low of 532 in 2006 (see Appendix A). The trend has been toward fewer reports recently than in the first years after the NPDB opened. The average number of reports per year has been 650, which is $1/8^{th}$ of the PHS estimate and about $1/16^{th}$ of the AMA estimate.

Failure to report disciplinary actions to the NPDB violates the law and deprives health care organizations such as hospitals and state licensure boards of potentially useful information for their credentialing and regulatory activities, respectively.

Furthermore, in discussions with Bill Moran, senior vice president for Strategic Management, a hospital compliance consulting company, he advised us that "a hospital compliance officer informed him that while his hospital reports to the

---

[1] Unpublished data from the Health Resources and Services Administration, Department of Health & Human Services

NPDB when required, he and his staff are disheartened that many other hospitals do not."

## National Practitioner Data Bank

The Health Care Quality Improvement Act of 1986 (hereafter referred to as "the Act"),[2] as amended, created the National Practitioner Data Bank. Since it became operational in September 1990, the NPDB has received and maintained records of medical malpractice payments and adverse actions taken against licensed health care practitioners by hospitals, other health care entities, licensure boards, and professional societies. The NPDB makes these reports, with doctor identification, available to hospitals, licensure boards, and managed care organizations to facilitate their background checks and credentialing. As a result of resistance from the AMA and other health care organizations, the NPDB statute does not allow for public access to the doctor-specific information.[3]

The NPDB is operated by the Health Resources and Services Administration (HRSA) within the Department of Health & Human Services. The NPDB does not currently receive a congressional appropriation; it is self-supporting through user fees (Congress provided funds for start up costs). Users are charged $4.75 per query. Hospitals, by law, are required to query in certain circumstances, such as when a physician applies for clinical privileges at the hospital and every two years thereafter.[4] Other health care organizations, such as HMOs, may query provided they have a formal peer review process. Medical licensing boards may also query.[5] Health care practitioners may query but only to get their own reports.[6] One-third of all queries are mandatory, i.e. from hospitals; two-thirds are optional. In 2007, the NPDB received 3.8 million queries and about 537,600 of these queries matched practitioner reports in the NPDB (a match rate of 14 percent).

HRSA has estimated that, based on a national survey, for a one year period, 48,075 licensure, credentialing, or membership decisions were affected by new information provided in NPDB responses.[7]

---

[2] Public Law 99-660, 42 USC 11101

[3] See AMA congressional testimony at September 20, 2000 hearing on H.R. 5122, the Patient Protection Act of 2000; this legislation would have partially opened up the NPDB to the public. http://bulk.resource.org/gpo.gov/hearings/106h/67118.txt. 56

[4] 42 U.S.C.§ 11135 (a)

[5] 42 U.S.C. § 11137 (a)

[6] 42 CFR 60.11 (a) (2)

[7] Teresa Waters, O. Almagor, P.Budetti, National Practitioner Data Bank User and Non-User Survey Final Report, April 2001, Table IV.C.94. The survey question was "Would your decision regarding the practitioner have been different if you had not received the NPDB response." 9.04 percent of the responses answered "yes." Applying this percentage to the 531,802 matches for 2007 results in an estimated 48,075 decisions that were affected by an NPDB report.

The legislative history is clear as to why Congress enacted this legislation. The House Committee on Energy and Commerce report noted, as follows:

> The Committee has reviewed testimony from numerous sources indicating that this legislation is essential to protect the public health and safety. This bill is needed to deal with one important aspect of the medical malpractice problem in this country – incompetent and unprofessional physicians [...]. The bill's focus is on those instances in which physicians injure patients through incompetent or unprofessional service, are identified as incompetent or unprofessional by their medical colleagues, but are dealt with in a way that allows them to continue to injure patients. Unfortunately, groups such as state licensing boards, hospitals and medical societies that should be weeding out incompetent or unprofessional doctors often do not do so. Even when such bodies do act against bad physicians, these physicians find it all too easy to move to different hospitals or states.[8]

Section 423 of the Act addresses incompetent or unprofessional physicians in hospital settings. Section 423 requires that each hospital or health care entity which takes a professional review action that adversely affects the clinical privileges of a physician for a period of longer than 30 days report to the NPDB the name of the physician involved and a description of the acts or omissions or other reasons for the action. Hospitals are also required to forward a copy of the NPDB report to each board of medical examiners where the practitioner is licensed.[9]

The House Report further noted:

> The purpose of requiring reports even for circumstances in which physicians surrender their privileges is to ensure that health care entities will not resort to 'plea bargains' [...]. While such agreements may serve the immediate self interests of the two parties involved, they may jeopardize the health and safety of future patients.[10]

Congress was also concerned that the threat of private money damage liability under federal law, or lawsuits against hospital peer review physicians, including treble damage liability under federal antitrust law, would discourage physicians from participating in peer review.

Thus, to encourage effective hospital professional review activities (i.e. peer review), Section 411(a) of the Act provides immunity for such activities. Specifically, the statute states, "any person who participates with or assists

---

[8] House Committee on Energy and Commerce, House Report No. 99-903, at 2, September 26, 1986
[9] 42 U.S.C. § 11133 (a)
[10] House Committee on Energy and Commerce, Op.Cit., 15

the body with respect to the action, shall not be liable in damages under any law of the United States or of any state."[11] The statute stipulates that in order for hospital professional review actions to qualify for immunity, the peer review action must be taken as follows:

- In the reasonable belief that the action was in the furtherance of quality health care.
- After a reasonable effort to obtain the facts of the matter.
- After adequate notice and hearing procedures are afforded to the physician.
- In the reasonable belief that the action was warranted by the facts.[12]

Hospitals that fail to report reportable actions to the NPDB risk losing the liability protection afforded to their professional review activities under the Act. The regulations implementing the Act require the Secretary of HHS to (1) investigate hospitals that appear to be substantially failing to comply with reporting requirements, (2) provide them with an opportunity to correct their practices if they are found to be in non-compliance, and (3) remove the liability protections for three years if they are found in non-compliance.[13]

For a hospital to lose its immunity, the hospital has to "substantially" violate the reporting requirement, meaning there has to be a pattern of non-compliance.

Although HRSA has investigated a small number of cases of non-compliance, as of November 2008, 18 years after the NPDB began, no hospital has ever been penalized through the loss of peer review immunity.[14]

Finally, the importance of hospital credential and privilege reviews cannot be overstated. *The Journal of the American Medical Association* has noted the following:

> Historically, there have been three pillars of quality assurance in health care: self-regulation by hospital credentialing committees, malpractice litigation, and external regulation by licensure boards. Hospital oversight of credentials and privileges [...] reflects the professional commitment to [...] self-regulation.[15]

---

[11] 42 U.S.C. § 11111(a) (1) (D). The Act's immunity provision does not apply to civil rights claims and it does not apply to government antitrust prosecutions. However, the Act's immunity does cover a private antitrust claim.

[12] 42 U.S.C § 11112 (a)

[13] 45 C.F.R.§ 60.9 (c) (1)

[14] According to HRSA staff, after identifying hospitals, usually through media reports or public court records, and contacting these hospitals, HRSA has always received a report or a satisfactory explanation of why no report was required.

[15] Troyen A. Brennan, MD, JD, MPH, Hospital Peer Review and Clinical Privileges Actions, Journal of the American Medical Association, July 28, 1999, V. 281, 4, 381.

A random sample survey in 2000 of NPDB users who had received matched responses from the NPDB about the physician for whom they were making a query found that it is an important aspect of the credentialing process for these users. The user survey included a wide variety of health care entities such as hospitals, managed care organizations, group practices, professional societies, state licensing boards, and ambulatory surgical centers.

The survey found that:

> ... a wide variety of different committees and individuals [...] used practitioner NPDB reports in their credentialing and disciplinary decision making [...]. On average, between 4 and 5 different individuals or committees reviewed each NPDB matched report. The entity's credentialing committee was most likely to use the report [...]. Other organizational groups that frequently reviewed NPDB reports included the medical staff committee [...]. Individuals who were likely to use the report included the chief of medical staff, the department chair and the chief executive officer.[16]

# Analysis of Hospital Compliance

## State Variation in Hospital Reporting

As of December 31, 2007, according to HRSA data, 2,845 of all 5,823 U.S. NPDB-registered hospitals (49 percent) had never reported a clinical privilege sanction to the NPDB (see Appendix B).

A 2007 analysis of accumulated HRSA data shows that extremely large state-by-state variation in the rate of non-reporting hospitals exists (See Appendix B).

For example, 75 percent of the 56 hospitals in South Dakota have never reported; 70 percent of the 47 hospitals in North Dakota have never reported; 69 percent of the 150 hospitals in Kansas have never reported; and 69 percent of the 29 hospitals in Wyoming have never reported. About one-third of the hospitals in Illinois, New Jersey, and California have never reported. And about 48 percent of the 110 hospitals in Massachusetts have never reported.

However, only 24.1 percent of hospitals (7 of 29 hospitals) in New Hampshire, 25 percent of hospitals (10 of 40) in Connecticut, and 28.5 percent of hospitals (68 of 239) in New York have never reported.[17]

The HRSA analysis that used hospital-specific data found that "clinical privilege reporting seemed to be concentrated in a few facilities even in

---

[16] Teresa Waters, et al., The Role of the National Practitioner Data Bank in the Credentialing Process, American Journal of Medical Quality," 2006, 34
[17] Unpublished HRSA data

States with comparatively high overall hospital clinical privileging reporting levels."[18]

Several previous studies of hospital reporting have used "bed size" or "admissions" as a surrogate for physician exposure.

A 1995 Office of Inspector General (OIG) study of hospital reporting for the period September 1990 (when the NPDB opened) to December 31, 1993, found that:

- The approximately 6,500 hospitals in the U.S. submitted only 3,154 adverse action reports to the NPDB. This represented 2.6 reports per 1,000 hospital beds during the 3 1/3 year period.

- With the focus on the number of reports per 1,000 hospital beds rather than on number or percent of reporting hospitals, the state-by-state picture changed somewhat. For instance, New Jersey, which ranked first in the proportion of hospitals sending at least one report to the NPDB, ranked 18th in the number of reports per 1,000 beds. More striking, New York shifts from 4th to 33rd.

- Reporting rates per 1,000 hospital beds varied greatly state to state – ranging from 8.5 in Nevada to 0.7 in South Dakota. In most states, the reporting rate was between 1.5 and 4.0. The median rate was 2.5 adverse action reports per 1,000 hospital beds.

- Some of the differences among states in reporting rates per 1,000 hospital beds were considerable. For example, California, the state with the largest number of hospital beds, the rate of adverse actions was 3.7 per 1,000 beds. In New York, the state with the second largest number of hospital beds, the rate was "considerably less," 2.1. In Ohio, the rate was 2.9; in nearby Illinois, the rate was 1.5.[19]

The OIG report also noted that "Whatever the State-to-State differences, there is also reason to suspect that the level of reporting in the nation [...] may be unreasonably low."[20] As an example, OIG cites the 1991 Harvard Medical Practice study of hospitalized patients in New York State that found 1 percent of hospitalizations in a random sample involved adverse events caused by negligence. On the basis of the sample, it was estimated that during one year, negligent care provided in New York State was responsible

---

[18] 2005 HRSA Annual Report, 8
[19] Office of Inspector General, Department of Health & Human Services, Hospital Reporting to the National Practitioner Data Bank, OEI-01-94-00050., Feb.1995, ii, 3, http://oig.hhs.gov/oei/reports/oei-01-94-00050.pdf
[20] Ibid., 4

10

for 27,179 injures, including 6,895 deaths and 877 "permanent and total disabilities."[21]

A July 28, 1999, article in the JAMA addressed hospital reporting to the NPDB. The article, which was based on a HRSA funded-study by the University of Washington, examined the variation in clinical privilege reporting, the changes in reporting over time, and the association of hospital characteristics with reporting. The study looked at 4,743 hospitals between 1991 and 1995; the majority of the hospitals were non-governmental, not-for-profit, and accredited by the Joint Commission; they were equally distributed between urban and rural hospitals. The study, which found evidence of a low and declining level of reporting, noted the following:

- About a third of the hospitals (34.2 percent) reported at least one action over the study period. The range of the privileges action rates for individual hospitals that had taken actions was between 0.40 and 52.27 per 100,000 admissions. The overall privileges action rate for the study hospitals in aggregate was 2.36 per 100,000 admissions.

- Urban hospitals and hospitals accredited by the Joint Commission were more likely to have reported one or more privileges actions and had higher rates of reported actions per 100,000 admissions than their counterparts for nearly all bed size categories. State and local hospitals were least likely to have reported.

- The majority of hospitals that were members of the Council of Teaching Hospitals of the American Association of Medical Colleges, and had bed sizes of 300 or more, had lower rates of reporting than non-member hospitals.

- There were significant regional differences in privilege action reporting. Hospitals in the east south Central region, such as Alabama, Kentucky, Mississippi and Tennessee, had some of the lowest reporting rates. [22]

## Importance of Hospital Reporting For State Licensure Board Actions

The OIG report noted earlier found that, during the period of the OIG review, 1990 – 1993, hospitals reported about 3,154 practitioners to the NPDB. During

---

[21] Ibid., 4
[22] "Baldwin, et al, Hospital Peer Review and the National Practitioner Data Bank, Clinical Privilege Action Reports, JAMA, July 28, 1999, V 282, 4.,351, http://jama.ama-assn.org/cgi/content/full/282/4/349

the same time period, state medical boards took disciplinary actions against about 8,000 physicians. The OIG notes "these numbers are not directly comparable, but [...] the discrepancy is sufficiently large to raise legitimate questions about whether hospitals are being sufficiently rigorous in taking adverse actions against practitioners on their staffs."[23]

A similar observation was made in the July 1999 JAMA article, which noted that "there were nearly three times the number of licensing actions [...] than privileges actions over the study period. In addition, licensing actions increased between 1991 and 1995, while privileges actions decreased."[24]

Every year HRSA calculates a ratio comparing the sum of adverse action reports for both hospitals and managed care organizations to adverse licensure reports for in-state physicians.[25] According to HRSA data, during the seventeen-plus year history of the NPDB, state licensure adverse action reports have been more than double the number of adverse (hospital and HMO) clinical privilege reports: 32,748 vs. 13,618. From state to state, the ratio of adverse clinical privilege reports to adverse licensure action reports range from a low of one clinical privilege report for every five state licensure actions in Colorado and Connecticut to a high of 1.51 clinical privilege reports in Hawaii for every adverse licensure action report. According to HRSA, "While these ratios reflect variations in the reporting of both State licensure actions and clinical privileges actions, the extreme variation from State to State is instructive. It seems likely that the extent of the observed differences may at least in part reflect variations in willingness [of hospitals and medical boards] to take actions rather than a substantial difference in the conduct or competence of the physicians practicing in various States."[26] This is reinforced by the lack of evidence that the overall quality of physician practice varies from one state to another.

A 1999 article in the *American Journal of Law and Medicine* makes a point about the role of hospital peer review and its relationship to state licensing boards:

> The peer review system [...] should address problems of physicians before they impact a physician's license to practice medicine. Notwithstanding the differences between what the hospital peer review system is designed to accomplish and the state physician licensing system, the significantly higher rate of state actions

---

[23] OIG, Op.Cit., 4

[24] Baldwin, Op.Cit., 353

[25] Managed care organizations "adverse actions" are when physicians are removed from panel membership in the organization because of competency or conduct. HRSA uses "in-state" adverse licensure data to avoid including reciprocal actions based on a licensure action taken by another State.

[26] HRSA NPDB Annual Report, 2005, 36

12

raises the question of whether hospital peer review is taking place at an adequate level.[27]

From the perspective of state medical licensure boards, hospital reports are an important source of data for regulatory oversight. Results of a Citizen Advocacy Center (CAC) survey on hospital reporting highlighted the importance of hospital reports to state medical boards:

- Several medical boards emphasized the high quality of the information in hospital reports. Boards value hospital reports because they are based on peer investigation and review. Because hospitals are so concerned about being sued by doctors against whom they take clinical privilege actions, when a hospital does report, there is substantial evidence of a serious problem.

- The acting director of the Office of Professional and Medical Conduct in New York State said that 31 percent of the facility reports her board receives have led to charges of misconduct or surrender of license. This means that nearly one in three mandatory reports results in the board opening a disciplinary action. In many states, fewer than 10 percent of consumer complaints lead to disciplinary action.

- The executive director of the Arizona board indicated that while only 2 percent of the complaints received by his board in 1995 were from hospital mandatory reports, 66 percent of these had to do with quality of care (as opposed to 54 percent of complaints from all sources) and 17 percent of hospital reports ultimately led to discipline and 11 percent to stipulated limitations on practice, as opposed to 2 percent and 5 percent complaints from all sources.[28]

Representative responses to the CAC survey included:

- 'This information would be kept confidential [from the board] if not for mandatory reporting laws.'

- 'The mandatory reports provide useful 'leads' for the Board about the possibility of substandard practice which otherwise may not be known. The Board would never receive the information without mandatory reporting.'[29]

CAC also asked boards about oversight of state hospital reporting laws. "Many state medical boards replied that they had no jurisdiction over hospitals. [...]

---

[27] Scheutzow, Susan, _State Medical Peer Review: High Cost But No Benefit – Is It Time for a Change?_, 25 Am. Journal of Law & Medicine, 7, 1999, 5

[28] Rebecca Cohen and David Swankin, Citizen Advocacy Center, _Hospital Reporting to State Regulators and to the National Practitioner Data Bank_, March 1997, 21

[29] Ibid., 21

While their state statute may require a hospital to report adverse actions to the medical board, actual enforcement authority is usually the responsibility of another state office, such as the agency that licenses hospitals."[30]

Under-reporting of hospital privilege sanctions deprives state regulators and other users of the NPDB of critical information.

To help increase hospital reporting, CAC, in collaboration with the Administrators in Medicine, an organization composed of the Executive Directors of State Medical Boards, wrote and issued a Model Act in March 1999 that addressed hospital reporting to state boards.[31]

The Model Act's many recommendations include: (a) requiring the chief executive officer of every health care organization to file an annual disciplinary report that covers all disciplinary actions taken or state that no actions were taken; submission of the report provides the licensing authority with an affirmative declaration on file; (b) requiring the medical director of a hospital to be the responsible party for reporting, with failure to report being grounds for a disciplinary offense; (c) giving the medical board authority to enforce hospital reporting; (d) establishing penalties of up to $1,000 per day per unreported adverse action, up to a maximum of $100,000 for each incident of failure to report.

To examine the relationship between hospital reports and state licensure actions, and the extent to which state actions follow hospital actions, Public Citizen analyzed the NPDB Public Use File for the period September 1, 1990, through September 30, 2008. The Public Use File does not contain any data which would identify individuals or reporting entities; however, it does contain coding that allows the user to identify all reports associated with each specific number-coded practitioner. Our analysis found that 25,136 physicians were included in the NPDB because they had been reported one or more times for an adverse action by a state licensure board, while 9,877 physicians had been reported at least once for an adverse action by a hospital.[32]

There were 3,566 physicians in the database that had both adverse state licensure and adverse hospital clinical privileges reports. Of the physicians that had both adverse state licensure and adverse hospital clinical privileges reports, the majority, 2,538 (71 percent), had at least one adverse hospital clinical privileges action preceding their first adverse licensure action. We also found that 1,028 physicians had one or more licensure actions followed by at least one adverse clinical privilege action, but no preceding adverse clinical

---

[30] Ibid., 39

[31] Citizen Advocacy Center, in collaboration with the Administrators in Medicine, A Model Act to Improve Reporting of Adverse Actions by Health Care Organizations to State Health Professional and Occupational Licensing Authorities. March 1999

[32] The 9,877 physicians reported by hospitals for adverse clinical privileges actions is lower than the total number of hospital reports, 11,221, because some physicians have more than one report.

14

privilege report. It is unclear why these 1,028 physicians had hospital actions following licensure board reports. If a license is revoked, automatic loss of hospital privileges is not reportable. Without additional research we can only speculate. One possibility is that these physicians were either put on the medical staff or retained on the staff despite a licensure action and that they subsequently got into trouble for some new reason.

Although hospital reports are an important source of information for state boards, the Public Citizen analysis of the NPDB Public Use File also found that 5,359 physicians (out of the 9,877 physicians who had been reported at least once for an adverse action by a hospital) have at least a single adverse hospital clinical privileges action that was not followed by a state licensure action. As can be noted from the table below, 952 physicians have two or more adverse hospital clinical privileges reports but no subsequent state licensure action. In addition, 31 physicians had five or more adverse hospital clinical privilege reports but no subsequent state licensure action. Given the value of hospital reports to state boards, as noted earlier, the fact that all these reported hospital actions involved at least a suspension or restriction of clinical privileges for more than 30 days raises concern that state licensing boards may not be taking disciplinary actions needed to protect the public. It seems hard to believe that state licensure action would not be appropriate in most of these cases.

| Physicians With Adverse Clinical Privilege Reports But No Subsequent Licensure Board Action ||
|---|---|
| Number of Adverse Clinical Privilege Reports Per Physician | Number of Physicians With Hospital Adverse Clinical Privilege Reports But No Licensure Action |
| 1 | 4,407 |
| 2 | 690 |
| 3 | 186 |
| 4 | 45 |
| 5 | 19 |
| 6 | 6 |
| 7 | 3 |
| 8 | 2 |
| 9 | 1 |
| Total Physicians with 2 or More Adverse Hospital Reports - 952 ||

Because of our concern with the apparent lack of medical licensing board follow-up on these reports, we are recommending that the OIG, HHS, initiate a study of these cases. The OIG has in the past conducted evaluations of state health professional licensing and regulatory boards.

## Factors Affecting Hospital Reporting

### Failure to Report

In October 2005, the California legislature, because of concerns about under-reporting to the state medical board, requested an independent review of peer review in the state. The final report, issued in July 2008, involved a sample of 245 California health care entities (hospitals, health plans, professional societies, medical groups) and was based on the following methodology: on-line survey, analysis of peer review minutes, peer review cases, interviews and site visits. The report noted the following:

- There are inconsistencies in the way health care entities conduct peer review, select and apply criteria, and interpret the [state] law.[33]
- **These variations can result in physicians continuing to provide substandard care (at times for years) impacting the protection of the public.**[34] (emphasis added)
- The tracking of cases over time in most entities is poor or lacking.[35]
- Entities try numerous remedial interventions (peer counseling, education, training, mentoring, observation, behavior counseling, UCSD Physician Assessment and Clinical Education Program) before informing the physician that a "final proposed action" is being taken. The process is almost never shorter than one year.[36]
- The most common reasons for cases being referred for peer review were (1) disruptive behavior/impairment, (2) substandard technical skills and (3) failure to document/record patient treatment.[37]

At the federal level, to better understand the variation in reporting, in 1994 HRSA funded a study of 144 rural hospitals in the Pacific Northwest. The study found that, since the NPDB opened, 20 percent of hospitals reported an increase in certain activities that allowed the hospitals to avoid the federal reporting requirement. The authors note "the most frequent changes were increases in monitoring clinical privileges (13 percent), requiring continuing medical education rather than restricting privileges (12 percent), having physicians resign or voluntarily surrender clinical privileges (7 percent) and imposing disciplinary periods of shorter than 31 days (5 percent)...." The authors further note that restricting clinical privileges for less than 31 days has the potential to adversely affect the quality of care and undermine the legislative intent of the NPDB.[38]

---

[33] Lumetra, Comprehensive Study of Peer Review in California: Final Report, July 31, 2008, 1 (http://www.mbc.ca.gov/publications/peer_review.html)

[34] Ibid., 1

[35] Ibid., 64

[36] Ibid., 64, 65

[37] Ibid., 65

[38] William E.Neighbor, MD, Lura-May Baldwin, MD, Peter .West, MD, L. Gary Hart, PhD, Rural Hospitals Experience With the National Practitioner Data Bank, 87 Am. J. Pub. Health (1997), 664, 665

16

The 1999 JAMA article cited earlier noted that the "low level of quality of care problems as an explanation for the low level of reporting is unlikely."[39]

> The evidence from this study cannot be used to definitively identify the causes for the low and declining level of clinical privileges action reporting. Supporting evidence from other sources and the high degree of dissatisfaction with the concept of the NPDB [...] suggest that underascertainment of physicians with performance problems and the use of penalties that do not require reporting were the most significant contributors to these findings, however."[40]

Problems with hospital reporting to states provides insight into reporting to the NPDB. Most states have mandatory reporting laws governing hospitals' clinical privilege actions. Some states require hospitals to report any action, regardless of the time period that the sanction covers. Other states mirror the NPDB reporting requirement more closely, limiting reporting to actions involving competency or conduct and requiring the reporting of actions that affect privileges for over a certain number of days. These laws also vary on the penalty for failure to report; state penalties range from a fine as high as $10,000 to no penalty. Only three states had a potential fine of $5,000 or more, while 14 states had a fine under $5,000. Thirty-three states and the District of Columbia lacked any penalty, according to a study published in 1999.[41]

The CAC report quotes the President of the California Medical Board as stating the following in the January 1995 issue of the Board's newsletter regarding the issue of hospital reporting:

> The issue of 805 (peer review) reporting is one of the most important and most misunderstood Medical Practice Act requirements. Over the past year we have noted a deterioration in the cooperation required between hospitals and the Board in protecting consumer/patient safety. We have experienced incomplete reports [...] and, on some occasions, excuses for not reporting at all.[42]

Based on a survey and subsequent workshop, the CAC suggested, among other factors, a "cultural aversion" to reporting.[43] The CAC report quotes the chief administrative officer of the Rhode Island Board as stating:

---

[39] Baldwin, JAMA, Op.Cit. 351

[40] Ibid., 354

[41] Scheutzow, Op.Cit., 14

[42] Cohen and Swankin, Op. Cit., 2,3

[43] The other "factors" CAC cites are: deficiencies in state reporting laws; lax enforcement; and lack of knowledge on the part of hospitals to report.

17

> Doctors and other professionals don't like to 'snitch' on a colleague. This unwillingness to turn in a peer, laws to the contrary notwithstanding, has resulted in many licensing boards never receiving a complaint from a peer, even when laws require such reports.[44]

According to CAC, the "psychology" of hospital reporting may be similar, and every effort might be made to work out a solution to a problem in such a way as to make it "unreportable." Furthermore, the hesitation to report a colleague may be reinforced by the adoption in hospitals of continuous quality improvement strategies which similarly discourage reporting of individual physicians. In the environment of continuous quality improvement, the reporting of adverse actions may be seen as punitive and counter-productive.[45]

A recent study published in the *Annals of Internal Medicine* found that "physician behavior did not always reflect the standards that they endorsed. For example, although 96 percent of respondents agreed that physicians should report impaired or incompetent colleagues to relevant authorities, 45 percent of respondents who encountered such colleagues had not reported them."[46]

A second HRSA-funded study by the University of Washington Medical School concerning hospital reporting and state peer review protections statutes noted that **"the adjusted analysis found that hospitals in states with strong penalties for not reporting adverse privilege actions had significantly higher numbers of reporting to the NPDB than hospitals in states with no penalty."**[47] (emphasis added)

According to this study, after adjusting for differences in hospital characteristics, hospitals in states with strong penalties were 40 percent more likely to have reported an adverse action over the five years of the study than hospitals in states with no penalties. The author notes "converting this data to actual numbers, in states with a high penalty for failure to report adverse peer review actions, 100 urban, nongovernmental, nonprofit hospitals with between 100 and 300 beds and other characteristics typical of many hospitals could be expected to file eleven more adverse action reports [per 100 hospitals] over the five-year study period than hospitals with the same characteristics that are located in states with no penalties."[48]

The study hypothesizes two possible explanations as to why a strong penalty for failure to report adverse actions to state authorities would generate more reporting to the NPDB. The author notes, as follows:

---

[44] Cohen and Swankin, Op. Cit., 33
[45] Ibid., 33,34
[46] Eric G. Campbell, PhD, et al. Professionalism in Medicine: Results of a National Survey of Physicians. Annals of Internal Medicine. 2007 December 4, vol 147, 795
[47] Scheutzow, Op.Cit., 17
[48] Ibid., page 17

18

> First, hospitals may render adverse peer review decisions but fail
> to report adverse actions to both the NPDB and the state
> authorities.  When hospitals face stiff sanctions for failure to
> report adverse actions to the state, hospitals may fully comply
> with both state and federal reporting requirements.  Second,
> because the law concerning the reporting of adverse peer review
> action is at times ambiguous, hospitals may interpret the law as
> not requiring such actions to be reported.  However, if significant
> sanctions for nonreporting exist at the state level, hospitals may
> likely interpret ambiguities in their reporting obligation to favor
> reporting of adverse peer review actions.[49]

A member of a medical board in the Mid-Atlantic region, who requested
anonymity, advised Public Citizen on January 27, 2009, and March 24, 2009,
emails that "hospitals often avoid reporting by fashioning by-laws in such a way
that reporting can be avoided [...]. I've also learned that hospitals are giving
docs *leaves of absence* instead of suspensions in order to avoid reporting."

### Failure to Act

There is evidence that under-reporting (and patient harm) is also caused by the
failure of hospital peer review to take timely action against physicians who
practice substandard care.

In October 2002, in response to a whistleblower complaint, the FBI raided
Redding Medical Center, a 240-bed hospital in Redding, California. An FBI
affidavit estimated that at up to fifty percent of cardiac surgeries performed
by two cardiac physicians may have been medically unnecessary.  According to
a June 2008 study, evidence from the FBI raid showed that these physicians
performed unnecessary cardiac procedures on more than 600 patients between
1995 and 2002.[50]

The study states:

> ...hundreds of patients underwent unnecessary bypass and valve surgery
> from which some suffered debilitating injuries and others died. The
> Redding case, while singular for the number of patients abused and the
> length of time it went on, is hardly unique. There is a long history of
> similar cases in which effective peer review and oversight could have
> made a difference.[51]

---

[49] Ibid., 3

[50] G. Rogan, M.D., F. Sebat, M.D., I. Grady, M.D., How Peer Review Failed at Redding Medical
Center, and why it is failing Across the Country and What Can Be Done About It, June 1, 2008.,
8. http://roganconsulting.com/docs/Congressional_Report-Disaster_Analysis_RMC_6-1-08.pdf.

[51] Ibid., 4

19

The study further notes that one of the physicians at Redding Medical Center was able to use his influence, which was based on earnings generated by unnecessary surgery, to block hospital peer review.[52] The study notes, "motivated by income generated by its rainmaker physicians, Redding Medical Center [...] preferred to support them rather than identify quality problems."[53] For example, according to hospital by-laws, one of the physicians should have been suspended every day for 1992 because he refused to complete medical records. He was never suspended because his "production bought him power and influence within Redding Medical Center."[54] According to the California Medical Board web site, as of April 13, 2009, one of the physicians has had his license revoked while the other is awaiting a hearing (the web site states that he is not practicing because he has not paid his license renewal fee). Also, according to a November 17, 2005, *Medical News Today* article the hospital owners paid about $54 million to settle the federal case and established a $395 million fund for the 769 cardiac patients and their families to settle a civil lawsuit.

The authors of the Redding Medical Center study conclude that "it wasn't peer review alone that failed in Redding and elsewhere. The larger and more difficult problem, but also perhaps the one most susceptible to legislative solution, is the failure of [*state and federal*] oversight."[55] For example, a June 1999 state survey of Redding found that the hospital:

> ...failed to regularly review cardiovascular surgery cases, both preoperatively and postoperatively, and failed to implement proper quality controls. It further found that the medical staff did not consider a serious patient care adverse event caused by a cardiovascular surgeon, when reappointing that physician to the medical staff [...]. Concurrently but independently the Joint Commission and the California Medical Association's Institute for Medical Quality inspected Redding Medical Center. Both of these non-government organizations found the same peer review deficiencies, which also violated Joint Commission's accreditation standards [...]. Although Joint Commission asked Redding Medical Center to correct these peer review deficiencies, it immediately accredited Redding Medical Center for three more years.[56]

Redding is not the only example of problematic peer review.

On July 10, 2002, an orthopedic surgeon left the operating room at a hospital in Cambridge, Massachusetts during a complex back operation. Seven hours into surgery, the patient was left under anesthesia with an open incision in his back, while the surgeon went to a bank to cash his paycheck. He was gone 35

---

[52] Ibid., 8
[53] Ibid., 31
[54] Ibid., 8
[55] Ibid., 6
[56] Ibid., 10, 11

minutes. Although the doctor had a history of disruptive behavior and two brushes with the law, there was apparently no peer review intervention prior to July 10, 2002.[57]

In Hawaii in 2001, a surgeon operated on a man to stabilize a disc injury to his spine. The titanium rod he needed to insert was not available in the operating room, so he used a nearby screwdriver. After three more surgeries by the doctor to correct the problem, the patient was left a bedridden, incontinent paraplegic. He subsequently died. At the time of the surgery, the physician had been charged with drug addiction and incompetence; his medical license had been suspended in Oklahoma and revoked in Texas. Despite these problems, his surgery was apparently not monitored by peers.[58]

The authors of the Redding report provide additional examples of failed peer review; we provide details on two of these cases, as follows:

> For six years ending in 2001, physicians, administrators and management company Executives at Edgewater Medical Center in Chicago conspired to defraud Medicare of tens of millions of dollars in a scheme that would have been impossible to implement had there been effective peer review and oversight. [A cardiologist], admitted performing unnecessary angioplasties and angiograms on more than 750 patients, two of whom died as a result of these unnecessary procedures.
>
> [A surgeon] at the University of Kansas Medical Center, Bethany Medical Center and Providence Medical Center [...] convinced patients to undergo unnecessary surgery to fill his surgical schedule resulting in bodily harm to at least one patient. [The surgeon] was sentenced to six years in prison and his medical license was revoked, but it took 15 years and the involvement of federal law enforcement agencies to stop him.[59]

The authors of the paper on Redding Medical Center have noted:

> In each of these cases, effective peer review would have cut short the careers of these malefactors and saved innocent patients from having to undergo unnecessary invasive procedures, some of which caused permanent damage or even death. While peer review functions well in many hospitals - identifying opportunities for improvement, errors caused by mistake or gross negligence - there are structural problems that need to be addressed to improve the chances that it will work well everywhere.[60]

---

[57] Boston Globe, August 18, 2002 and March 21, 2004

[58] Dr. Ira E. Williams, First Do No Harm, The Cure for Medical Malpractice, 2004, 1

[59] G.Rogan, Op.Cit.,5

[60] Ibid., 5

21

According to the authors, although Redding Medical Center complied with most of the Medicare Conditions of Participation, "one critical element, peer review for cardiac services (Element 54), remained violated [...]. According to the Centers for Medicare & Medicaid Services, a violation of an element of a Condition is not sufficient to rule the entire Condition is violated. Partial compliance is good enough."[61]

The study made 17 recommendations, which included the following:

- The standards for compliance with the [Medicare] Conditions of Participation must include all aspects of peer review and quality oversight. Violation of any element must be sufficient to find the entire Condition is violated.
- Congress should determine how conflicts of interest impair the peer review process and consider appropriate remedies.
- Congress should provide the Centers for Medicare and Medicaid Services with the authority to impose intermediate sanctions against hospitals and physicians, including loss of provider status for selected services until patient safety and quality is assured, and stopping payment for elective services in a department where peer review is absent.[62]

Finally, Dr. Ira Williams, a board certified oral and maxillofacial surgeon who served as chairman of the dental department and executive committee at Methodist Hospital in Madison, Wisconsin wrote the following about hospital peer review:

Instead of shining a searchlight on the performance of their own members, hospital peer review committees prefer to stay in the shadows. They are willing to identify past problems and may recommend a slow, orderly change in standards of care, but they will not make substantial changes. Most important, their first priority is to preserve the rights and privileges of doctors. Their work is dictated by the desires of the medical staff and is rarely influenced by the needs of patients. Members of a peer review committee, it must be noted, are not evil or sinister people. Nor are they megalomaniacs. They are individuals who have been burned by circumstances and have learned to become robots who see no evil, hear no evil, speak no evil, in order to survive. The weaknesses of the peer review system are human weaknesses. [...] Because licenses to practice give doctors a monopoly on medical care, the characteristics of a monopoly are obvious in medical organizations - arrogance, complacency, and abuse of power.[63]

---

[61] Ibid., 15, 16
[62] Ibid., 35, 36
[63] Williams, Op.Cit., 97,98

22

### OIG Investigations of Hospital Under-Reporting and Peer Review

The 1995 OIG study of hospital reporting that was noted earlier was initiated because of HHS concerns about the low number of hospital reports. The final report noted:

> Our review suggests a sufficient basis for concern about the hospitals' response to [NPDB] reporting requirements. The wide variation in reporting rates from State to State is in itself troubling. It could suggest differences in the quality of care rendered or perhaps in the capacity or willingness of hospitals to submit reports to the [NPDB]. The explanation is unclear.[64]

The OIG also noted that the Joint Commission, which is the national hospital oversight organization, reviews hospital adverse actions affecting the clinical privileges of physicians to determine if they were reportable to the NPDB. However, according to the 1995 OIG report on hospital under-reporting, this aspect of the Joint Commission surveys **"is very limited and a very minor part of the survey process [...]. It does not result in apparent violations of the NPDB reporting law being reported to the Department of Health and Human Services for investigation. And, it does not lead to any probing to determine whether or not a hospital might be circumventing the intent of the Health Care Quality Improvement Act by taking adverse actions of less than 31 days or by other means."**[65] (emphasis added).

The 1995 OIG report on under-reporting recommended that HRSA (1) study the problem further, possibly through case studies, and (2) sponsor a national conference on the issue to explore causes and remedies. In addition, OIG recommended that HRSA collaborate with the Centers for Medicare and Medicaid Services (CMS) to ensure that the Joint Commission assesses more fully hospitals' compliance with the NPDB reporting requirement. The OIG also recommended that such collaboration include the following:

> (a) Send a joint letter to the Joint Commission urging that it incorporate the [NPDB] requirements into its standards, conduct a more thorough review of hospital peer review efforts and adverse actions as part of its survey process, and seek to identify any indications of hospitals circumventing the intent of the [NPDB's] reporting requirements.

> (b) [Through a regulatory change,] amend the Medicare Conditions of Participation in a manner that will specify hospitals' responsibilities under the [NPDB] law.

---

[64] OIG, Hospital Reporting to the National Practitioner Data Bank, Op.Cit., ii
[65] Ibid., 6

23

(c) Propose legislation that would call for hospitals [NPDB] responsibilities to be addressed in the Medicare Conditions of Participation and for the Joint Commission to focus more attention on the fulfillment of these responsibilities during its survey.[66]

The Joint Commission's written response to the OIG report called for additional research into the issue and indicated that it was "premature" for the Joint Commission to address hospital reporting until there was a better understanding of the problem.

The American Hospital Association, in its response to the OIG report, noted that when the NPDB legislation was enacted "it was recognized that mandatory reporting requirements would lead to an increase in litigation as physicians faced with disciplinary action challenged peer review actions. In an effort to reduce the chilling effect such litigation would have on effective peer review, Congress provided qualified immunity in the peer review process."[67] The American Hospital Association further stated:

Peer review immunity, however, has been only partially effective because many courts have not required physicians to rebut the statutory presumption of immunity with credible evidence prior to trial. Early resolution in these cases is impossible, even where there is no objective evidence of improper peer review activity. Although by no means all the cases have misinterpreted the immunity provisions, some courts have substantially ignored them, denying motions for summary judgment and forcing trials. Unless the availability of these provisions is determined objectively and early in litigation, they cannot help but fall short of their statutory purpose. The specter of baseless, time-consuming and expensive litigation serves as a powerful disincentive to effective peer review.[68]

Public Citizen responded to the OIG report with the following recommendation:

We urge the Public Health Service [what is now HHS] to propose legislation strengthening penalties for noncompliance by hospitals. That legislation should authorize (in addition to loss of the law's limited liability protection) monetary penalties up to $10,000 per incident for hospitals that fail to report [...]. This would make hospital penalties at least comparable to those applied to malpractice insurers who fail to submit payment reports [to the NPDB as mandated by law].[69]

---

[66] Ibid., 8
[67] Ibid., Appendix B
[68] Ibid., Appendix B
[69] Ibid., Appendix B

24

The OIG, as a follow-up to its 1995 report, issued a memorandum report in 1999 entitled "Legislative Recommendation to Improve Hospital Reporting to the National Practitioner Data Bank." The report concluded:

> To more fully encourage hospitals to follow the intent of Section 423 of the Health Care Quality Improvement Act, we recommend that HRSA propose legislation that would establish a civil money penalty of up to $10,000 for each instance of a hospital's failure to report to the [NPDB] [...]. This penalty is consistent with the current civil money penalty sanction that can be imposed for failure to report a malpractice payment.[70]

In response to the OIG recommendation to establish a civil money penalty for hospital non-compliance, HRSA initiated a legislative proposal for Fiscal Year 2001 that provided for a civil money penalty of up to $25,000 for each instance of a hospital's failure to report an adverse action to the NPDB. The legislative proposal was not approved by HHS, and therefore it was never submitted to Congress.

The Joint Commission, in a recent email to Public Citizen, noted the following:

> As of a couple of years ago, there had not been a single action taken against a hospital who ignored this regulation [...] even if there was an action, the penalty is minimal at best. The hospital industry is well aware of this history of no penalty and well understands that there is no significant punishment associated with not following the requirement.[71]

Because HHS has still not approved such a legislative proposal, the OIG recommendation appears in the 2008 OIG publication, "Compendium of Unimplemented Recommendations." This annual OIG publication, which is sent to senior HHS officials and Congress, contains significant unimplemented programmatic and fiscal recommendations.[72]

In addition to the problem of Joint Commission's oversight of hospital reporting to the NPDB, there is evidence that accreditation surveys do not adequately focus on the granting and renewing of hospital privileges, the peer review process that establishes a physician's scope of practice within a

---

[70] OIG/HHS Report, Legislative Recommendation to Improve Hospital Reporting to the National Practitioner Data Bank, OEI-12-99-00250, July 21, 1999, http://oig.hhs.gov/oei/reports/oei-12-99-00250.pdf

[71] July 21, 2008 email to Public Citizen Health Research Group from the Vice President, Division of Standards and Survey Methods, The Joint Commission

[72] OIG/HHS Compendium of Unimplemented Recommendations, May 2008, 61, http://www.oig.hhs.gov/publications/docs/compendium/compendium2008.pdf

hospital. A July 1999 OIG investigation of the Joint Commission addresses accreditation surveys' focus on privileging, as follows:[73]

> The Joint Commission surveys are unlikely to detect substandard patterns of care or individual practitioners with questionable skills. Quick-paced, tightly structured, educationally oriented surveys afford little opportunity for in-depth probing of hospital conditions or practices.[74]

> In reviewing medical records, surveyors focus more on processes than appropriateness of care: surveyors "do not judge directly whether the care given is good or bad, right or wrong." Likewise the review of physician credentials and privileges falls short of identifying individuals whose skills may be questionable.[75]

Further evidence of the Joint Commission's lackluster focus on hospital peer review and privileging activities can be found in OIG reports on credentialing and privileging at three Indian Health Service hospitals, all of which had been accredited by the Joint Commission. At the Blackfeet Community Hospital, OIG found that "For more than half the practitioners tested, Blackfeet Hospital did not perform a complete credentialing review [...] the hospital had not issued current privileges to six percent of the practitioners we tested."[76] At the Crow Hospital, OIG found that "for more than half the practitioners tested, Crow Hospital did not perform a complete credentialing review [...]. Additionally, the hospital had not issued current privileges for 20 percent of the practitioners we tested."[77] At the Shiprock Hospital, OIG determined that, of the 84 practitioners reviewed, 67, or 80 percent, did not have current privileges.[78]

## 1996 Consensus Agreement That Under-Reporting Is a Problem

In response to the February 1995 OIG report on under-reporting, HRSA sponsored a national conference (called "roundtable") of major medical and health organizations in Chicago in October 1996 to discuss the problem. The attendees included representatives from the American Medical Association, American Hospital Association, the Joint Commission on Accreditation of Healthcare Organizations (now called the Joint Commission), Health Care Financing Administration (now called the Centers for Medicare and Medicaid Services), Public Citizen Health Research Group, the Federation of State

---

[73] Office of Inspector General, The External Review of Hospital Quality, A Call for Greater Accountability, July 1999, 2, http://www.oig.hhs.gov/oei/reports/oei-01-97-00050.pdf
[74] Ibid.,2
[75] Ibid.,15
[76] OIG, Credentialing and Privileging Practices at HIS Blackfeet Community Hospital (A-07-03-00152), June 2005, i
[77] OIG, Credentialing and :Privileging Practices at HIS Crow/Northern Cheyenne Hospital (A-07-03-00159), June 2005, i
[78] OIG, Credentialing and Privileging Practices at Northern Navajo Medical Center (Shiprock) (A-06-04-00023), August 2004, 3

Medical Boards, and the OIG, HHS. The Institute for Health Services Research and Policy Studies, Northwestern University, also participated and served as a facilitator.[79]

Prior to the conference, all participants received a case survey on court decisions concerning the use of peer review immunity under the Act. The survey concluded that the immunity provisions of the Act were protecting professional review activities in the vast majority of cases. Out of 47 surveyed decisions, 39 were adjudicated in favor of defendant peer reviewers. Twenty-nine of these favorable decisions were based on immunity. Most cases were decided at the summary judgment stage.[80]

The final report from the October 1996 HRSA sponsored conference noted "substantial participant consensus" on a number of reporting issues, including the following:

- The number of reports in the NPDB on adverse actions against clinical privileges is unreasonably low, compared with what would be expected if hospitals pursued disciplinary actions aggressively and reported all such actions.

- There are numerous factors that might be contributing to this conclusion, some of which will be difficult to subject to research: these include divergent explanations ranging from nondisciplinary approaches to quality improvement to outright evasion of reporting.

- Researching these factors is nevertheless desirable, because the results can be used to improve hospital peer review.

- Hospital peer review, as envisioned by the Act, focuses on restricting the clinical privileges of the so-called 'outlier physician' and thereby leads to improved patient care at the margins.[81]

There was "near consensus" on the following: (1) "The perceived or actual high expense of litigation under the Act has an impact on hospital reporting activity, at least in part because the effectiveness of the Act's legal protections in most recent court cases is not widely known," (2) "There are emerging tensions between peer review with disciplinary actions and Continuous Quality

---

[79] There were also participants from: American Osteopathic Healthcare Association; Citizens Advocacy Center; Northwestern Memorial Hospital (Chicago); Doctor's Hospital (Columbus, Ohio); Illinois Hospital and Healthcare System Association; New Jersey State Hospital Association; law firm of Horty, Springer and Mattern, Pittsburg, Pennsylvania.
[80] Victoria M. Smith, HRSA Roundtable, Conference Summary Report, Northwestern University, Institute for Health Services Research and Policy Studies, Oct. 26, 1996
[81] Ibid., 2

27

Improvement programs," and (3) "There is a need for increased education of medical professionals and hospital administration on these topics."[82]

Based on conference discussions, the Conference Facilitator made the following recommendations:

- Since the existence of professional review activity is easily discernable in their surveys, the Joint Commission on Accreditation of Healthcare Organizations should immediately make reporting by hospitals of adverse actions taken against clinical privileges a specific point of review.

- The [AHA], other hospital associations and hospital legal representatives should educate their hospital members and clients, as soon as is practicable, on the effectiveness of legal protections under the [Act's] immunity provisions as they have been interpreted by most courts.

- The [AMA], other physician associations, and physician legal representatives should educate their physician members and clients, as soon as is practicable, on the effectiveness of legal protections under the [Act's] immunity provisions as they have been interpreted by most courts.

- HRSA should sponsor a study examining the effects of proposing amendments to the Act to allow immediate appeal of a denial of immunity, and to provide for monetary sanctions against any violation with the reporting provisions.[83]

## Failure of Hospitals to Voluntarily Comply In a Study on Hospital Reporting

In 2002, HRSA contracted with PricewaterhouseCoopers (PwC) LLP to examine, in greater depth, hospital (and managed care organization) reporting.[84] Underlying the contract was HRSA's hope that HRSA could obtain to cooperation of health care organizations in conducting the analysis. Under the statement of work for the contract, PwC was to develop methodologies for conducting compliance reviews and recruit a sample of nine hospitals and nine managed care organizations. HRSA and PwC offered five incentives for participation: "amnesty for any reporting errors found; exemption from future audits for a period of time to be determined by HRSA; guarantees of confidentiality from NPDB (and PwC) of their participation in the study and its

---

[82] Ibid., 3

[83] Ibid., 4

[84] Feasibility Study for Assessing Compliance with NPDB Clinical Privileges Reporting Requirements, Summary Report, PricewaterhouseCoopers, 2002.

findings; help improve the quality of data reported; [and] the opportunity to provide input on the access and feedback mechanisms used to report and verify the data in the NPDB."[85]

PwC contacted 42 hospitals and 36 managed care organizations, but only three hospitals and five managed care organizations elected to participate in the pilot study.

As a result of the small numbers, the study was aborted. However, PwC recommended that HRSA seek legislative authority and funding for conducting compliance reviews of clinical privilege reporting, including authority to access peer review records. The PwC report noted:

> The largest obstacle experienced in this study was obtaining the voluntary participation of hospitals and [managed care organizations]. HRSA has no direct authority that insures access to clinical privileging and peer review records. This absence or lack of legislative authority hampered participation in this study. Many organizations chose not to participate once they confirmed that participation in the reviews was not required (i.e., mandatory) [...]. If HRSA possessed legislative authority that insured access to peer review records gaining participation for this study (and future compliance reviews) would have been greatly simplified. HRSA should seek legislative authority and funding for conducting compliance reviews of clinical privileges reporting [...]. This authority would enable HRSA to assess the level of clinical privileges reporting compliance through a statistically valid study and/or engage in an ongoing compliance monitoring program.[86]

# Conclusion and Recommendations

## Public Citizen's Health Research Group Conclusion

HRSA data, HRSA-funded studies, the 1995 and 1999 OIG reports, and the 1996 HRSA-sponsored conference involving OIG and major health care stakeholders (e.g. AMA, AHA), plus reports on how peer review itself has sometimes failed, point to the need to address both hospital peer review and hospital reporting to the NPDB. Although many of the studies and other activities documenting the under-reporting problem were completed a number of years ago, the recommendations for the most part have not been implemented and thus, not surprisingly, the level of reporting has not improved. In addition, there is evidence from the 2008 Lumetra in-depth study of peer review in California, and what happened at Redding Medical Center, as well at other hospitals cited

---

[85] Ibid., 8
[86] Ibid., 31

in this report, that greater oversight of the hospital peer review process is necessary.

Public Citizen Health Research Group has determined that of the numerous recommendations made by (1) the OIG reports, (2) the 1996 national conference, and (3) the PwC consulting report for HRSA, only one of 10 recommendations has been fully acted upon, namely the OIG recommendation that HRSA hold a national conference on the under-reporting issue, which was 12 years ago. Although HRSA and CMS, in response to an OIG recommendation, wrote a joint letter to the Joint Commission, the Joint Commission has not taken positive steps to address HHS concerns. Also, although HRSA funded the PwC study, it was ultimately unsuccessful in achieving its objective. The following chart shows the status of the recommendations cited in this report.

## Status of Previous Recommendations

1. HRSA should study the problem further, possibly through case studies.
   - Source: OIG Report, Feb. 1995, OEI-01-94-00050.
   - Status: The only "case study" was a HRSA-funded contract with PricewaterhouseCoopers to look at possible compliance reviews, but the contract was unsuccessful due to industry's failure to cooperate.

2. HRSA should sponsor a national conference on the issue.
   - Source: OIG Report, Feb. 1995, OEI-01-94-00050
   - Status: National conference held in Chicago in October 1996.

3. HRSA and CMS should send a joint letter to the Joint Commission urging that it incorporate the NPDB's reporting requirement into its standards, and conduct a more thorough review of hospital peer review efforts as part of its survey process.
   - Source: OIG Report, Feb. 1995, OEI-01-94-00050
   - Status: Letter sent Feb. 27, 1995 but no action yet by the Joint Commission.

4. HRSA and CMS should work together to achieve a regulatory and statutory change so that the Medicare Conditions of Participation specifies hospitals' responsibilities under the Health Care Qualify Improvement Act.
   - Source: OIG Report, Feb. 1995, OEI-01-94-00050
   - Status: CMS has taken no taken despite HRSA's written request

5. The Joint Commission should immediately make reporting by hospitals of adverse actions taken against hospital privileges a specific point of review.
   - Source: Conference Facilitator, Oct. 1996, National Conference on Hospital Reporting to the NPDB.
   - Status: Joint Commission has taken no action.

6. The AHA and hospital legal representatives should educate their hospital members and clients, as soon as practical, on the effectiveness of legal protections under the Health Care Quality Improvement Act's immunity protections, as them have been interpreted by most courts.
   - Source: Conference Facilitator, Oct. 1996, National Conference on Hospital Reporting to the NPDB
   - Status: The American Hospital Association (AHA) could not find any record of an AHA response to this recommendation. The AHA advised Public Citizen Health Research Group that "...Based on the information currently available we do not know how AHA may have responded to the report..."

7. The American Medical Association and physician legal representatives should educate their physician members and clients, as soon as practicable, on the effectiveness of legal protections under the Health Care Quality Improvement Act's immunity provisions.
   - Source: Conference Facilitator, October 1996, National Conference on Hospital Reporting to the NPDB
   - Status: The AMA provided Public Citizen Health Research Group a list of three NPDB links from the AMA web site. Although two of the web links, which contain duplicative wording, describe the statutory protection for "medical peer review," the links do not address the conference's recommendation asking the AMA to advise members about the effectiveness of such protections.

8. HRSA should sponsor a study, to begin within the next 12 months, examining the effects of proposing an amendment to the Act to allow immediate appeal of denial of the Act's immunity provision.
   - **Source:** *Conference Facilitator, Oct. 1996, National Conference on Hospital Reporting to the NPDB*
   - **Status:** No action taken.

9. HRSA should propose legislation that would establish a civil money penalty of up to $10,000 for each instance of a hospital's failure to report to the NPDB.
   - Source: OIG Report, July 21, 1999, OEI-12-99-00250
   - Status: In response to the OIG recommendation, HRSA initiated a legislative proposal that would impose a civil money penalty of $25,000; however, the proposal was not approved by HHS. Therefore, the proposal was not sent to Congress.

10. HRSA should seek legislative authority and funding for conducting compliance reviews of clinical privilege reporting, including authority to access peer review records.
    - **Source:** PricewaterhouseCoopers LL.P, Nov. 15, 2002
    - **Status:** No action taken.

## Public Citizen Health Research Group Recommendations

*A. HRSA and CMS should work together to achieve a regulatory and statutory change so that the Medicare conditions of participation specifies hospitals' reporting responsibilities under the Health Care Quality Improvement Act.*

The 1995 OIG report recommended such a regulatory and statutory change. The OIG noted that "this inclusion would compel the Joint Commission to devote greater oversight to hospitals' performance of the responsibilities."[87] Also, since the Medicare Improvements for Patients and Providers Act of 2008 allows organizations other than the Joint Commission to conduct accreditation reviews, our recommendation would impact all hospital accreditation organizations.

---

[87] OIG, Hospital Reporting to the National Practitioner Data Bank, Op.Cit., 8

*B. CMS should require that the standards for compliance with the Medicare conditions of participation include all aspects of peer review.*

Events at Redding Medical Center demonstrate that ineffective or non-existent peer can affect patient safety. Currently, a violation of an element of a Medicare Condition of Participation is not sufficient to rule the entire Condition violated. According to CMS, partial compliance is good enough. Although one critical element, peer review for cardiac services, remained in non-compliance, Redding was still accredited.

*C. Congress should provide CMS with the authority to impose sanctions on hospitals and physicians for failure to perform peer review.*

For hospital departments where peer review is absent, CMS should stop payment for selective services in such departments.

*D. Congress should amend the Health Care Quality Improvement Act to impose a civil money penalty for failure to report.*

Research has shown that states with financial penalties for failure to report have higher levels of hospital reporting to the NPDB. The "Model Act" developed by CAC and the Administrators in Medicine recommends a penalty of $1,000 per day per unreported adverse action. Even the Joint Commission believes that a strong penalty provision would likely encourage reporting. Furthermore, a July 1999 Inspector General Report recommended a civil money penalty of up to $10,000 or each instance of non-compliance. In response to the OIG recommendation, HRSA developed a legislative proposal that would have created a $25,000 civil monetary penalty for failure to report. As noted in the body of this report, HHS did not approve the HRSA proposal. Congress should amend the Act to authorize a civil money penalty of up to $25,000 for each instance of a hospital or other health care entity's (e.g. HMO) failure to report an adverse action to the National Practitioner Data Bank.

*E. HRSA should also seek legislative authority for conducting compliance reviews of clinical privilege reporting, including authority to access peer review records.*

In 2002, HRSA contracted with PricewaterhouseCoopers LLP (PwC) to establish a pilot assessment of the extent of hospital non-compliance with NPDB reporting. The assessment was to use the voluntary cooperation of hospitals. As noted earlier, the study could not be conducted because of the failure of the sample hospitals to cooperate. We support the PwC recommendation to HRSA that the agency seek legislative authority for HRSA to access peer review records for the purpose of assessing the level of clinical privileges compliance reporting.

*F. The Office of Inspector General should review hospital practices relating to granting and renewing privileges.*

32

When a hospital grants privileges to a physician, the institution has evaluated the physician's education and experience and determined that physician can perform within a specified scope of practice. This peer review, which takes place at the time of hiring and periodically thereafter, is critical to assuring that the practitioner has the necessary knowledge and skills to provide patient care within the designated scope of practice.

Unfortunately, there are numerous examples of physicians who provided questionable and/or unnecessary care. There is also evidence that Joint Commission surveys do not go far enough in evaluating hospital privileging activities.

According to the Medicare Conditions of Participation, hospitals must ensure that all patient care is provided in accordance with medical staff criteria for the granting and renewing of privileges.[88]

Although OIG has reviewed credentialing and privileging activities at HHS funded hospitals, i.e. at Indian Health Service facilities, OIG has apparently not focused on "private sector" hospitals. The OIG should investigate non-federal hospitals' compliance with the Medicare Conditions of Participation relating to medical staff privileges.

*G. HRSA should initiate educational and compliance activities involving hospitals that have not reported.*

As a first step, HRSA should send letters to all hospitals reiterating reporting responsibilities, asking if they understand the reporting requirement and expressing a willingness to discuss their concerns in a confidential manner. A copy of the letter should be shared with Public Citizen and other members of the National Practitioner Data Bank Executive Committee.[89]

At the end of six months, HRSA should identify those hospitals that still have not reported and refer them to the OIG for follow-up.

*H. HHS should implement specific recommendations from the 1996 Chicago National Conference on Under-Reporting.*

1. The conference recommended that HRSA study the problem further, possibly through case studies. As soon as possible, HRSA should address the issue of "peer review immunity." Notwithstanding the peer review immunity protection afforded by NPDB legislation, hospitals apparently remain concerned

---

[88]  42 CFR § 482

[89] In addition to Public Citizen, the NPDB Executive Committee includes representatives from all the major NPDB constituencies including the AHA, AMA, The Federation of State Medical Boards, malpractice insurers, accreditation organizations such as the Joint Commission, OIG/HHS, and, of course, HRSA.

33

about lawsuits. HRSA should update the survey of court decisions that was prepared for the October 1996 national conference in Chicago. As noted earlier, the survey concluded that the immunity provisions of the Act were protecting professional review activities in the vast amount of cases. HRSA should make results of the updated survey available to the AHA and AMA to share with the hospital and medical community, respectively.

2. The 1996 national conference recommended that the Joint Commission make reporting by hospitals of adverse actions taken against hospital privileges a specific point of review. Following the national conference, HRSA and CMS wrote the Joint Commission asking for assistance. To date, the Joint Commission has not taken steps to include hospital reporting in its accreditation surveys. The Joint Commission should amend its standards to incorporate compliance with NPDB reporting.

*I. State medical boards should request their respective state legislatures to adopt those provisions of the CAC model act that have the potential to increase reporting.*

Strong state laws (such as monetary penalties) and enforcement activities have the potential to improve hospital reporting to the NPDB.

*J. State medical boards and HRSA should work together to facilitate reporting to the NPDB.*

According to the Citizen Advocacy Center, "a number of states report that they frequently visit with hospital executives on their responsibilities under state mandatory reporting laws."[90] CAC recommended, and Public Citizen agrees, that HRSA staff should explore with state officials the feasibility of including hospitals responsibilities to report to the NPDB as part of these "educational" visits.

*K. Congress should provide the Office of Inspector General, HHS, with authority to review state medical boards' handling of adverse clinical privilege reports.*

The value of hospital mandatory reports is clear. This raises the question of how to explain the fact that 952 physicians with two or more clinical privilege reports in the NPDB had no disciplinary action imposed by a licensing board. Until 1993, the OIG at HHS conducted evaluations of the performance of state medical boards.[91]

---

[90] Cohen and Swankin, Op.Cit. vi

[91] The OIG did a total of seven studies of state medical boards. See for example, http://www.oig.hhs.gov/oei/reports/oei-01-92-00050.pdf, and, http://www.oig.hhs.gov/oei/reports/oei-01-92-00050.pdf

34

However, because of legal concerns involving OIG authority to conduct reviews of state health professional licensing boards, OIG no longer considers performing such studies. OIG believes that since state health professional boards do not receive HHS funding, it has no authority to focus on state medical boards. However, these boards regulate the practitioners who provide medical services to millions of Medicare and Medicaid beneficiaries. Therefore, Congress should give OIG the authority to conduct such reviews.

### L. Hospital compliance officers should monitor hospital peer review and reporting to the NPDB.

Hospital Compliance Programs have their origin in the Federal Sentencing Guidelines of 1987 (Guidelines). On May 1, 1991, the Guidelines, which had focused only on the behavior of individuals, were broadened to include "organizations." The organizational guidelines "provide incentives for far reaching compliance programs and have produced a new occupation that advises organizations on how to build effective programs that promote ethical behavior. Furthermore, by promoting compliance and ethics programs, the organizational guidelines not only provide incentives for substantial changes in organizational behavior, but also further some of the main goals of the Sentencing Reform Act: the prevention and deterrence of criminal conduct."[92] On February 23, 1998, the OIG, HHS, issued a guidance entitled "Compliance Program Guidance for Hospitals." This guidance covers quality of care and financial risk areas. According to Strategic Management Systems, a consulting company to hospitals on compliance issues, there are four elements of the quality of care risk area: accuracy of quality-reporting data; medically unnecessary services; deficient care (failure to meet accepted standards of care) and, practitioner qualifications.

The Health Care Compliance Association (HCCA) is a national non-profit professional membership organization made up of health care compliance and ethics professionals. According to HCCA, it has approximately 6,000 members. Many of these compliance and ethics professionals work in hospitals while others work for health care organizations such as health plans and nursing homes.

Hospital compliance officers are in the unique position of independence from medical and management staff. Compliance officers should therefore monitor hospital peer review, including sitting in on such reviews, and evaluate hospitals compliance with NPDB reporting law. To achieve this, we specifically recommend the following:

---

[92] Diana E. Murphy, The Federal Sentencing Guidelines for Organizations: A Decade of Promoting Compliance and Ethics, Iowa Law Review, January 31, 2002, 699

1. HRSA and the Health Care Compliance Association should work together in publicizing the NPDB reporting requirement through joint letters, webinars, and other training opportunities.

2. The Health Care Compliance Association should include NPDB reporting in its agenda for national and regional conferences.

3. The OIG should consider revising the Feb. 23, 1998 Compliance Guidance for Hospitals to include hospital peer review and NPDB reporting as risk areas.

*M. The Office of Inspector General, HHS, should use corporate integrity agreements to assure hospital compliance with NPDB reporting requirements.*

OIG often negotiates compliance obligations with health care providers including hospitals as part of a settlement of federal health care program investigations arising from a variety of civil false claim statutes. A provider consents to these obligations as part of the civil settlement and in exchange to the OIG's agreement not to seek an exclusion from Medicare or Medicaid or other federal health care programs. There are currently over 400 corporate integrity agreements and related agreements posted on the OIG web site.[93] These agreements encompass both quality of care and/or financial issues. The agreements require the hospital to establish a program to monitor corrective action and compliance. One such agreement notes:

> Hospital Corporation 'A' has established, and shall maintain during the term of the CIA, a Clinical Quality Department [...] for monitoring clinical quality at Hospital A's hospitals, including the credentialing, privileging, and peer review programs."[94]

Currently OIG does not require hospital compliance programs to assure compliance with the NPDB reporting requirement. OIG should include compliance with NPDB reporting as part of future hospital Corporate Integrity Agreements.

---

[93] http://www.oig.hhs.gov/fraud/cia/cia_list.asp
[94] http://oig.hhs.gov/fraud/cia/agreements/TenetCIAFinal.pdf, 6

**Appendix A:** Total Number of Adverse Hospital Privileges Reports by Year – Source: Unpublished HRSA data



Total number of adverse hospital clinical privilege reports

*Total Number of Adverse Hospital Clinical Privilege Reports for 17+ years = 11,221*

**Appendix B:** Currently Active Registered Non-Federal Hospitals That Have Never Reported to the National Practitioner Data Bank by State,* September 1, 1990 - December 31, 2007, *Source: Unpublished HRSA Data*

| State | Number of Hospitals with "Active" NPDB Registrations | Number of "Active" Hospitals that Have Never Reported | Percent of Hospitals that Have Never Reported |
|---|---|---|---|
| Alabama | 118 | 68 | 57.6% |
| Alaska | 18 | 8 | 44.4% |
| Arizona | 82 | 34 | 41.5% |
| Arkansas | 95 | 49 | 51.6% |
| California | 414 | 132 | 31.9% |
| Colorado | 78 | 42 | 53.8% |
| Connecticut | 40 | 10 | 25.0% |
| Delaware | 10 | 3 | 30.0% |
| District of Columbia | 13 | 4 | 37.5% |
| Florida | 227 | 105 | 46.3% |
| Georgia | 174 | 71 | 40.8% |
| Hawaii | 28 | 16 | 57.1% |
| Idaho | 44 | 26 | 59.1% |
| Illinois | 206 | 75 | 36.4% |
| Indiana | 149 | 72 | 48.3% |
| Iowa | 117 | 73 | 62.4% |
| Kansas | 150 | 103 | 68.7% |
| Kentucky | 116 | 59 | 50.9% |
| Louisiana | 209 | 144 | 68.9% |
| Maine | 41 | 19 | 46.3% |
| Maryland | 62 | 22 | 35.5% |
| Massachusetts | 110 | 53 | 48.2% |
| Michigan | 161 | 59 | 36.6% |
| Minnesota | 133 | 85 | 63.9% |
| Mississippi | 102 | 62 | 60.8% |
| Missouri | 140 | 70 | 50.0% |
| Montana | 51 | 34 | 66.7% |
| Nebraska | 83 | 53 | 63.9% |
| Nevada | 43 | 25 | 58.1% |
| New Hampshire | 29 | 7 | 24.1% |
| New Jersey | 102 | 35 | 34.3% |
| New Mexico | 39 | 18 | 46.2% |
| New York | 239 | 68 | 28.5% |
| North Carolina | 125 | 53 | 42.4% |
| North Dakota | 47 | 33 | 70.2% |
| Ohio | 209 | 89 | 42.6% |
| Oklahoma | 144 | 94 | 65.3% |
| Oregon | 62 | 19 | 30.6% |
| Pennsylvania | 242 | 102 | 42.1% |
| Rhode Island | 16 | 3 | 18.8% |
| South Carolina | 74 | 34 | 45.9% |
| South Dakota | 56 | 42 | 75.0% |
| Tennessee | 144 | 74 | 51.4% |
| Texas | 536 | 340 | 63.4% |
| Utah | 49 | 16 | 32.7% |
| Vermont | 15 | 4 | 26.7% |
| Virginia | 111 | 44 | 39.6% |
| Washington | 92 | 37 | 40.2% |
| West Virginia | 66 | 30 | 45.5% |
| Wisconsin | 134 | 74 | 55.2% |
| Wyoming | 29 | 20 | 69.0% |
| All Jurisdictions** | 5,823 | 2,845 | 48.9% |

*"Currently active" registered hospitals are those listed by the NPDB as having active status registrations on December 31, 2007. A few hospitals have more than one registration and are including more than once in this table. Non-federal are hospitals not owned and operated by the federal government.

**The total includes hospitals in American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and U.S. Virgin Islands (49 hospitals with active registrations, 33 hospitals which have never reported).

State variations in the percentage of hospitals reporting represents just one way, but not the only way, to compare states in hospital under-reporting. Depending on the data available to the researcher and the purpose of the study, state reporting rates can also be analyzed by such variables as hospital reports per 1,000 hospital beds in the state, reports per 1,000 admissions in the state, or other variables.

# 10. Discrepancies in Dr. Durrani's Background Not Discovered by Children's

1. Dr. Durrani's application for licensure to the Kentucky Board of Medical Licensure includes many discrepancies including the following:

   A. The date he attended and graduated from the Army Medical College, Rawalpindi, Pakistan.

   B. Not reporting he had a South Carolina License.

   C. It's unclear if he's board certified at the time of application.

   D. Inconsistent dates of birth.

   E. Did not timely complete the Kentucky HIV/AIDS education.

   F. Inconsistent dates of residency and fellowship testimony.

   G. A September 16, 2004, claims he had no accreditation

   H. The Credentialing Analysis Report states the following Omissions:

      a. The Postgraduate Medical Education form completed by Children's Hospital Medical Center was not sealed or notarized.

      b. The Postgraduate Medical Education form completed by Texas Scottish Rite Hospital for Children was not sealed or notarized.

      c. The USMLE Certified Transcript of Scores reports prior examination history exists taken through the ECFMG. Score transcripts for the NBME Parts I and II as reported by the applicant are not enclosed.

      d. The documented date of birth is _____. The Confirmation of ECFMG Certification indicates the date of birth is _____.

      e. The applicant reports ECFMG Certification was issued 3/13/1991. The Confirmation of ECFMG Certification and the ECFMG Certificate report the date of issue is 8/19/1993.

      f. The applicant reports attendance at Army Med Coll from 04/1986 to 03/1991. The institution reports attendance from 04/12/1986 to 01/06/1991.

      g. The applicant reports sitting for USMLE Steps 1 and 2 in 03/2004 and 04/2004. The USMLE transcript indicates the examination date was 02/21/2004 and 03/19/2004, respectively.

      h. FCVS requests the applicant provide a photocopy of a birth certificate, passport, court order, baptismal certificate, naturalization certificate, marriage certificate or

divorce decree to support alternate names. If the applicant cannot provide one of these documents, we request completion of the Explanation of Alternate Name Form. This information is provided as information only. No follow up performed.

i.  The attendance dates reported by Texas Scottish Rite Hospital for Children are irregular, ending in December.

j.  The attendance dates reported by University of Florida College of Medicine are irregular, beginning in January.

k.  The attendance dates reported by University of Louisville School of Medicine are irregular, beginning in August.

l.  There is a gap of approximately 2 months between completion of medical education at Army Med Coll (ends 01/06/1991) and graduation (03/13/1991).

m.  There is a gap of approximately 6 ½ years between graduation from medical school at Army Med Coll (03/13/1991) and entrance into the postgraduate training program at Children's Hospital Medical Center (begins 07/01/1997).

I.  He did not complete his full fellowship from the University Of Florida College Of Medicine.

J.  He barely passed the Nevada and Ohio Boards.

K.  In 2008, he claims hospital staff privileges in Kentucky. Where? Unknown. In 2012, he claims no.

L.  He was never the editor or on the board of the spine magazine he claims.

11. Discovery To Be Answered

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
CIVIL DIVISION

|  |  |  |
|---|---|---|
| **FREIDA AARON, et al.** | : | **Case No:** |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Judge:** |
| **v.** | : | |
| | : | |
| **CINCINNATI CHILDREN'S** | : | |
| **HOSPITAL MEDICAL CENTER** | : | |
| | : | |

## INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Comes now, by and through counsel, hereby request that Defendants respond to the following Interrogatories and Requests for Production of Documents in the case listed above in accordance with the Ohio Rules of Civil Procedure:

## I. DEFINITIONS AND INSTRUCTIONS

The following definitions apply to these Interrogatories and Requests for Production of Documents.

A.      The term "document" as used herein shall be used in its broadest sense and shall mean and include all handwritten, printed, typed, recorded, computer-generated and/or graphic matter of every kind and description, including as defined by Rule 34 of the Rules of Civil Procedure, and includes all copies, drafts, proofs, both originals and copies either (1) in the possession, custody or control of Defendant regardless of where located, or (2) produced, generated by, known to or seen by Defendant, but not now in his/her possession, custody or control, regardless of where located or not still in existence.

Such "documents" shall include, but are not limited to applications, resumes, job posting, contracts, leases, agreements, papers, photographs, tape recordings, transcripts, checks,

1

checkbooks, check stubs, check statements, bank statements, deposit slips, journals, general and subsidiary ledgers, other types of ledgers, worksheets, accounts, bills, promissory notes, invoices, punch cards, purchase orders, acknowledgments, authorizations, sales slips, receipts, shipping papers, letter or other forms of correspondence, envelopes, folders or similar containers, communications, programs, telex, TWX, and other teletype communications, computer printouts and any other printout sheets, movie film, slides, microfilm, video or audio tapes, memoranda, reports, studies, summaries, minutes, minute books, circulars, notes (whether typewritten, handwritten or otherwise), agenda, bulletins, notices, announcements, proofs, sheets, instructions, charts, tables, manuals, brochures, magazines, pamphlets, lists, visitor's logs, schedules, price lists, telegrams, drawings, sketches, plans, specifications, diagrams, drafts, books and records, formal records, desk calendars, notebooks, diaries, registers, appointment books, budgets, analyses, projections, minutes of meetings, conferences or discussions of any kind, tax returns, and other data compilations from which information can be obtained (including matter used in data processing) or translated, and any other printed, written, recorded, stenographic, computer-generated, computer-stored, or electronically stored matter, however and by whomever produced, prepared, reproduced, disseminated or made.

For purposes of the production of "documents", the term shall include copies of all documents being produced, to the extent the copies are not identical to the original, thus requiring the production of copies that contain markings, additions or deletions that make them different in any way from the original.

B.     When an Interrogatory asks for the description or identification of a document, it is intended that the answer shall state the following information with respect to each such document:

    a. Title;

    b. Date;

    c. Author(s);

    d. Addressee(s);

    e. Recipient(s) of original or copy;

    f. File Number or other identifying mark or code;

    g. Nature and subject matter of the document; and

2

h. Location by room, building, and address, or if lost or no longer in existence, the last known location and custodian and the circumstances of the loss or destruction.

In lieu of identifying any document, a copy of such document may be attached to Defendant's responses.

C.     When an Interrogatory requires the description or identification of an individual, it is intended that the answer shall state the following information with respect to each such individual:

a. Name;

b. Present or last known address;

c. Present or last known business address, including name of current employer and employment classification or job title;

d. Present or last known home and business telephone number;

e. Whether the individual is a present or former employee of Defendant and, if so, the precise job or position titles held, the dates of employment, and the reason for termination of employment if individual is a former employee.

D.     "Relating to" means in whole or in part constituting, containing, concerning, embodying, reflection, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to the subject matter specified in the Interrogatory or document request.

E.     "Representative" or "representatives" used with reference to a person means (a) officers, directors, partners, associates, employees, servants, agents, independent contractors, volunteers, assistants, non-paid assistants, subsidiaries, and affiliates of such person; and (b) other persons or legal or business entities acting on behalf or, or in concert with, such person, including, without limitation, consultants, advisors, lawyers, accountants and any other person of any description retained or employed for business or financial reasons of any kind.

F.     "And" and "or" are to be construed whether conjunctively or disjunctively as necessary to bring within the scope or the specification all materials that might otherwise be construed to be outside its scope; and "any" and "all" as used herein mean "each" and "every". The use of the term "including" shall be construed to mean "without limitation".

G.     The term "address" refers to the current address or last known address, if the current address is unknown.

3

H.      The term "telephone number" refers to the current phone number, including area code, or the last known area code and phone number, if the current phone number is unknown.

I.      The terms "you" and/or "your" refers to the Defendant on whom these Interrogatories were served or any person answering these Interrogatories on behalf of the Defendant.

J.      With respect to all Interrogatories, all information is to be divulged which is within the knowledge, possession or control of the Defendant, his/her attorneys, investigators, agents, employees, guardian, or next friend, or other representatives.

K.      The word "incident" refers to the acts or omissions of the Defendant which are the subject matter of this litigation.

L.      Where an Interrogatory calls for an answer in more than one part, each part should be separated in the answer so that the answer is clearly understandable.

M.      All answers must be made separately and fully stated under oath.

N.      You are under a continuing duty to seasonably supplement the answers to these Interrogatories with respect to any question directly addressed to identify and location of persons having knowledge of discoverable matters, the identity and location of persons expected to be called as expert witnesses at trial, the subject matter on which expert witnesses are expected to testify, and to correct any response which you know or later learn is not correct.

O.      Space for your answers has been provided beneath each Interrogatory; should there not be sufficient space to complete your answer, you may complete it in sequence on a separate appendix attached to the answers and identified appropriately.

P.      Any reference to the "visits", "examinations", "treatments" or "incidents" means the occurrence of the actions that took place concerning the care and treatment of Plaintiff, as referred to in the Complaint.

Q.      Any reference to the "dates of this incident" without further description mean the dates spanning the care and treatment of Plaintiff by Defendants.

R.      In these requests, a reference to Children's or Children's Hospital means Children's Medical Center of Cincinnati, Inc.; a reference to West Chester means West Chester Hospital, LLC; a reference to UC means UC Health; a reference to Durrani means Dr. Abubakar Atiq Durrani; and a reference to CAST means Center for Advanced Spine Technologies, Inc.

4

## INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

1. Identify all claims, whether filed or not filed as a lawsuit, settled from 2004 through 2008 which Dr. Durrani was named in the lawsuit or treated the patient who brought the claim or filed the lawsuit. This includes claims occurring at Christ Hospital and University Hospital during this time period when Dr. Durrani was an employee at Children's Hospital. If it was a lawsuit, produce a copy of the lawsuit. Produce all settlement agreements and releases and all emails and correspondence between counsel and/or Children's involving those settlements and releases. This is regardless of how or when the matter was settled. If Durrani treated them in any manner, we want the information.

   ANSWER:

2. Produce the same referenced in #1 for any time frame, not just from 2004 through 2008.

   ANSWER:


Respectfully Submitted,

Stephanie L. Collins (0089945)
THE DETERS LAW FIRM, P.S.C.
5247 Madison Pike
Independence, KY 41051
859-363-1900 - telephone
859-363-1444 - facsimile
scollins@ericdeters.com


## CERTIFICATE OF SERVICE

I do hereby certify that a true and exact copy of the foregoing was sent electronically on this

___23___ day of December, 2014 to all counsel of record:

   /s/ Stephanie Collins
   Stephanie Collins

5

A 1 4 0 7 4 5 2

Frieda Aaron

Children's Hospital
Records



## COMMON PLEAS COURT
## HAMILTON COUNTY, OHIO

Frieda Aaron, et al.

A 1 4 0 7 4 5 ₂

CASE NO. _____

**VS**

Cincinnati Children's Hospital Medical Center

**WRITTEN REQUEST FOR SERVICE**
**TYPE OF PAPERS TO BE SERVED ARE**

Complaint And Jury Demand _____

( ☒ ) **PLEASE CHECK IF THIS IS A**
**DOMESTIC CASE**

**PLAINTIFF/DEFENDANT REQUESTS:**

**CERTIFIED MAIL SERVICE** _X_____

**PERSONAL SERVICE** _____

**PROCESS SERVICE** _____

**EXPRESS MAIL SERVICE** _____

**REGULAR MAIL SERVICE** _____

**RESIDENCE SERVICE** _____

**FOREIGN SHERIFF** _____

ON Frank C. Woodside, III; 1900 Chemed Center, 255 E. Fifth Street, Cincinnati, Ohio 45202

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH
2014 DEC 23  A 10: 40

**FILED**

## Erica Deters

**ATTORNEY**

5247 Madison Pike Independence, KY 41051

**ADDRESS**

## 859-363-1900

**PHONE NUMBER**

0092576

**ATTORNEY NUMBER**

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

**Frieda Aaron, et al.**
_____
Plaintiff

-vs-

Cincinnati Children's Hospital Medical Center
_____
Defendant

**INSTRUCTIONS TO THE CLERK**

CASE NUMBER: A 1 4 0 7 4 5 3

**IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).**



Erica C. Deters
_____
ATTORNEY OF RECORD        (TYPE OR PRINT)

**12/23/2014**
_____
DATE

ATTORNEY'S SIGNATURE

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

2014 DEC 23 A 10:40

FILED